# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JOSEFINA DOE; ISABELA DOE;
COMMOR JEROME WELCH;
FELIPE NIOMAR MARTINEZ ORTIZ; and
JOSE DOE; on behalf of themselves and all
others similarly situated, and
THE AMERICAN FRIENDS
SERVICE COMMITTEE,
IMMIGRANT RIGHTS PROGRAM

              Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT;

**(CONTINUED ON NEXT PAGE)**

Civil Action No.

---

Gavin J. Rooney, Esq.
Alexander Shalom, Esq.
Natalie J. Kraner, Esq.
Naomi D. Barrowclough, Esq.
Anish Patel, Esq.*
Ruth Zimmerman, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500

Shira Wisotsky, Esq.
Raquiba Huq, Esq.
Zoe Burke, Esq.
Emily Thornton, Esq.*
**LEGAL SERVICES OF NEW JERSEY**
100 Metroplex Drive, Suite 402
Edison, New Jersey 08817
(908) 882-2665

Tiffany J. Lieu, Esq.*
Philip L. Torrey, Esq.*
**CRIMMIGRATION CLINIC
HARVARD IMMIGRATION &
REFUGEE CLINICAL
PROGRAM**
6 Everett Street, Suite 3106
Cambridge, Massachusetts 02138
(617) 496-5497

*Pro Bono Counsel for Plaintiffs*

*\*pro hac vice* motion forthcoming

ALEJANDRO MAYORKAS,
Secretary of the Department of
Homeland Security, in his official
capacity;

PATRICK J. LECHLEITNER,
Acting Director of Immigration and Customs
Enforcement ("ICE"), in his
official capacity;

DANIEL A. BIBLE,
Executive Associate Director of ICE's
Enforcement and Removal Operations,
in his official capacity;

CAMMILLA WAMSLEY,
Field Office Director for the ICE
Philadelphia Field Office, in her
official capacity;

FRANCIS KEMP,
Assistant Field Office Director for the
ICE Philadelphia Field Office, in his
official capacity,

                    Defendants.

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTION AND VENUE ..........................................................7

PARTIES.............................................................................................9

    I.    Individual Plaintiffs................................................................9

    II.   Organizational Plaintiff......................................................20

    III.  Defendants...........................................................................21

LEGAL BACKGROUND ..................................................................24

FACTUAL ALLEGATIONS ..............................................................25

    I.    A significant proportion of the noncitizens Defendants detain at Moshannon do and will need access to New Jersey state courts to participate in resolving criminal charges brought against them. ...................................................................25

    II.   Defendants have a policy and practice of refusing to permit noncitizens detained in Moshannon access to state court proceedings....................................................................29

    III.  Defendants and Moshannon have the obligation and the ability to provide noncitizens in detention access to state court proceedings....................................................................35

    IV.  The Refusal Policy and Practice thwarts noncitizen New Jerseyans detained at Moshannon from exercising their Federal and State constitutional and statutory rights. ......................................37

        a.    People charged with criminal offenses have federal and state constitutional rights to participate in cases brought against them and their defense.................................37

        b.    Defendants' Refusal Policy and Practice relies on nonproduction and the inability of noncitizen New Jerseyans at Moshannon to secure and effectuate writs of in-person production. ...................................40

        c.    Most municipal courts in New Jersey are completely or primarily virtual. .........................................42

      d.     Defendant ICE encounters individuals in New Jersey prior to the resolution of criminal charges following changes to New Jersey bail reform practices. ............................................. 44

V.    Defendants' Refusal Policy and Practice is arbitrary and capricious. ........................................................................... 45

      a.     Access to state-criminal courts is arranged for at other immigration detention facilities run by Defendants. ............... 45

      b.     Defendants have failed to use any of the mechanisms available to them to ensure that the people they detain can access state courts. .................................................... 46

      c.     Defendants' Refusal Policy and Practice harms New Jerseyans and the State of New Jersey. ..................................... 47

      d.     When Defendants prohibit noncitizens from accessing state courts to contest charges levied against them, they exacerbate and incorporate the already-existing disproportionalities experienced by people of color in the criminal legal system. ............................................. 52

VI.    Defendants' Refusal Policy and Practice harms the Individual Plaintiffs, members of the Putative Class, and AFSC IRP. ............... 56

      a.     Defendants' Refusal Policy and Practice harms Individual Plaintiffs and members of the class by prolonging detention. .................................................................. 57

      b.     Defendants' Refusal Policy and Practice harms AFSC IRP. ................................................................................. 63

CLASS ALLEGATIONS .................................................................... 70

CLAIMS FOR RELIEF ...................................................................... 74

PRAYER FOR RELIEF ...................................................................... 81

CERTIFICATION UNDER L. CIV. R. 11.2 ........................................ 86

Plaintiffs, who require access to the courts of New Jersey to obtain relief critical to their and their clients' liberty, and to exercise their and their clients' constitutional rights, by and through undersigned counsel and on behalf of those similarly situated, bring this action to challenge the federal government's unconstitutional, arbitrary, and capricious policy of denying them the ability to appear in state court criminal matters.

## INTRODUCTION

1.      Persons with unresolved criminal charges[1] have the right to appear in court and defend themselves. This is a core principle guaranteed under the First, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. Yet Defendants are denying the Individual Plaintiffs and the Putative Class this core right, for no reason other than a nonsensical bureaucratic fiat.

---

[1] As used in this Complaint, the terms "criminal matters" and "criminal charges" refer to charges deemed "criminal" for the purposes of immigration proceedings, and encompass charges brought against individuals in both New Jersey's Superior and Municipal Courts. *See, e.g.*, *Wong v. Garland*, 95 F.4th 82, 94 (2d Cir. 2024) (holding that a New Jersey disorderly persons offense "resulted in a 'conviction' for purposes of his removability under the [Immigration and Nationality Act ('INA')]"); *see also Castillo v. Att'y Gen.*, 729 F.3d 296, 311 (3d Cir. 2013) (describing when a disorderly persons conviction in New Jersey's municipal courts is considered a conviction under the INA); *Matter of Cuellar-Gomez*, 25 I. & N. Dec. 850, 851–54 (B.I.A. 2012) (finding that an adjudication of guilt for a misdemeanor in a municipal court constituted a "conviction" in a "genuine criminal proceeding" under the INA).

2.     The Individual Plaintiffs[2] are noncitizens with unresolved criminal matters in New Jersey Superior and/or Municipal courts (hereinafter "State-court criminal matters" or "proceedings") who were apprehended in New Jersey and are currently detained by Defendant Immigration and Customs Enforcement ("ICE") at its Moshannon Valley Processing Center ("Moshannon") in Philipsburg, Pennsylvania. Moshannon routinely allows the Individual Plaintiffs and the Putative Class to participate in both immigration and certain family-court hearings remotely, via Zoom, Microsoft Teams, or the telephone. However, when it comes to State-court criminal proceedings, Moshannon denies the Individual Plaintiffs and the Putative Class the same opportunity to participate in those proceedings remotely. There is no valid reason for Moshannon to distinguish between immigration and certain family-court proceedings, on the one hand (where virtual participation **is** allowed), and State-court criminal proceedings on the other hand (where virtual participation is **not** allowed). This is the very definition of an arbitrary, capricious, and nonsensical policy, especially in this day and age when, for the sake of efficiency and public health, remote hearings have become commonplace in all contexts.

3.     Denial by Defendants of remote access to State-court criminal proceedings is a standard practice at Moshannon. Therefore, the Individual Plaintiffs

---

[2] The term "Individual Plaintiffs" is defined herein to include Plaintiffs Josefina Doe, Isabela Doe, Commor Jerome Welch, Felipe Niomar Martinez Ortiz, and Jose Doe.

bring this class action on behalf of all similarly situated people to challenge Defendants' unconstitutional policy and practice of denying the people detained there access to video-conferencing technology like Zoom, or, when appropriate, the telephone, to appear and participate in their pending criminal proceedings in New Jersey (the "Refusal Policy and Practice").

4.      The inability to appear remotely causes a host of negative consequences and harms for the Individual Plaintiffs and the Putative Class.  It of course prejudices their defense in the State-court criminal proceedings, including their ability to secure a public defender, win dismissal of charges, avoid a default, confront their accusers, and mount a defense to the charges. The harm extends to reputational damage resulting from unresolved criminal charges and the loss of employment opportunities. There is also a profound liberty interest at stake: many people in immigration custody qualify for release on bond or parole pending completion of removal proceedings, but unresolved State-court criminal matters significantly reduce or preclude an individual's chances of securing such release.

5.      The Immigrant Rights Program of the American Friends Service Committee ("AFSC IRP"), the Organizational Plaintiff in this matter, joins this action because of the harm Defendants' Refusal Policy and Practice has wrought on their clients and on their organization. With respect to the harm to AFSC IRP's clients, unresolved criminal cases, even for low-level offenses, can negatively affect

an individual's applications for relief from removal and their ability to receive lawful immigration status or admission in the future.

6.     There is no valid reason to deprive the Individual Plaintiffs and the Putative Class of the right to participate remotely in State-court criminal proceedings. Moshannon already provides video-conferencing technology to people in detention so that they can participate in immigration court and certain family court proceedings. Defendants could easily do the same for State-court proceedings. Instead, however, Defendants insist that people detained there secure a State-court writ for *in-person* production to court. If such a writ is issued, the State must dispatch law-enforcement personnel to pick up from, and return the individual to, Moshannon (at least an eight-hour, round-trip drive), regardless of expense; and the State must detain, and pay for the detention of, the individual, even if a State-court judge had already found there is no basis for detention. In practice, of course, this rarely happens – it is not realistic, feasible, or possible that State and municipal entities will expend their limited resources in this fashion, and for all of the people with unresolved criminal charges transferred by Defendants to Moshannon.

7.     Putting aside the impracticality of the in-person writ requirement, Defendants transfer people immediately following an arrest and before they have either been appointed with public defense counsel by the Court or have had an opportunity to engage defense counsel. They are therefore often left to navigate the

convoluted procedure of seeking and enforcing a writ *pro se* and without the assistance of a lawyer.

8.    Defendants, including the Director and Assistant Director of the Philadelphia Field Office of ICE, know that the Refusal Policy and Practice prevents noncitizen New Jerseyans at Moshannon from participating in State-court criminal proceedings.

9.    Many people Defendants apprehend in New Jersey, including the Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class, have viable grounds for immigration relief that would allow them to remain lawfully in the United States, and many are statutorily eligible to request release from detention on bond or parole while their removal proceedings are pending.[3] However, arrests, unresolved criminal matters, and criminal convictions impact their claims to remain in the United States or to be released on bond or parole, particularly when Congress has granted ICE or an immigration judge discretion to determine release or relief.

---

[3] *See* 8 U.S.C. § 1226. In Fiscal Year 2020, 37% of individuals ICE detained were not subject to mandatory detention and could be released at ICE's discretion. U.S. Immigration and Customs Enforcement, U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report, https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf (last accessed Sept. 9, 2024). Upon information and belief, 2020 was the last year ICE released data regarding mandatory detentions in a fiscal year report.

10.    Not only does the Refusal Policy and Practice have significant consequences for the Individual Plaintiffs and the members of the Putative Class, and their pendent liberty interests, but it makes it less likely that an immigration judge will grant AFSC IRP's clients certain forms of relief, impacting its ability to fully represent its clients.

11.    The Refusal Policy and Practice also limits AFSC IRP's ability to seek release or bond for its clients—AFSC IRP is forced to either attempt to seek bond or release while its clients have unresolved criminal charges clouding these requests, or advise its clients to delay such requests and remain detained in hopes that the pending criminal charges can somehow first be resolved without the benefit of virtual appearances. Either way, AFSC IRP's clients at Moshannon are detained for prolonged periods of time, which places a strain on AFSC IRP's resources, including staff time and capacity to serve additional clients, and its attorneys' relationships with their clients.

12.    The Refusal Policy and Practice has also forced AFSC IRP's attorneys into a new and uncharted role of serving as a liaison between the client and the criminal court, and attending hearings in their clients' stead as a friend of the court, draining AFSC IRP's resources. Moreover, because AFSC IRP's clients are subjected to prolonged detention, they remain on AFSC IRP's docket for a longer period of time, meaning that it cannot accept new clients as often as it could if cases

did not last as long in duration. This has the cumulative impact of limiting AFSC IRP's ability to fully effectuate its mission and serve additional noncitizen New Jerseyans in immigration detention facing removal proceedings.

13.    The remedy that Plaintiffs and the Class seek is simple – a declaration that the Refusal Policy and Practice is unconstitutional and an injunction requiring Defendants to allow the Individual Plaintiffs and the Putative Class to participate in New Jersey criminal proceedings through remote means, such as Zoom, Microsoft Teams, WebEx, or, if appropriate, the telephone,[4] to access state court proceedings in the same way that Defendants permit people in their custody to use the same technology to access other types of legal proceedings.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a)(2), as this case is a civil action arising under the Constitution and laws of the United States.

15.    This Court has the authority to provide the relief requested under 5 U.S.C. §§ 702, 2201, and 2202, and its inherent equitable powers.

---

[4] It is not the position of Plaintiffs that *all* criminal court appearances can be completed via telephone, but that *some* can. Defendants must still virtually produce individuals via video conference for proceedings with constitutional significance. And, Individual Plaintiffs retain their rights for in-person appearances when needed, necessary, and constitutionally required.

16.    Federal courts also have federal question jurisdiction, through the Administrative Procedure Act ("APA"), to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also requires that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The APA affords a right of review to a person who is "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Defendants' refusal to allow the Individual Plaintiffs, Putative Class, and clients of AFSC IRP access to New Jersey's court system has rendered them "adversely affected or aggrieved by agency action." Additionally, for the purposes of this case, the United States has waived sovereign immunity under 5 U.S.C. § 702.

17.    Venue properly lies in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) and (e) because this is a civil action in which one of the defendants is an agency of the United States and all of the Individual Defendants are employees of the United States and sued in their official capacities; a substantial part of the acts or omissions giving rise to this Complaint arose from events occurring within this judicial district; Plaintiffs reside in the judicial district; and there is no real property involved. Moreover,

a. The Organizational Plaintiff, AFSC IRP, is headquartered at 89 Market Street, Newark, New Jersey 07102, and has multiple offices in this judicial district.

b. With the exception of one, the Individual Plaintiffs in this matter reside within this judicial district.

c. The State-court criminal proceedings at issue occur within this judicial district.

d. The harm that impacts federal immigration removal proceedings occurs within this judicial district.

e. Defendants apprehended and detained the Individual Plaintiffs and Putative Class members within this judicial district.

f. Defendants transferred the Individual Plaintiffs and Putative Class members from this judicial district.

g. The harm Defendants have caused and continue to cause occurs within this judicial district.

## **PARTIES**

### I.    **Individual Plaintiffs**[5]

18.    **Josefina Doe** is a Latina noncitizen seeking asylum in this country following significant abuse in the Dominican Republic, her country of origin. She resided in Perth Amboy, New Jersey, with her partner and his family before

---

[5] Three of the Individual Plaintiffs, Josefina Doe, Isabela Doe, and Jose Doe, have filed a motion seeking the Court's permission to litigate pseudonymously, in place of their real names, due to fears of retaliation by abusive partners in the United States or abusive partners or gangs in their countries of citizenship.

Defendant ICE apprehended her. After briefly detaining her in New Jersey, Defendant ICE transferred her to Moshannon in May 2024.

   a. When Josefina lived with her partner and his family in Perth Amboy, she did all of the housework and childcare, unpaid, because if she did not, her partner would verbally harass her. The family did not include her in the meals she would cook, and to eat she relied on food donations from churches. Once, when he became angry, he kicked her out of the car, into freezing weather and high snowdrifts, and left her on the side of the road at 3 a.m., without any money. He became physically abusive in March of 2024, chasing Josefina around the house, causing her to fall and injure her knee.

   b. It was in this context that Josefina was arrested by local police on May 5, 2024, for charges relating to domestic violence, after her partner's family members called the police during a similar domestic incident. Josefina does not speak English, and the arresting officers did not utilize an interpreter, but spoke only to her partner and his family. Following that arrest, and after a state court judge held a virtual hearing and released her from custody, Defendant ICE apprehended Josefina.

   c. On May 7, 2024, when ICE agents arrested Josefina, she told one of the agents that she had a July 18 court date and that she would have to periodically report to the court. The agent responded that she would not be able to go because the municipal courts are "not on top of the federal."

   d. Since arriving at Moshannon, accessing the criminal court in New Jersey has been Josefina's primary concern. Josefina desperately wants to tell her side of the story, especially since local law enforcement did not listen to her, leading to her arrest and Defendant ICE apprehending her.

   e. Although the charges against Josefina began in Superior Court, right now, the only charges pending against Josefina, simple assault and disorderly conduct charges, are in the Perth Amboy Municipal Court.

-10-

That court holds only virtual sessions.[6] If Josefina cannot be produced virtually she cannot participate in the case. The next court date is in October.

f.  Josefina has asked staff at Moshannon at least four times about getting produced for criminal court. Ms. Brown, the caseworker at Moshannon responsible for legal issues, told Josefina that she could not access the state court system on her behalf. When Josefina asked her again, immediately before a Perth Amboy court date, whether she could call the court to ask about the hearing, Ms. Brown said no.

g.  The only staff worker at Moshannon who Josefina knows to speak Spanish explained to her that ICE's policy is that people detained at Moshannon cannot participate in criminal court proceedings.

h.  Because of Moshannon's refusal to grant Josefina access to the technology necessary for her to appear virtually, she missed the initial court appearance in municipal court. Counsel is typically appointed at that juncture, and so she was not appointed a public defender, and cannot seek one unaided.

i.  Josefina wants to go to criminal court because first her partner silenced her, and then the police would not hear her. The criminal court is the only place that she can tell her story. She has the right to speak in her own defense.

j.  Until the criminal charges pending against Josefina are resolved, it is extraordinarily difficult for her to seek bond and release from detention. That means that she cannot work to help support her adult daughters, harming their future.

k.  Being detained at Moshannon has been harmful to Josefina's health. The poor quality of food makes her sick. She suffers from high blood pressure that has gone untreated, and can no longer receive physical therapy for the knee injury she suffered due to her partner's abuse.

---

[6]    *See*    Perth    Amboy    Municipal    Court    Website, https://www.perthamboynj.org/government/departments/municipal_court ("NOTE:  All court sessions will be held virtually on zoom…") (last accessed Aug. 12, 2024).

Prior to Defendant ICE's apprehension of Josefina she was receiving treatment for fibromas in her uterus, for which the medical staff at Moshannon have been slow to treat. Finally, the traumatic experience of detention has caused her psychological symptoms and difficulty with her memory. When she sought psychological help at the facility, the English-speaking therapist advised her to exercise more. Prior to Defendant's apprehension of Josefina, she was able to access medical services, and with providers who speak a language that she can understand.

19.    **Commor Jerome Welch** is a Black noncitizen from Jamaica, who was living in East Orange, New Jersey, prior to Defendant ICE apprehending him. Defendants have detained Commor at Moshannon for about a year. Defendants briefly detained Commor in New Jersey and then another facility in Pennsylvania before transferring him to Moshannon. During the time that Defendants have detained Commor, his wife gave birth to his child, who he has been unable to meet as he is detained at a remote and hard-to-reach detention facility.

    a.    The Newark police arrested Commor for weapons-related charges on August 9, 2023. He saw a judge in the Essex Superior Court, who ordered him released from state custody with pre-trial monitoring conditions and told him he was obligated to check in with the Court and that his next court date would be on September 29, 2023.

    b.    Following his release from state custody, Defendant ICE arrested Commor. While still in New Jersey, Commor informed the ICE officer that he had to stay in the state because he had to go to court there. Defendant ICE's officer said that he "actually had to deal with immigration," and transferred him to Pennsylvania.

    c.    Commor missed the September court date in New Jersey. Immediately prior, Commor asked an ICE officer at Moshannon if he could go to court in New Jersey. Defendant ICE's officer informed him that the only way he could attend was if New Jersey came and retrieved him.

Commor asked if he could "go to court in New Jersey over the screen," like he did when he was initially in the New Jersey jail. Defendant ICE's officer said no. Commor then asked if ICE could ask the New Jersey court to bring him to court if he could not attend himself or initiate the ask. Defendant ICE's officer said no.

d. Two weeks later, Commor spoke again with an officer of Defendant ICE to ask if he could attend court in New Jersey over the computer. Defendant ICE's officer said no.

e. The Immigration Judge denied Commor's October 2023 request for bond because of the unresolved criminal charges filed against him.

f. Commor and his father are co-defendants in this criminal matter. They had hired private defense counsel to represent them in the state criminal proceedings. In April 2024, Commor's criminal defense attorney made a motion for the criminal court to dismiss the charges against Commor for lack of evidence. Because of Defendants' Refusal Policy and Practice, Commor had no choice but to waive his appearance at this critical motion.  The motion to dismiss was denied, and the criminal case is moving forward without Commor being able to participate or provide a defense.

g. Commor's criminal defense attorney was simultaneously representing him and his co-defendant (his father). His father, who is not in custody, could participate in the unresolved court case with counsel, but Commor could not. Commor fired his criminal attorney and needs a public defender appointed.

h. In his application to be relieved as defense counsel, Commor's prior criminal defense attorney declared:

> The relationship between attorney and client has gone beyond repair primarily because the defendant has indicated to me that he no longer wants me to represent him. He believes that I should be able to do more to get him to be present in this Court for his adjudication of his criminal matter. Mr. Welch is held by the Department of Homeland Security (DHS) in Immigration Detention Center, Moshannon Valley Processing, 555 GEO Drive,

-13-

Philipsburg, Pa. and they refused to present him for his criminal case.

i. Commor cannot seek appointment of a public defender unaided without access to the criminal court. Currently, the charges stand and he is unable to appear or exercise his right to have counsel appointed.

j. Commor's wife filed a family-based petition to allow him to stay in this country, which was approved. Commor has a pending application for lawful permanent residence on the basis of the approved spousal petition. Resolving the criminal charges against him is an important part of his application to adjust status.

k. Because Commor remains detained, he is unable to work to support his wife and infant child. His medical needs are also not getting met while he is in detention. For instance, he recently had significant itching on his body, and the medical team did not provide him with a solution.

20.    **Jose Doe** is a twenty-one-year-old Latino individual from El Salvador who has been detained by Defendant ICE for over a year-and-a-half. He came to this country as a teenager, fleeing gang violence and is seeking protection under the Convention Against Torture. Before ICE apprehended him, he lived in New Jersey with his mother.

a. There are charges pending against Jose in two New Jersey courts. There are charges for alleged assault pending against Jose in the Hudson County Superior Court, and charges based on drug possession pending against Jose in the Hoboken Municipal Court. Both courts have issued bench warrants for Jose because he has not appeared while detained at Moshannon.

b. Jose was ordered to appear in the Hudson County Superior Court on May 8, 2023, for a post-indictment arraignment hearing. He missed that court date while detained by Defendant ICE, and the court subsequently issued a bench warrant. There has been no activity or movement in that matter since the warrant was issued.

c.  The Hoboken Municipal Court had scheduled Jose for a virtual court appearance on March 7, 2023. He was unable to attend while at Moshannon, and the court subsequently issued a bench warrant.

d.  On August 12, 2024, the Deputy Court Administrator in the Hoboken Municipal Court emailed Jose's case manager at Moshannon, a GEO employee, writing that "[a]t this time the court is requesting to see the defendant via Zoom. Please inform the court as to how long the defendant may be detained for and as to dates and time the defendant may be produced via Zoom."

e.  Ms. Lumadue, the case manager, responded that same day, writing, "[t]his is not something I can schedule without approval from an Immigration Officer. Please submit your request to the following address (cc our group email schedulemvpc@geogroup.com) and be sure to let them know if this is a criminal, civil [or] family matter. MVPCoutreach@ICE.DHS.GOV."

f.  The Deputy Court Administrator in Hoboken then wrote to the ICE email address, describing that Jose "has a warrant since 3/8/23 for [a] criminal case . . . at this time we are requesting to schedule the defendant for a virtual court appearance so that we may resolve this matter. We have court on Tuesday, Wednesdays, and Thursday mornings. Please notify as to whether or not the defendant is able to be produced and if he requires any interpreter services. Thank you in advance for your assistance."

g.  An unidentified individual responded from Defendant ICE's email address on August 13, writing "Moshannon Valley Processing Center (MVPC) cannot accommodate teleconference, zoom, team meetings, etc. for criminal court matters. All criminal matters are handled via writs. The requesting jurisdiction is responsible for the pick up and return of the noncitizen. Please contact by email at mvpcoutreach@ice.dhs.gov to schedule the pick up via writ."

h.  On August 16 the Deputy Court Administrator forwarded that information to Jose's legal advocate, writing: "Please be advised that the Hoboken Police Department does not travel out of state to pick up defendants for court."

-15-

    i. On August 22, Jose's immigration attorney wrote to ICE: "I'm writing to follow up on this. It seems we're in a bind. Based on the constraints you and the Municipal Court have articulated, Mr. [Doe] cannot get released from detention until his case is resolved, and he also can't get his case resolved until he is released from detention. He cannot get a public defender to resolve the criminal cases that are keeping him detained without being produced for court and it looks like he can't get produced for court while detained. While we understand your policy, the cumulative policies here are generating a serious due process violation. What can we do to resolve this?"

    j. Rather than permitting Jose to participate in a court date via Zoom, ICE responded on August 23 that "[w]e have reached out to Elizabeth Detention [C]enter to see if they would take custody at their facility."

    k. On August 27, ICE advised that "[a]t this time transfer to [the Elizabeth] detention center is unavailable due to the subject[']s risk classification."

    l. Upon information and belief, Jose's "risk classification" is at least in part due to the nature of the pending charges against him, charges that he has been unable to contest because of Defendants' Refusal Policy and Practice.

    m. To date, Defendant ICE has not suggested any resolution to the due process concerns raised by Jose's immigration attorney.

21. **Felipe Niomar Martinez Ortiz** is a Venezuelan and Latino asylum-seeker who resided in the Bronx, New York, with his wife and two children before ICE apprehended him in New Jersey.

    a. Felipe has claims for asylum stemming from his reasonable fear of paramilitary groups and his participation in anti-Maduro political protests.

    b. The police arrested Felipe in Paramus, New Jersey, on June 19, 2024, for charges related to alleged shoplifting in New Jersey.

-16-

c. During his brief detention in the Bergen County Jail, the authorities put Felipe on a video call with a judge in New Jersey. He was told that his next court date was July 16, 2024, and that he would have to check in with a social worker at the court as a condition of release.

d. Defendant ICE apprehended Felipe immediately upon his release from state court custody. Defendants detained him briefly in New Jersey, and then transferred him to Moshannon.

e. Before the July 16 court date, Felipe spoke with a case manager at Moshannon, Tia Wisor. Ms. Wisor does not speak Spanish, and Felipe does not speak English, and staff at Moshannon usually do not use interpreters, so a stranger detained with Felipe interpreted their conversation. Felipe asked Ms. Wisor to call the criminal court to tell them that he is detained. While Ms. Wisor did try to place the call at first, there was no answer. When Felipe asked that she call again, she told him that helping with the criminal court was not her job.

f. Felipe was unable to attend the July 16 court date due to Defendants' Refusal Policy and Practice.

g. Felipe's understanding is that no one can appear before a criminal court while at Moshannon. People can talk to their attorney and nothing else. Other individuals in detention have explained to him that they are also unable to access criminal courts in their home states.

h. Because Felipe was not produced to court, he could not ask for the appointment of a public defender. He was only provided with a public defender after undersigned counsel intervened and assisted him.

i. The charges against Felipe were downgraded from indictable offenses to disorderly persons offenses only three days after counsel was finally appointed to represent him in the criminal matter. Because the charges were downgraded, and the Office of the Public Defender only represents people with charges pending in the Superior Court, Felipe is no longer represented by counsel.

j. The charges against Felipe are now pending in the Paramus Municipal Court. A virtual hearing was scheduled by the Court for October 9,

2024. A public defender has not yet been assigned in the Municipal Court, and because of Defendants' Refusal Policy and Practice, Felipe will not be able to attend the first hearing in that court.

    k. The unresolved charges are enormous obstacles for Felipe to seek bond. He is a father of two children and is unable to see his children, or help support them, while Defendants detain him.

22.    **Isabela Doe** came to this country in 2021, fleeing domestic violence at the hands of the father of her four oldest children, who followed her from Venezuela, her home country, to Colombia. She crossed the border in Texas, and asked for asylum.

    a. Soon after arriving in this country, Isabela entered into a relationship with the father of her youngest child. While kind at first, he became physically, emotionally, and sexually abusive, even hitting her with sticks while pregnant. For example, after Isabela gave birth, at night he would tear up and rip off her clothing and force her to do things she did not want to do, even when she would tell him that she did not want to be with him. The only time she became physical with him was when he was trying to beat her, and she fought back. Isabela's partner is also addicted to crack cocaine.

    b. Isabela's partner told her that she could only leave him if she was dead or being deported.

    c. Sometimes the police were called to Isabela's home, but when they arrived they did not communicate with Isabela in Spanish, and would only speak with her abusive partner, in English. Sometimes they would arrest Isabela because of what he told them, without ever speaking with her about the circumstances.

d. It was in those circumstances that the police responded to a call and arrested Isabela for alleged domestic violence on June 17, 2024.[7] A New Jersey judge ordered her released from custody the next day. ICE met Isabela at the police station and immediately apprehended her. ICE held her in New Jersey for several days, and then transferred her to Moshannon.

e. Although Isabela has asked staff at Moshannon at least four times if she could participate in the charges against her, Isabela has missed at least two criminal court dates while at Moshannon. Currently, the charges against her are pending in the Clifton Municipal Court.

f. The first time that Isabela sought production was on July 17, 2024, immediately before a hearing, when she asked a Captain in the women's dormitory. She made the same request again on July 20, 2024. Both times, the Captain responded that Isabela was not "authorized" to participate in the criminal case in New Jersey, even by telephone.

g. Isabela was desperate to understand what was happening in the criminal cases, and so she spoke with her ex-partner. He explained that the court was proceeding virtually and provided her with the phone number for the court and the Zoom ID and access codes for upcoming court dates.

h. Isabela brought the Zoom ID and access codes to the staff at Moshannon and asked again if she could participate in the next court dates, explaining that the Court might issue a bench warrant to arrest her if she did not attend. Moshannon staff reiterated that she was not authorized to attend.

i. Isabela missed another court date, a virtual appearance in the Clifton Municipal Court, on August 27, 2024, because of Defendants' Refusal Policy and Practice. The Court issued a bench warrant and set bail in the amount of $1,500.

---

[7] It is possible that there are two additional open cases against Isabela for domestic violence, arising out of similar circumstances and stemming from two other arrests. However, upon information and belief, those matters are neither listed nor active in either the New Jersey municipal court public system, or in the New Jersey electronic court system.

j.  Isabela is one of at least seven women who suffered domestic violence and wants to access the courts in New Jersey to explain the circumstances. All of the women were arrested while defending themselves against abusive men. The women organized to speak together to the Moshannon staff and, with Isabela, explained to the Captain that they need access to the courts. The Captain responded that it was not allowed because "Moshannon has nothing to do with criminal court." The Captain said that "if [they] wanted to fight the charges . . . [they] would have to hire an attorney, and the attorney would have to take care of it on the outside."

k.  Isabela does not have an attorney "on the outside," and cannot access one without access to the courts or additional legal help.

l.  During Isabela's last hearing in the immigration case, she asked the Immigration Judge if she could get released from detention on bond. The Immigration Judge said she should "wait to resolve the cases on the outside before asking again."

m.  Isabela is desperate for a bond and release from detention because her youngest child is with her ex-partner. He is abusive and addicted to drugs. She wants to care for her child and remove her child from her ex-partner's "care."

## II.  Organizational Plaintiff

23.  Organizational Plaintiff **American Friends Service Committee, Immigrant Rights Program** ("AFSC IRP") is one of four providers in New Jersey's Detention and Deportation Defense Initiative ("DDDI"). DDDI is a state-funded legal representation program, administered through the New Jersey Department of Human Service's Office of New Americans, and offers free and expert advice and representation to indigent New Jersey residents facing detention and removal (deportation) proceedings.

24.     AFSC IRP is headquartered in Newark, NJ, at 89 Market Street. It has additional offices in Newark, NJ, at 570 Broad Street, and in Red Bank, NJ, at 54 Broad Street. AFSC IRP is also a part of the New Jersey Coalition for Immigrant Representation, a partnership that leads the campaign to advance a fully-funded universal representation program to ensure access to representation for all low-income New Jerseyans who are detained during removal proceedings.

25.     AFSC IRP accounts for forty percent of the total DDDI state budget. Their DDDI team consists of seventeen attorneys, five paralegals, and three social workers, all of whom work together to provide representation to noncitizens in immigration detention. Many of AFSC IRP's clients are noncitizen New Jerseyans detained at Moshannon. Almost all of them have unresolved State-court criminal proceedings.

26.     The clients of AFSC IRP are also part of the Putative Class and harmed in the same way as the Putative Class. Because Defendants' Refusal Policy and Practice frustrates their clients' ability to participate in court proceedings, AFSC IRP brings this case on their behalf.

## III.    Defendants

27.     Defendant **U.S. Department of Homeland Security** ("DHS") is a cabinet department of the United States federal government. Its mandate includes the administration of the interior enforcement provisions of U.S. immigration laws.

28.     Defendant **ICE** is a federal law enforcement agency within DHS. ICE is responsible for the enforcement of immigration laws, including the apprehension, civil detention, and removal of noncitizens who are unlawfully present. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. Defendant ICE is a legal custodian of the Individual Plaintiffs and Putative Class members

29.     Defendant **Alejandro Mayorkas** is the Secretary of DHS. Mayorkas is charged with enforcing and administering immigration laws. He oversees each of the component agencies within DHS, including ICE, and has ultimate authority over all policies, procedures, and practices relating to ICE detention facilities. He is responsible for ensuring that all individuals held in ICE custody are detained in accordance with the Constitution and all relevant laws. Defendant Mayorkas is sued in his official capacity.

30.     Defendant **Patrick J. Lechleitner** is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Lechleitner oversees the enforcement of the nation's immigration laws and the operation of the government's immigration detention system. To that end, he directs the administration of ICE's detention policies, procedures, and operations, including those regarding the apprehension of noncitizens in New Jersey and the detention of noncitizens at Moshannon. He is also responsible for ensuring that all individuals

held in ICE custody are detained in accordance with the Constitution and all other relevant laws. Defendant Lechleitner is sued in his official capacity.

31.    Defendant **Daniel A. Bible** is the Executive Associate Director of ERO. Defendant Bible oversees the twenty-five field office directors nationwide. He has authority over the implementation of any remedy provided by the Court and is in an immediate supervisory position to oversee compliance. Defendant Bible is sued in his official capacity.

32.    Defendant **Cammilla Wamsley** is the Field Office Director for the ICE Philadelphia Field Office, a division of ERO. Defendant Wamsley has day-to-day responsibility for policies, procedures, and practices relating to transfer of individuals from New Jersey to Moshannon and to the detention of detained noncitizen New Jerseyans at Moshannon. She is responsible for ensuring that all individuals held in ICE custody at Moshannon are detained in accordance with the Constitution and all relevant laws. Her duties include oversight of GEO Group's production of all individuals in custody at Moshannon for immigration court proceedings in Elizabeth, New Jersey. She is sued in her official capacity.

33.    Defendant **Francis Kemp** is the Assistant Field Office Director for the ICE Philadelphia Field Office, a division of ERO. Defendant Kemp has day-to-day immediate responsibility for and oversight of the transfer of individuals from New Jersey to Moshannon and the detention of detained noncitizen New Jerseyans

transferred to Moshannon. He is responsible for ensuring that all individuals held in ICE custody at Moshannon are detained in accordance with the Constitution and all relevant laws. His duties include oversight of GEO Group's production of all individuals in custody at Moshannon for immigration court proceedings in Elizabeth, New Jersey. He is sued in his official capacity.

## **LEGAL BACKGROUND**

34.     Numerous provisions of the U.S. Constitution safeguard access to state courts for U.S. citizens and noncitizens alike. Those provisions include:

> a. The Petition Clause of the First Amendment to the U.S. Constitution, which guarantees the right of petition, including the right to petition the government for a redress of grievances. This right includes the right to access state courts and to participate in state court proceedings as a witness, party, or complainant;

> b. The Due Process Clause of the Fifth Amendment of the U.S. Constitution, which forbids the federal government from depriving an individual of life, liberty, or property without due process of law. Due process includes the right to access state courts and to participate in state court proceedings as a witness, party, or complainant; and

> c. The Sixth Amendment to the U.S. Constitution, which guarantees defendants in criminal prosecutions the right to a speedy and public trial, compulsory process, assistance of counsel, and to be confronted with witnesses against them.

35.     The basis for detaining noncitizens in immigration detention facilities is civil, not criminal. The Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*,

as amended ("INA"), gives the government the same kind of civil-arrest authority that was historically used to institute civil proceedings. The INA authorizes civil immigration arrests and governs removal proceedings.

36.    Under 8 U.S.C. § 1357(a)(2), ICE may detain a noncitizen without a warrant if ICE has "reason to believe that the [noncitizen] . . . is in the United States in violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest." DHS has promulgated regulations that govern its enforcement activities. *See*, *e.g.*, 8 C.F.R. §§ 287.1–12.

37.    The INA today, as in 1952 when it was enacted, gives no indication that the authority Congress granted differs in any way from the civil-arrest authority that existed at common law, or otherwise extends to placing limits on whether and how an individual can exercise their constitutional rights to access the court system once subject to civil arrest and detention.

## FACTUAL ALLEGATIONS

**I.    A significant proportion of the noncitizens Defendants detain at Moshannon do and will need access to New Jersey state courts to participate in resolving criminal charges brought against them.**

38.    Moshannon is located at 555 GEO Drive, Philipsburg, PA 16866. It is approximately 250 miles from Newark, New Jersey.

39.     Moshannon has the capacity to hold 1,878 noncitizens in detention. It is one of only twelve ICE facilities that houses more than 1,000 noncitizens in detention, and the only one in the northeastern region of the country.[8]

40.     Cornell Companies, a for-profit private prison corporation, first opened Moshannon as a federal prison in 2006 under contract with the Federal Bureau of Prisons ("BOP"). On August 12, 2010, The GEO Group ("GEO"), a private for-profit prison corporation, acquired Cornell Companies. On March 31, 2021, the facility closed to the BOP. Five months later, in September 2021, GEO announced the reopening of the same facility as an immigration detention center through a new contract with ICE.

41.     Defendant ICE's contracts constitute a significant portion of total revenue for large private prison corporations like GEO. In fact, contracts with Defendant ICE accounted for 43.9% of GEO's total revenue in 2023.[9]

42.     GEO brings in approximately $53 million in annualized revenue from its contract to operate Moshannon as an immigration detention facility on behalf of Defendants.[10]

---

[8] Felicia J. Persaud, Twelve U.S. Immigration Detention Centers Each Surpass 1,000 Detainees – TRAC, NEWS AMERICAS NOW, https://www.newsamericasnow.com/us-immigration-news-twelve-immigration-detention-centers-1k-detainees-trac/.

[9] THE GEO GROUP, INC., ANNUAL REPORT 1 (2023).

[10] In 2021, the GEO group entered into a 5-year $263.6 million contract with ICE via an inter-governmental service agreement with Clearfield County to operate

43.    Defendant ICE's contractual relationship with Moshannon began around the same time that there were significant changes to the scope of immigration detention in the State of New Jersey.

44.    As of August 2021, only one immigration detention facility in the State, the Elizabeth Contract Detention Facility in Elizabeth, New Jersey, remains open.

45.    The majority of noncitizen New Jerseyans detained by Defendant ICE's Enforcement and Removal Operations are apprehended immediately after an arrest or other interaction with the New Jersey criminal legal system, and then immediately or subsequently transferred to Moshannon.

46.    Federal immigration authorities have long been tasked with the arrest and detention of noncitizens charged with, but not necessarily convicted of, criminal offenses. For example, in 2017, the President directed the Secretary of Homeland Security to "prioritize for removal . . . removable [noncitizens] who," among other things, "[h]ave been charged with any criminal offense, where such charge has not been resolved."[11] Under the current administration, Defendants ICE and DHS have

---

Moshannon as an ICE detention facility. Sept. 29, 2021, Inter-Governmental Service Agreement (IGSA).

[11] Exec. Order No. 13768, § 5(b), 82 Fed. Reg. 8799, 8800 (Jan. 25, 2017).

continued to prioritize the apprehension, detention, and removal of noncitizens following *any* entanglement with the criminal legal system.[12]

47.    The percentage of individuals apprehended in New Jersey and transferred to Moshannon with unresolved criminal matters is nearly double the national average.

48.    Upon information and belief, Defendants required GEO to install facilities so that all individuals detained at Moshannon could be virtually produced for immigration court proceedings. However, Defendants did not require GEO to make other substantial alterations when it transitioned from a carceral institution to one housing people in civil detention. Defendants thereby failed to accommodate for the reality that a much larger percentage of individuals who would come into Defendants' custody at Moshannon would have pending criminal matters, frequently in out-of-state courts, and that the population of people detained there would not solely be comprised of people serving criminal sentences.

49.    Defendants, moreover, do not require GEO to make telephones, tablets, computers, or other electronic devices available to people in detention for court

---

[12] *See* Memorandum, Department of Homeland Security Enforcement Priorities and Prosecutorial Discretion Initiatives (Sept. 28, 2023), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf; *see also USA v. Texas*, 599 U.S. 670 (2023) (permitting Mayorkas priorities memorandum to take effect).

appearances at Moshannon outside of immigration appearances and limited family court matters.

## II. Defendants have a policy and practice of refusing to permit noncitizens detained in Moshannon access to state court proceedings.

50.    Under Defendants' Refusal Policy and Practice, noncitizens in their custody at Moshannon cannot use routinely and widely available video-conferencing technology, or even the telephone, in order to participate in criminal court appearances in New Jersey state courts.

51.    Defendants also do not make telephones or other technology available so that people with unresolved criminal matters can call courts or counsel to notify them that they cannot appear because of Defendants' Refusal Policy and Practice at Moshannon, or to otherwise try and facilitate a resolution of the unresolved criminal matter.

52.    Instead, Defendants' Refusal Policy and Practice allows access to State-court criminal proceedings *only* to those for whom a state court judge has issued a writ of *in-person* production—assuming the state has legal authority to hold the person for purposes of such production—*and* for whom the state has consented to expend enormous resources to travel the long distance to retrieve, house, and then return them to ICE custody in Moshannon.

53.    Upon information and belief, these conditions are seldom met when the State has brought or plans to bring charges against an individual in Superior Court.

54.    Additionally, the conditions of Defendants' Refusal Policy and Practice are, upon information and belief, never met when the State has brought charges against an individual in Municipal Court.

55.    Accordingly, noncitizens detained at Moshannon are obstructed from accessing state criminal proceedings.

56.    Defendants' Refusal Policy and Practice does not account or make exceptions for indigent individuals who have not yet been appointed public defense counsel, who, even absent the other circumstances described below, cannot initiate the process to obtain a writ for in-person production while proceeding *pro se* and being denied access to the court.

57.    The Refusal Policy and Practice was adopted by Defendants at the height of the COVID-19 pandemic, when courts were transitioning to virtual operations. From at least May 2022 through the present, Defendants have clearly and consistently communicated their Refusal Policy and Practice multiple times to Individual Plaintiffs as outlined above, to staff of the New Jersey judiciary, and to advocates for individuals in detention at Moshannon, including staff members of AFSC IRP:

   a. On May 6, 2022, following a request for video production submitted by a Court Administrator from the Union City, New Jersey, Municipal Court, Philip Morgan, a Senior Detention and Deportation Officer ("SDDO") in the Philadelphia Field Office, a Division of ICE ERO, emailed an attorney at Legal Services of New Jersey ("LSNJ"). After acknowledging that the municipal court was operating *only* virtually,

and that the *only* way for the individual to attend court was via video appearance, Mr. Morgan instructed that the individual would have to be picked up by local authorities and "attend court via video from the local jail [i.e. in or near Union City, NJ]."

b.  On June 28, 2022, following a request for virtual production of a noncitizen New Jerseyan from the Immigrant Rights'/ International Law Clinic at Seton Hall University School of Law, Philip L. Regelman, an SDDO in Defendant ICE's Philadelphia Field Office, advised that "[t]he subject will not be able to attend the proceeding virtually from [Moshannon]. The local police department ***will need to writ him out*** of ICE custody and return him to our custody at the conclusion."

c.  On October 17, 2022, Tracey Lumadue, an employee of GEO working at Moshannon, advised advocates at the Nationalities Service Center, that "[r]equests for detainees that need to appear in court for criminal charges will need to go through ICE asking that the detainee be released ***on a WRIT*** and returned to [Moshannon] once their cases are complete or to appear in court virtually. Please direct your request to this email address: mvpcoutreach@ice.dhs.gov."

d.  On October 20, 2022, SDDO Regelman wrote to the Nationalities Service Center that "[w]e are unable to accommodate virtual, tele or zoom, criminal appearances from [Moshannon]. [Your client] will need to be taken from ICE custody ***by writ*** and returned upon the conclusion of proceedings. The subject will need to be transported to and from MVPC, Philipsburg, Pennsylvania by an officer assigned by the court."

e.  On November 14, 2022, an advocate at the Immigrant Rights'/ International Law Clinic at Seton Hall University School of Law wrote to the mvpcoutreach@ice.dhs.gov email address to ask: "Are detainees currently able to appear virtually for hearings in criminal court?" That same day, using the MVPCPublicReply@ice.dhs.gov email address, SDDO Regelman replied: "We cannot accommodate teleconference, zoom, teams meetings, etc. for criminal court matters. The subject must be taken from ICE custody, ***by Writ***. Transportation from and back to [Moshannon], Philipsburg, PA must be handled by your local law enforcement."

f.  On February 17, 2023, Joanne Passmore, an employee of GEO working at Moshannon, advised an advocate from AFSC IRP: "I wanted to let you know the procedure for these appearances in the future. Case Managers are not authorized to schedule any virtual hearings via phone call or video conferencing. Had you indicated the zoom was for a hearing, we would have directed you to contact our ICE officers at the facility for approval. ICE has indicated that [for] all hearings, other than with ICE[,] court will be conducted by having the detainee taken out of the facility *on writ* to the Court and returned. They do not want our resources used for anything other than contact between the attorney and their client."

g.  On March 31, 2023, an unidentified officer used the Philadelphia.Outreach@ice.dhs.gov email address to write the following to staff at New Jersey's Paterson Municipal Court following the Court's request for a virtual production: "Thank you for contacting U.S. Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO). MOSHANNON VALLEY PROCESSING CENTER (MVPC) cannot accommodate teleconference, zoom, team meetings, etc. for criminal court matters. The subject must be taken from ICE custody, *by Writ*. Transportation from and back to [Moshannon], Philipsburg, PA must be handled by your local law enforcement. You can request to schedule legal phone calls by email at schedulemvpc@geogroup.com. Detained individuals can write a request to their case manager via tablet or paper request to schedule an unmonitored legal phone call. Attorneys can also schedule a legal visit via teleconference calls by contacting the facility during normal business hours from 8AM to 4PM, (814) 768-1200." The email was signed from the Philadelphia Field Office, Enforcement and Removal Operation, Immigration and Customs Enforcement.

h.  On May 10, 2023, Tia Wisor, a case manager and employee of GEO working at Moshannon, responded to a request for virtual production from New Jersey's Plainfield Municipal Court as follows: "My role at the facility is to facilitate legal phone calls between residents and their attorneys. I am not able to accommodate criminal hearings via phone/VTC. If you would like, you may request for to be taken [sic] *via writ* from ICE custody. You will need to reach out to philadelphia.outreach@ice.dhs.gov for this request and include the information below: Specify that the subject will be transported to and

-32-

from the Moshannon Valley Processing Center in Philipsburg, PA. Your local law enforcement must be used for transportation. The subject must not be released on bond, ror,[13] house arrest, etc."

i. On July 28, 2023, Becky Brown, an employee of GEO working at Moshannon, responded to an attorney's request for the virtual production of a noncitizen New Jerseyan for criminal court as follows: "Is this for a criminal case? Unfortunately, we cannot do video calls for criminal hearings. If you would like, you may take the subject ***by writ*** from ICE custody. The writ must specify that the subject will be transported to and from the Moshannon Valley Processing Center in Philipsburg, PA. Your local law enforcement must be used for transportation. The subject must not be released on bond, or house arrest, etc. Please direct your request to Immigration and Customs Enforcement at this email address: mvpcoutreach@ice.dhs.gov."

j. On September 15, 2023, in the context of refusing to honor a writ of virtual production issued by a Municipal Court in New Jersey, Francis N. Kemp, the Assistant Field Office Director of the Philadelphia Field Office, a division of ICE ERO, wrote to the advocate of a noncitizen New Jerseyan, undersigned counsel in this matter: "Defendants for criminal proceedings ***must be writted out***. Officers from the receiving jurisdiction must pick up the defendant from Moshannon and return them upon completion of proceedings." That same day he advised, "[w]e do not have the recourses [sic] to facilitate criminal court hearings by tele video at Moshannon."[14]

k. On September 18, 2023, Tracey Lumadue, a GEO employee who works at Moshannon, responded to a request from the Immigrant Rights Clinic at Rutgers University to virtually produce a noncitizen New Jerseyan for criminal court as follows: "We are not able to facilitate zoom calls for criminal matters due to limited capabilities and staffing. If you

---

[13] Plaintiffs understand "ror" to reference a release on an individual's own recognizance.

[14] Included on those email chains was alternatively the "Detention Legal Access" ICE email address, Detention.LegalAccess@ice.dhs.gov, and Jessica F. Jones, a Senior Policy Advisor for ERO. Upon information and belief, Ms. Jones and the Detention Legal Access team are located in Washington D.C. and are part of Defendant ICE's leadership.

would like, you may take the subject *by writ* from ICE custody. The writ must specify that the subject will be transported to and from the Moshannon Valley Processing Center in Philipsburg, PA. Your local law enforcement must be used for transportation. The subject must not be released on bond, ror, house arrest, etc. Please direct your request to Immigration and Customs Enforcement at this email address: mvpcoutreach@ice.dhs.gov."

l.  On October 6, 2023, Becky Brown, an employee of GEO that works at Moshannon, advised an attorney for a noncitizen New Jerseyan: "Unfortunately, we cannot do hearings for Criminal Court. ICE does not permit hearings to be held via zoom unless they are family court. If a resident has an outside hearing, you may request for them to be taken *via writ* from ICE custody. You will need to reach out to mvpcoutreach@ice.dhs.gov for this request and include the information below: Specify that the subject will be transported to and from the Moshannon Valley Processing Center in Philipsburg, PA. Your local law enforcement must be used for transportation. The subject must not be released on bond, ror, house arrest, etc."

m.  On April 23, 2024, following a request from an advocate to virtually produce a noncitizen New Jerseyan for a proceeding at the Municipal Court in Edison New Jersey, Denise Harmic, a GEO employee who works at Moshannon wrote: "Unfortunately, he will not be able to appear for this hearing virtually. We do not have the resources available to facilitate criminal matters. He would need to be physically taken to the court for the hearing, *via writ*."

n.  On April 24, 2024, following a request from a New Jersey Court to virtually produce a noncitizen detained at Moshannon, an unnamed individual monitoring the mvpcoutreach@ice.dhs.gov email wrote to the Court Administrator for the Guttenberg, New Jersey Municipal Court: "Moshannon Valley Processing Center (MVPC) cannot accommodate teleconference, zoom, team meetings, etc. for criminal court matters. All criminal matters are handled via writs. The requesting jurisdiction is responsible for the pick up and return of the noncitizen. Please contact the facility during normal business hours from 8 a.m. to 4 p.m., (814) 768-1200 or by email at mvpcoutreach@ice.dhs.gov to schedule the pick up *via writ*."

o. On June 20, 2024, an advocate emailed MVPCOutreach@ice.dhs.gov to request that a noncitizen New Jerseyan be virtually produced for a municipal court appearance in New Jersey, explaining that "[t]his case is very important to [the individual's] bond case and could impact his immigration relief as well." Moshannon outreach responded by asking whether the request was for "a criminal or family court matter." Upon receiving confirmation that the matter was "a criminal matter in municipal court," MVPCOutreach@ice.dhs.gov responded: "Moshannon Valley Processing Center (MVPC) cannot accommodate teleconference, zoom, team meetings, etc. for criminal court matters. All criminal matters are handled *via writs*. The requesting jurisdiction is responsible for the pick up and return of the noncitizen. Please have the responsible Law Enforcement Agency contact mvpcoutreach@ice.dhs.gov to schedule the pick up via writ."

p. On June 24, 2024, in response to an attorney providing Zoom information for a forthcoming New Jersey criminal court hearing for a noncitizen New Jerseyan detained at Moshannon, Becky Brown, a GEO employee who works at Moshannon wrote: "Criminal proceedings are not held via Zoom, or other web-based communications, at [Moshannon] due to a lack of resources. They are not prohibited by ICE. We do not have the resources to facilitate the many hearings for all of the residents here with open criminal cases. If a resident has an outside hearing, you may request for them to be taken *via writ* from ICE custody. You will need to reach out to mvpcoutreach@ice.dhs.gov for this request and include the information below: Specify that the subject will be transported to and from the Moshannon Valley Processing Center in Philipsburg, PA. Your local law enforcement must be used for transportation. The subject must not be released on bond, or, house arrest, etc."

(Emphases added).

## III.  Defendants and Moshannon have the obligation and the ability to provide noncitizens in detention access to state court proceedings.

58.    Defendants and the staff at Moshannon have the technical ability to

provide noncitizens in their custody with virtual access to state court proceedings.

59.     There are currently 220 telephones, 225 Talton tablets, and 30 Virtual Attorney Visitation ("<u>VAV</u>") Booths for use by individuals detained at Moshannon. *Any* of these existing facilities can be used to allow the Individual Plaintiffs and the Class to appear remotely for their New Jersey criminal proceedings.

60.     The 225 ICE Talton Tablets have video visitation capabilities.[15]

61.     In 2022, ICE rolled out its VAV program at Moshannon, which allows virtual attorney-client conversations through Zoom and Microsoft Teams.[16]

62.     Defendants already require staff at Moshannon to provide, and the staff at Moshannon do provide, people in their custody with virtual access to other forms of court proceedings—specifically, immigration and certain family court proceedings.

63.     Nearly *all* individuals detained at Moshannon must appear in immigration court. The immigration court that hears all immigration custody and removal proceedings pertaining to individuals detained at Moshannon is physically located in Elizabeth, New Jersey. The only way for individuals detained at Moshannon to participate in immigration court proceedings is virtually. Defendants

---

[15] ICE, Supplement to the ICE National Resident Handbook, Moshannon Valley Processing Center *14 (2024)
[16] ICE, Virtual Attorney Visitation at Moshannon Valley Processing Center (2022), https://www.ice.gov/doclib/detention/vavMoshannonPC.pdf.

require staff detailed to Moshannon to arrange virtual production before the Elizabeth Immigration Court for *each* appearance that is part of those proceedings.

64.    Defendants also permit staff detailed to other detention facilities to arrange for virtual production in state court criminal proceedings. For example, Defendant ICE's employees at the Elizabeth Contract Detention Facility in Elizabeth, New Jersey, routinely produce noncitizen New Jerseyans detained by ICE for virtual proceedings in New Jersey state courts.

65.    Likewise, Defendants permit staff detailed to the Buffalo Service Processing Center (Batavia) in New York to arrange for virtual production in state courts. Defendants ICE, Wamsley, and Kemp allow staff at the Pike and Clinton County Correctional Facilities in Pennsylvania to produce noncitizens detained there to virtually participate in criminal court proceedings. Defendants, however, deny the same right to individuals at Moshannon.

## IV.    The Refusal Policy and Practice thwarts noncitizen New Jerseyans detained at Moshannon from exercising their Federal and State constitutional and statutory rights.

### a.    People charged with criminal offenses have federal and state constitutional rights to participate in cases brought against them and their defense.

66.    The noncitizens impacted by Defendants' policies, including Individual Plaintiffs, clients of AFSC IRP, and members of the class, have unresolved criminal

matters before New Jersey courts and, like all defendants, enjoy the presumption of innocence and the right to participate in their own defense.

67.    The Refusal Policy and Practice impacts the ability of those individuals to attend court appearances and pursue robust defenses of their criminal cases, contrary to their own legal interests, the efficiency interests of the courts, and, in many instances, in violation of the Constitution:

    a.  When an individual is prevented from speaking out in their own defense or from submitting a petition to a court, they are unable to exercise their rights as provided by the First Amendment.

    b.  When an individual is prevented from participating in a criminal case against them, they are unable to confront their accuser, as provided by the Confrontation Clause of the Sixth Amendment.

    c.  When an individual is prevented from participating in a criminal case against them, and that case is paused, they are unable to vindicate their rights to a speedy trial, as provided under the Sixth Amendment.

    d.  When an individual is prevented from participating in a criminal case against them, they are deprived of their constitutional rights to testify on their own behalf, should they wish to do so, as provided by the Sixth and Fourteenth Amendments.

    e.  When an indigent individual is prevented from participating in a criminal case against them and thus cannot access public defense counsel, they are deprived of their right to counsel under the Fifth and Sixth Amendments.

    f.  When an individual is prevented from attending a plea hearing or sentencing they are deprived of their right of allocution.

    g.  When an individual is prevented from attending the significant stages of criminal court proceedings they are deprived of their right to the

privilege of presence and the ability to participate in the charges against them, as provided by the Due Process Clauses.

h. Even in instances where an individual is facing charges that risk jail time of one year or less under N.J.S.A. 2C:43-8 (describing risk of imprisonment for disorderly persons offenses and petty disorderly persons offenses), federal and state constitutional due process rights attach.[17] The refusal to provide access to court for people facing disorderly persons and petty disorderly persons charges in New Jersey is a denial of that individual's federal and state constitutional due process rights, in addition to the rights enumerated above.

68. When Defendants deny people in detention access to the criminal legal system, among other harms, they:

a. cause criminal charges to remain unresolved, which can lead to arrest warrants for failure to appear in criminal court;

b. cause people who are indigent to miss the initial court appearance in which public defense counsel is appointed;

c. prevent people from challenging evidence brought against them and establishing their innocence;

d. prevent people from exercising their Confrontation Clause Rights and hearing testimony regarding the alleged actions they took;

e. prevent people from allocuting or entering plea agreements generally;

---

[17] *See State v. Gibson*, 219 N.J. 227, 240 (2014) ("A municipal court proceeding is a quasi-criminal proceeding in which a defendant is entitled to due process of law . . . Those include the requirement that the State prove the elements of the crime beyond a reasonable doubt, a trial in accordance with the Rules of Evidence, the right against self-incrimination, and the right to confront the witnesses against him." (internal quotation marks and citations omitted)); *State v. Cahill*, 213 N.J. 253, 267 (2013) (recognizing right to a speedy trial extends to matters pending in municipal courts).

    f.   prevent people they are subjecting to immigration detention from accepting plea agreements that would not harm their immigration case; and

    g.   prevent people from participating in sentencing proceedings in their own case.

**b.   Defendants' Refusal Policy and Practice relies on nonproduction and the inability of noncitizen New Jerseyans at Moshannon to secure and effectuate writs of in-person production.**

69.    It is not feasible or realistic to require local authorities to pick up for in-person production, and then drop back off, each noncitizen with unresolved criminal matters who Defendants choose to detain miles away from their home, their loved ones, and the court system. Depending on their location within the State, New Jersey courts can be as close as 200 miles away from Moshannon, and as far as 340 miles. It can take up to eight hours to make the trip from New Jersey to Moshannon, in one direction. The impracticability of this policy and practice is all the more apparent and nonsensical when the court proceedings are exclusively virtual.

70.    Defendants are or should be aware that New Jersey state and local governments cannot expend resources to pick up and then return to their custody the hundreds of their residents that Defendants opt to transport to a rural and remote area in Pennsylvania.

71.    Moreover, for the many reasons further detailed below, bringing many individuals into state custody in New Jersey from immigration detention, even for

the brief purpose of appearing at a state or municipal criminal court proceeding, is legally impossible.

72.    Defendants are or should be aware that the Refusal Policy and Practice thwarts individuals from accessing courts because advocates, including staff working for AFSC IRP, and court personnel consistently contact Defendants and their employees to try to find ways to virtually produce people for court; because other detention facilities routinely dedicate resources to produce people in their custody for state court proceedings; and because, upon information and belief, the hundreds of individuals with unresolved criminal matters detained at Moshannon have not been transferred to and from custody for state court hearings, *en masse*, since the facility opened in 2021.

73.    Despite knowing that they cannot meet the constitutionally-required needs of individuals detained at Moshannon, Defendants continue to expand the number of people detained there without providing or requiring any additional resources or infrastructure to ensure that the people in their custody can access state courts.

74.    Defendants' stated rationale for refusing to permit virtual production—a lack of resources—is illogical and in fact rests on the assumption that in-person court production will also not happen. Allowing only in-person production for state court proceedings, and not virtual production, is only less resource-intensive *if*

Defendants rely on in-person production not actually occurring. Every time the facility admits or releases an individual, it is required to go through exhaustive and exhausting intake and release procedures, including transportation by staff at Moshannon; body and property searches by staff at Moshannon; the completion of paperwork by staff at Moshannon; and coordination with local authorities by staff at Moshannon.[18] Allowing an individual to virtually participate in state court proceedings, something that is done routinely by staff for other forms of court proceedings, is comparatively less resource-intensive than having the individual leave and return to the facility, and does not include check-in and check-out procedures.

### c. Most municipal courts in New Jersey are completely or primarily virtual.

75.    Most criminal court cases in New Jersey start in or are transferred to municipal courts,[19] and proceed entirely or primarily virtually.

76.    According to data from the 2022 Annual Report of the New Jersey Courts, the number of defendants scheduled for virtual appearances in the municipal

---

[18] *See* U.S. IMMIGR. & CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS (2011) §§ 1.3, 2.1 for an exhaustive lists of transportation protocols.

[19] The New Jersey Courts, A Guide to the Judicial Process, at 10 (Aug. 2019) ("By far, most of the cases filed in New Jersey's courts are heard in the municipal courts. In fact, more than six million of the seven million cases filed in New Jersey's courts each year are filed in the Municipal Courts.").

courts has increased year after year since 2020, and more than doubled from 573,441 in 2020, to 1,158,509 in 2022.

77.    This is consistent with directives issued by the New Jersey court system.

78.    On October 27, 2022, the New Jersey Administrative Director of the Courts ordered that "[r]outine motions and conferences will continue to be virtual," and provided Municipal Court Judges with discretion on scheduling virtual appearances.[20]

79.    On March 13, 2023, the Administrative Director of the Courts issued a Notice to the Bar stating that, "the initial appearance in all Municipal Court cases, including those involving consequences of magnitude, will be scheduled as a *virtual* initial appearance." (emphasis in original). The Notice further explained that, "[a]fter the initial virtual court date, Municipal Court judges will continue to have discretion to schedule matters either in person or virtually . . . ."[21]

---

[20] Glenn A Grant, NOTICE TO THE BAR AND PUBLIC, THE FUTURE OF COURT OPERATIONS—UPDATES TO IN-PERSON AND VIRTUAL COURT EVENTS (Oct. 27, 2022), https://www.njcourts.gov/sites/default/files/notices/2022/10/n221027a.pdf?cb=659 d2262.

[21] Glenn A Grant, NOTICE TO THE BAR AND PUBLIC, MUNICIPAL COURT-VIRTUAL FORMAT FOR ALL INITIAL APPEARANCES (Mar. 13, 2023), https://www.njcourts.gov/sites/default/files/notices/2023/03/n230315c.pdf?cb=099 6287c.

80.     Based on a survey of municipal court websites, at least 158 (or 37%) of the 418 municipal courts in New Jersey hold *only* virtual proceedings. An additional 83 (or 20%) are primarily virtual. Only 14 (or 3%) of the municipal courts in New Jersey indicate that they are only in-person.

**d.     Defendant ICE encounters individuals in New Jersey prior to the resolution of criminal charges following changes to New Jersey bail reform practices.**

81.     Defendants' insistence on in-person production as the only option is complicated by New Jersey's laudable bail reform efforts. On January 1, 2017, the New Jersey Criminal Justice Reform Act, N.J.S.A 2A:162-15 to -26 ("CJRA"), took effect. The law moved New Jersey from relying principally on setting monetary bail as a condition of release to a risk-based system, modeled after the federal system, when determining pre-trial release in criminal cases.

82.     Before New Jersey passed the CJRA, many individuals with unresolved criminal matters would remain in state custody, unable to afford bail, until the resolution of those charges.

83.     Since the CJRA took effect, individuals arrested in New Jersey with unresolved criminal matters and who are not ordered detained pre-trial are released from state custody before the criminal matters are resolved. ICE now apprehends individuals either immediately or soon after release from state custody.

84.    The CJRA enumerates particular charges for which a defendant may be detained pre-trial. Each of those charges carries a presumption for or against detention.[22] Most of the enumerated charges carry a presumption of release. In fact, a rebuttable presumption of detention exists only for murder or other crimes carrying the possibility of life imprisonment.

85.    New Jersey state courts have been clear that trial courts may not consider the impact of ICE detention on a person's ability to appear for state court when considering whether to detain a person pre-trial.[23]

## V.    Defendants' Refusal Policy and Practice is arbitrary and capricious.

### a.    Access to state-criminal courts is arranged for at other immigration detention facilities run by Defendants.

86.    Defendants permit staff detailed to the Buffalo Service Processing Center (Batavia) in New York to arrange for virtual production in state courts. Defendants ICE, Wamsley, and Kemp allow staff at the Pike and Clinton County Correctional Facilities in Pennsylvania to produce noncitizens detained there to

---

[22] N.J.S.A. §§ 2A:162-18(b), 19(a), 19(b).

[23] *State v. Lopez-Carrera*, 245 N.J. 596, 625-26 (2021) (precedent "does not support the proposition that decisions by immigration officials can justify pretrial detention under the CJRA"); *see id.* at 624 ("The legal standard and the realities of immigration proceedings are not easily reconciled."); *see also State v. Molchor*, 464 N.J. Super. 274, 288-89 (App. Div. 2020) (deciding that an individual may not be "detained where release conditions may be crafted to assure the defendant's appearance, but for his possible detention and removal by federal immigration officials").

virtually participate in criminal court proceedings. Defendants, however, deny the same right to individuals at Moshannon.

### b. Defendants have failed to use any of the mechanisms available to them to ensure that the people they detain can access state courts.

87.     Defendant ICE uses National Detention Standards ("NDS"), to establish "consistent conditions of confinement, program operations and management expectations within the agency's detention network."[24] ICE updated the NDS in 2019, and those detention standards apply to, *inter alia*, ICE's IGSA facilities which were formerly operating under the 2000 NDS. ICE explains that the "NDS 2019 streamlines several prior standards and incorporates substantive additions addressing topics such as medical care, segregation, disability access, sexual assault and abuse prevention and intervention, and language access."

88.     Defendant ICE uses an additional set of standards applicable in this matter. Its Performance Based National Detention Standards ("PBNDS") govern the facilities it uses to hold civil detainees, including service processing centers, like Moshannon. ICE updated the PBNDS in 2011 and they are incorporated by reference into the contracts governing Moshannon.

89.     ICE relies on PBNDS, Appendix 2.2.B: ICE Custody Classification Worksheet, for appropriate case-by-case placement of any individual arrested by

---

[24] ICE Detention Standards (Aug. 8, 2023), https://www.ice.gov/factsheets/ice-detention-standards.

ICE. The ICE Custody Classification Worksheet asks ICE officials to use a "Severity of Offense" scale to determine an individual's security classification and make a custody recommendation. This scale is based only on the most serious past criminal *conviction* in an individual's criminal history. Neither the Worksheet nor the instructions for completing the Worksheet instructs employees of Defendant ICE to consider whether an individual has unresolved criminal matters, and would thus require access to state courts, when making a custody recommendation.

90.    ICE tracks whether individuals have unresolved criminal matters but does not consider this data when determining where to detain individuals.

91.    Defendants have not included *any* provisions in the NDS, PBNDS, or other governing policy that protects the constitutional rights to court access for people in their custody seeking to access state court systems.

92.    Defendants have also not included any requirements or standards in its contractual agreements for Moshannon to allow people detained there access to state court systems, including ensuring the necessary operating equipment and personnel.

**c.    Defendants' Refusal Policy and Practice harms New Jerseyans and the State of New Jersey.**

93.    Defendants' Refusal Policy and Practice disrupts the functioning of New Jersey's courts and imperils the rights of alleged victims in New Jersey, rendering it arbitrary and capricious.

94.    New Jersey Courts are routinely forced to pause, reschedule, and/or delay proceedings in cases involving individuals whom Defendants detain at Moshannon, wasting time and judicial resources, and contributing to the already significant backlog of cases in the Criminal Division of the New Jersey Court System,[25] forcing an already overburdened judicial system to keep otherwise resolvable cases open for additional months or years.

95.    Defendants' Refusal Policy and Practice is known to courts throughout the State of New Jersey. For example, on November 15, 2023, when discussing how to arrange production for a noncitizen detained by Defendant ICE at Moshannon, Judge Baxter of the Ocean County Superior Court stated on the record that the defendant "is in ICE custody in Pennsylvania so there is no way that we can arrange a Zoom proceeding."

96.    Employees of the New Jersey Judiciary have expressed that Defendants' Refusal Policy and Practice, in turn, causes problems across the state.

---

[25] Since the start of the Covid-19 pandemic, backlogs in all of the New Jersey courts have increased year over year and have reached a historic high. Between 2021 and 2022, the backlog of cases in the Criminal Division of the New Jersey Judiciary increased 47% from 8,497 cases in 2021 to 12,497 cases in 2022. As of January 2024, the Criminal Division had a backlog of 18,077 pre-indictment and 13,554 post-indictment cases. NEW JERSEY JUDICIARY, ANNUAL REPORT COURT YEAR 2021-2022. *See also* NEW JERSEY JUDICIARY, STRATEGIC PLAN FOR COVID-19 BACKLOG REDUCTION 7 (Mar. 2024).

97.    In March 2023, staff at the Paterson Municipal Court were trying to ascertain how to get three individuals detained at Moshannon produced for virtual proceedings. On March 30, Feliesha Pockhai, a deputy court administrator for the Paterson Municipal Court, contacted the Philadelphia Field Office ("FO"), under the supervision of Defendants Wamsley and Kemp, requesting that an individual detained at Moshannon be made available for a video court appearance scheduled for April 4. The FO responded that the individual would not be made available via electronic means. After staff at the Paterson Municipal Court contacted the Passaic Superior Court for assistance, the Criminal Division Manager, John Harrison responded, "the Superior Court is not getting video hearings with the I.C.E. facility, so I was not sure how much more success the Municipal Court would have. This is a statewide issue."

98.    Because of Defendants' Refusal Policy and Practice, some New Jersey courts automatically issue bench warrants for people detained by Defendants at Moshannon, and/or deem it futile to schedule court appearances while a Putative Class member is detained there.

99.    For example, after an individual ICE detained at Moshannon missed a court date and wrote to the New Brunswick Municipal Court to request a new one, on January 17, 2024, the clerk Kaitlyn Cox responded, writing that the Court was unable to schedule a court date because the complaints were in "Warrant Status,"

but "once you are released from ICE custody, you can re[-]petition to have your Warrant lifted and the court rescheduled here."

100.   Similarly, when corresponding with an advocate regarding a bench warrant issued following a missed appearance, on March 20, 2024, the clerk of the North Bergen Municipal Court, Christoph Guillen wrote,

> It was noted that he is held up at an ICE facility in PA . . . . In order for the judge to recall the warrant, it would be helpful to obtain a release date for the defendant from the ICE facility or schedule a video conference, with granted permission from the ICE facility.

101.   Likewise, in response to an attorney's motion to vacate a bench warrant issued for an individual detained at Moshannon because "ICE refuses to transport him to this Court and will not cooperate with Zoom appearances for state court proceedings," Def.'s Br. at 1, *State v. Vasquez*, No. BER-24-000618, the State explained on August 16, 2024, that "the bench warrant serves as a detainer to ensure his eventual appearance in court," State's Br. at 3, *State v. Vasquez*, No. BER-24-000618. The State further noted that it "concurs with the need to bring defendant to New Jersey," highlighting that "the State is required under the Sixth Amendment's speedy trial clause to move the case forward." *Id.* at 4.

102.   Defendants' Refusal Policy and Practice also impacts alleged victims in New Jersey.

103.   The New Jersey Constitution provides that alleged crime victims "shall be treated with fairness, compassion and respect by the criminal justice system." N.J.

Const. art. I, ¶ 22. The State Supreme Court has also emphasized that "changes in the law [have] steadily strengthened the rights of victims to participate in criminal proceedings."[26] When a matter cannot be heard because the defendant is not produced, the alleged victim's right to participate in criminal proceedings is frustrated.[27]

104.    Additionally, delaying resolution of criminal legal proceedings can also harm a person's family in New Jersey. This is particularly true in instances in which a person has been accused of domestic violence but the alleged victim was misunderstood or does not wish to press charges. Such a scenario will often arise when local law enforcement respond to a call from a neighbor or community member, and upon encountering people with limited English proficiency, do not use interpretation services to accurately discuss the situation with either the alleged victim or alleged perpetrator. Delaying resolution of criminal charges in those circumstances can significantly prolong detention of a Putative Class member, causing financial and emotional harm to the individual's family.

---

[26] *State v. A.M.*, 252 N.J. 432, 453 (2023).

[27] *See* Report of the Joint Committee on Criminal Justice (March 10, 2014), https://www.njcourts.gov/sites/default/files/finalreport3202014.pdf (recognizing many harms caused by pre-trial delays, including "[w]ith the passage of time, witnesses' memories fade and evidence may be lost. Also, victims of crime are left to wait longer for cases to be resolved").

**d.  When Defendants prohibit noncitizens from accessing state courts to contest charges levied against them, they exacerbate and incorporate the already-existing disproportionalities experienced by people of color in the criminal legal system.**

105.  Defendants' thwarting of noncitizens from accessing state courts constitutes arbitrary and capricious action as it exacerbates and incorporates the already-existing disproportionalities experienced by people of color in the criminal legal system.

106.  As Attorney General Merrick Garland has explained, "there is discrimination and widespread disparate treatment of communities of color and other ethnic minorities in this country," and there "is no question there is disparate treatment in our justice system."[28]

107.  New Jersey is not immune to these disproportionalities.

108.  In the introduction to the 2021 annual report to the Governor and the Legislature on criminal justice reform, the Administrative Director of the Courts for New Jersey, the Honorable Glenn A. Grant, described:

> One longstanding problem candidly documented in this report is the continuing racial inequity that exists throughout New Jersey's criminal justice system. Black defendants are still disproportionately represented

---

[28] James Dobson, '*I don't care who pressures me in any direction:' Merrick Garland is the right person to lead the Department of Justice*, The Quinnipiac Chronicle (March 2, 2021), https://quchronicle.com/72277/opinion/i-dont-care-who-pressures-me-in-any-direction-merrick-garland-is-the-right-person-to-lead-the-department-of-justice/.

at each step in the criminal justice process, from initial arrest statistics to the jail population.[29]

109.    The Report documented that "historical inequities . . . begin with a defendant's interaction with law enforcement."[30]

110.    A new database launched by the New Jersey Attorney General's Office in 2023 aggregates information on criminal defendants in New Jersey. The data showed that "Black people continue to be disproportionately arrested, representing 38% of unique defendants even though they account for just 12% of New Jersey's population [as of June 2023]. They're also far likelier than white defendants to plead or be found guilty and to be incarcerated."[31]

111.    Publicly available data also shows that New Jersey state police traffic stops skew towards people who are Black and Hispanic, where (1) "[p]olice wrote citations for non-moving violations in about 18% of stops of white motorists compared with almost 25% of the stops of Blacks," and "[a]bout 26% of whites received a moving violation, while close to 37% of Hispanics were similarly cited;

---

[29] Judge Glenn A. Grant, Administrative Director of the Courts, *Annual Report to the Governor and the Legislature* 4 (2021), https://www.njcourts.gov/sites/default/files/courts/criminal/criminal-justice-reform/cjr2021.pdf.

[30] *Id.* at 20-22.

[31] Dana DiFilippo, *New public database sheds light on who gets arrested in New Jersey, and why*, N.J. Monitor (Jun. 13, 2023), https://newjerseymonitor.com/2023/06/13/new-public-database-sheds-light-on-who-gets-arrested-in-new-jersey/.

and (2) "Black motorists make up about 20% of all those stopped by the state police, but 41% of those arrested during traffic stops were Black. About 37% of those arrested were white, while whites accounted for 57% of those stopped."[32]

112.    As previously described, immigration authorities rely on the issuance of a summons or the fact of an arrest itself to initiate removal proceedings against noncitizens, apprehending and bringing many of those individuals into detention.

113.    Defendants' decision to bring an individual into immigration detention is made irrespective of a New Jersey state judge's review of the alleged facts and information surrounding the arrest and determination that the individual could be released in a manner that "will reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process."[33]

114.    By denying noncitizens the ability to contest the charges brought against them, Defendants are incorporating the racial biases and perpetuating disproportionalities from the state criminal legal system into the mechanisms by

---

[32] Colleen O'Dea, *State police arrest, charge more Black, Hispanic drivers than white*, N.J. Spotlight News (July 9, 2021), https://www.njspotlightnews.org/2021/07/nj-state-police-traffic-stops-more-blacks-more-hispanics-more-summonses-more-arrests/.
[33] N.J.S.A. 2A:162-19(b)(2).

which the federal immigration system operates. Defendants' actions constitute arbitrary, capricious, and unlawful agency action.

115.   These incorporated racial biases and disproportionalities are borne out in the way race correlates with individuals' experiences of detention at Moshannon.

116.   For individuals apprehended in New Jersey and detained by Defendants at Moshannon, race correlates with how long people spend in detention, whether they receive bond, and the likelihood that they are ordered deported.

117.   Individuals detained at Moshannon that Defendant ICE codes as Black spend far longer in detention at Moshannon on average than those coded as White and Non-Hispanic. Additionally, those coded by Defendant ICE as Black and Hispanic are also less likely to receive bond. With respect to ultimate relief, individuals Defendant ICE coded as Hispanic are more likely to be deported while in immigration detention than are individuals coded as White and non-Hispanic.

118.   In sum, Defendants capriciously rely on a criminal legal system—in which Black and Hispanic noncitizen New Jerseyans are disproportionally arrested by state law enforcement officials—to apprehend and detain those noncitizens, and then deny them access to defend themselves in that same, racially disproportionate criminal legal system, leading to all the consequences previously outlined and described below.

VI.    **Defendants' Refusal Policy and Practice harms the Individual Plaintiffs, members of the Putative Class, and AFSC IRP.**

119.    Defendants' Refusal Policy and Practice has created a vicious, bureaucratic cycle. ICE detains the individual following a finding that it is appropriate to do so given open criminal charges pending in a State court; the individual cannot resolve those very criminal charges while in detention due to the Refusal Policy and Practice; and the individual cannot secure release from Moshannon given the continued pendency of those same unresolved charges.

120.    Defendants' Refusal Policy and Practice significantly impacts the ability of AFSC IRP to fully and expeditiously represent their clients in immigration court. Unresolved arrests and charged criminal offenses will frequently negatively affect an individual's applications for relief from removal and their ability to receive lawful immigration status or admission in the future.

121.    Additionally, most people in immigration custody are eligible for release on bond or parole pending completion of removal proceedings. However, unresolved criminal matters significantly reduce or preclude an individual's chances of securing release from immigration detention.

122.    Therefore, people whom Defendants detain at Moshannon with unresolved criminal matters experience a series of challenges that impact their ability to secure release from detention and/or immigration relief.

a. **Defendants' Refusal Policy and Practice harms Individual Plaintiffs and members of the Putative Class by prolonging detention.**

123. While 8 U.S.C. § 1226 allows for detention of noncitizens during the pendency of removal proceedings, for the majority of people held in immigration detention, there is no law *requiring* that immigration authorities detain them while immigration proceedings are pending.[34]

124. Defendant ICE and its staff, including the ERO Defendants, have enormous discretion when deciding whether to detain individuals during the pendency of removal proceedings. The way they exercise that discretion is, in large part, linked to an individual's alleged criminal activity.[35] When detention is not legally required, ICE has discretion to either continue to detain people during their removal proceedings or release them on bond or conditional parole.[36] Unless other information is available, ICE officials often rely on uncorroborated arrest records from unresolved criminal cases to justify detention.

125. ICE's decision to continue discretionary detention may be challenged by a detained individual at a bond hearing before an immigration judge. The

---

[34] 8 U.S.C. § 1226(c); *Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018).

[35] *See* DHS Secretary Alejandro Mayorkas's Guidelines for the Enforcement of Civil Immigration Law (Sept. 30, 2021).

[36] 8 U.S.C. § 1226(a).

immigration judge may order release on bond only if the judge finds that the noncitizen does not pose a flight risk or present a danger to the community.[37]

126.  Unlike in criminal proceedings, however, the burden of proof lies with the individual in detention, and not with the government.[38] The Federal Rules of Evidence also do not apply in these proceedings.

127.  Immigration judges can consider allegations in unresolved criminal matters, and routinely request and review police records when considering bond and other discretionary relief in the event criminal charges remain pending.[39] Therefore, individuals in detention who are able to successfully defend themselves in criminal court have a significantly higher chance of securing bond. Conversely, detained noncitizens with pending charges may be unable to effectively refute the allegations in the police report or criminal complaint in the context of an immigration bond hearing.

---

[37] 8 U.S.C. § 1226(a); 8 C.F.R. § 236.1(d)(1); *see also Matter of Urena*, 25 I. & N. Dec. 140 (B.I.A. Nov. 17, 2009) ("[O]nly if [a noncitizen] has established that he would not pose a danger to property or persons should an Immigration Judge decide the amount of bond necessary to ensure the [noncitizen's] presence at proceedings to remove him from the United States.").

[38] *Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 279 (3d Cir. 2018) (holding that the noncitizen carries the burden of proof to show that he or she merits release on bond when challenging discretionary detention).

[39] *See, e.g.*, *Matter of Siniauskas*, 27 I. & N. Dec. 207, 209 (B.I.A. 2018); *Matter of Guerra*, 24 I. & N. Dec. 37, 40-41 (B.I.A. 2006) (upholding immigration judge denials of bond based on arrests and related records for charges that were still pending at the time of the custody hearing).

128.    Defendants' Refusal Policy and Practice renders it more difficult for noncitizen New Jerseyans detained by Defendants at Moshannon to have the opportunity to prove that they do not present a danger to the community at the bond hearing.

129.    Moreover, due to a growing backlog of immigration cases, many people denied bond or release can face months, or even years, of detention by Defendants while litigating their claims in immigration court.[40]

130.    Prolonged detention can pressure an individual into a decision to accept a deportation order rather than litigate their case.

131.    As an exacerbating factor, prolonged detention negatively impacts a noncitizen's ability to obtain counsel in removal proceedings. Noncitizens do not have a right to appointed counsel in these proceedings, and individuals detained for months in detention facilities are unable to work and often lack the resources to retain immigration counsel. Individuals who are not detained are 4.5 times more likely to obtain representation than those who are detained.[41] Consequently, many noncitizens in detention with limited English proficiency and understanding of

---

[40] The national immigration court backlog now exceeds three million cases and has tripled since 2019. TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE, *Immigration Court Backlog Tops 3 Million; Each Judge Assigned 4,500 Cases* (2023), https://trac.syr.edu/reports/734.
[41] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PENN. L. REV. 1, 32, 49 (2015).

America's complex immigration system are forced to litigate their immigration case without legal representation.

132.  Yet, having legal representation during these complex proceedings makes a significant difference in an individual's ability to obtain immigration relief. Noncitizens in removal proceedings bear the burden of proving that they are entitled to immigration relief and, in many cases, merit a favorable exercise of discretion. Detained individuals with immigration counsel are eleven times more likely to apply for relief, and ten and a half times more likely to successfully obtain relief, than those without counsel.[42] Individuals able to secure release from detention are better positioned to obtain counsel, improving their chance for a successful outcome by almost 20 times.[43]

133.  Overall, release from detention can have a significant effect on an individual's ability to succeed in their application for immigration relief and prevent deportation. Individuals in detention are more than twice as likely as those not detained to lose their immigration cases and have a final order of removal entered against them. In 2023, 45.6% of individuals whom ICE detained nationwide had a

---

[42] *Id.* at 49, 57.

[43] *See id.* at 70 (describing different outcomes for represented versus unrepresented noncitizens in removal proceedings between 2007 and 2012).

final order of removal entered against them as opposed to 21% of those not in immigration detention.[44]

134.  Additionally, released individuals can reunite with their loved ones, resume or seek employment, and be closer to the evidence and witnesses needed for their immigration case. All of these factors impact people's ability to adequately prepare and present their immigration case, as well as maintain and establish equities for positive consideration where relief is discretionary.

135.  Defendants' Refusal Policy and Practice also creates complications in the release process, even if the immigration court grants bond. As described above, Defendants' Refusal Policy and Practice frequently leads to the issuance of a bench warrant when the Defendant does not appear for the state court matter. And, Defendants will not release individuals with bench warrants from immigration custody upon payment of a bond, but will prolong their detention and transfer them to local custody where the individual will be held and temporarily detained until the bench warrant is resolved.

---

[44] In 2023, 108,084 of the 273,220 individuals that ICE detained had a final order of removal entered against them. U.S. Immigration and Customs Enforcement Fiscal Year 2023 Enforcement and Removal Operations Report, https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf (last visited Sept. 11, 2024). By contrast, 1.2 of the over 6.2 million individuals on ICE's non-detained immigration docket were ordered removed. U.S. Immigration and Customs Enforcement Fiscal Year 2020 Enforcement and Removal Operations Report, https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf (last visited Sept. 11, 2024).

136.   This prolonged detention is unjust and contravenes people's due process rights. It also results in an unnecessary waste of local resources.

137.   Additionally, there are material consequences within Moshannon when a person detained there has unresolved criminal charges. Unresolved criminal charges impact an individual's security classification, which, in turn, can be stigmatic and prohibits them from accessing material things. A security classification can impact a person's ability to get a work assignment, earn money, and purchase items from commissary. It also impacts when and for how long a person detained at Moshannon can be visited by family and other loved ones.

138.   Finally, deprivation of liberty and prolonged immigration detention is, in itself, a harm. Detention by Defendant ICE at Moshannon can be particularly harmful, as the facility's failures to provide adequate healthcare and language access and a safe environment, and its staff's discrimination against people on the bases of race and sexual orientation, have been documented by courts, components of Defendants ICE and DHS, and external stakeholders.[45]

---

[45] *See, e.g.*, *Perez-Barron v. United States*, 480 F. App'x 688, 689-90 (3d. Cir. 2012) (summary order) (alleging that Moshannon staff failed to provide adequate medical care for severe chronic head pain caused by a traumatic injury, prescribing only Motrin, failing to examine plaintiff's skull, and ignoring the advice of the plaintiff's general doctor that he may need reconstructive surgery); *Cerome v. Moshannon Valley Corr. Ctr.*, No. 09-2070, 2010 WL 4948940, at *1 (3d Cir. Dec. 7, 2010) (outlining that staff allowed prisoners to attack and brutalize the plaintiff and other Black people because of their race); DEP'T OF HOMELAND SEC. OFF. FOR CIV.

### b.    Defendants' Refusal Policy and Practice harms AFSC IRP.

139.    As a result of ICE's Refusal Policy and Practice, AFSC IRP has been

harmed in myriad concrete ways. In addition to the harm caused to its clients, it has

had to divert resources, including front-line and supervisory staff time, to train for,

supervise, and undertake a range of activities that it would not otherwise undertake,

and that are not a typical part of immigration representation.

---

RTS. AND CIV. LIBERTIES, SUMMARY OF CRCL'S RECOMMENDATIONS AND ICE'S RESPONSE, MOSHANNON VALLEY PROCESSING CENTER (Jun. 23, 2023), https://www.dhs.gov/sites/default/files/2024-04/23_090_crcl_close_summary_ice_calhoun_county_correctional_center_508_final.pdf.1 DEP'T OF HOMELAND SEC. OFF. OF IMMIGR. DET. OMBUDSMAN ("OIDO"), OIDO INSPECTION: MOSHANNON VALLEY PROCESSING CENTER 3 (2022), https://www.dhs.gov/sites/default/files/2022-10/OIDO%20Final%20Inspection%20Report%20-%20Moshannon%20Valley%20Processing%20Center_2.pdf; DEP'T OF HOMELAND SEC. OFF. FOR CIV. RTS. AND CIV. LIBERTIES, KEY CIVIL RIGHTS FINDINGS AND RECOMMENDATIONS SPOT-CHECK AT MOSHANNON VALLEY PROCESSING CENTER, COMPLAINT NO. 003761-22-ICE (Nov. 8, 2022), https://www.documentcloud.org/documents/24459971-crcl-movalley-response-2024-crfo-00086- responsive-mar-6-2024, at p. 1; Sheller Center for Social Justice, Temple University Beasley School of Law, In the Shadow of the Valley: The Unnecessary Confinement and Dehumanizing Conditions of People in Immigration Detention at Moshannon Valley Processing Center (June 19, 2024), https://law.temple.edu/csj/2024/09/04/moshannan-valley-processing-center/; ACLU of Pa. et al., Multi-Individual Complaint re: Egregious and Unconstitutional Conditions of Confinement at the Moshannon Valley Processing Center (Jul. 10, 2024), https://www.aclupa.org/en/cases/re-egregious-and-unconstitutional-conditions-confinement-moshannon-valley-processing-center; Shannon, Parsons, *Four detainees transported after altercation in local ICE center*, WTAG (Aug. 19, 2024), https://www.wtaj.com/news/local-news/numerous-first-responders-called-to-moshannon-valley-processing-center/ (describing recent fight and serious injuries between people at detention at Moshannon).

i.      **Defendants' Refusal Policy and Practice impacts AFSC IRP's ability to secure their clients' release from immigration detention and to secure immigration relief on their clients' behalf.**

140.    As the Supreme Court has recognized, deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945). Defendants' Refusal Policy and Practice directly impacts the ability of AFSC IRP to defend its clients in deportation proceedings.

141.    Civil immigration proceedings pit the government against the noncitizen in an adversarial process where each side is presumed to have the ability to represent its own interests, and during which the noncitizen does not have a right to appointed counsel. A DHS attorney, trained in substantive immigration law and immigration court procedures, represents the government.

142.    Unresolved criminal cases negatively impact people's applications for immigration relief. If Defendant DHS proves that an individual is removable (deportable), the burden shifts to the noncitizen to prove that they are eligible for relief.[46] Most relief applications that allow noncitizens to remain in the country are discretionary in nature.[47] As such, individuals seeking this discretionary relief must

---

[46] *See* 8 U.S.C. § 1229a(c) (describing burdens of proof in removal proceedings).
[47] *See* 8 U.S.C. § 1158(a) (establishing that asylum is a discretionary form of relief); 8 U.S.C. § 1229b (granting the Attorney General the discretion to cancel the removal

both demonstrate statutory eligibility for that relief and convince the court to exercise discretion to grant relief and permit them to remain in this country.

143.    Immigration judges are tasked with considering a wide range of factors in determining whether discretion should be exercised.[48] Like in bond application proceedings, the Federal Rules of Evidence do not apply in immigration proceedings.[49] A judge may consider records from unresolved criminal cases, which judges frequently weigh against a grant of discretionary relief.

144.    When Defendants refuse to permit noncitizens in detention access to state court proceedings and strip those noncitizens of the opportunity to exercise their constitutional rights to challenge unresolved criminal matters, Defendants are curtailing the ability of AFSC IRP to enforce the limited procedural safeguards available to people facing life-altering consequences. As explained above, an

---

and adjust the status of an inadmissible or deportable noncitizen); 8 U.S.C. § 1255 (setting that most adjustment of status applicants may only be granted lawful permanent resident (LPR) status in the discretion of the Attorney General); 8 U.S.C. § 1229c (providing that a voluntary departure can be granted as a matter of discretion).

[48] *See, e.g.*, *In re C-V-T-*, 22 I. & N. Dec. 7, 11 (BIA 1998) (summarizing discretionary considerations for adjudicating INA 240A(a) applications); *Matter of Castillo-Perez*, 27 I. & N. Dec. 664 (A.G. 2019) (INA 240A(b) applications); *Matter of Pula*, 19 I. & N. Dec. 467, 473-74 (BIA 1987) (asylum applications); *Matter of Arai*, 13 I. & N. Dec. 494, 495-96 (BIA 1970) (adjustment of status applications); *Matter of Mendez-Moralez*, 21 I. & N. Dec. 296, 301 (BIA 1996) (INA 212(h) inadmissibility waiver applications).

[49] *See Matter of Teixeira*, 21 I. & N. Dec. 316, 321 (B.I.A. 1996); *Matter of Grijalva*, 19 I. & N. Dec. 713, 722 (B.I.A. 1998).

unresolved criminal matter can be a strong adverse factor in an immigration custody hearing and discretionary relief analysis, making it harder for noncitizens to obtain release and return to their homes and families.

145.    Because unresolved criminal charges are likely to negatively impact (frequently dispositively so) a client's application for bond or other relief, AFSC IRP's typical legal strategy under these circumstances is to wait for a disposition on the unresolved criminal matters before seeking bond on behalf of their clients. AFSC IRP might also seek adjournments or other postponement of a merits hearing before an immigration judge while criminal matters remain unresolved.

146.    However, as noted above, Defendants' Refusal Policy and Practice has dramatically increased the timeframe for and difficulty of resolving criminal matters brought against AFSC IRP's clients detained at Moshannon. Additionally, because AFSC IRP's clients detained at Moshannon cannot access state court proceedings, AFSC IRP staff are frequently forced to insert themselves into the State-court criminal proceedings in their clients' stead to negotiate standard procedural requirements, like appointment of public defense counsel, and to appear as friends of the court and explain the impact of Defendants' Refusal Policy and Practice. Without those actions, the immigration cases of AFSC IRP clients will either indefinitely stall or their chances of deportation become astronomically higher than they already are.

147. Public defense counsel is typically appointed for an indigent individual at a first appearance before the state court. Because AFSC IRP's clients cannot virtually appear in State-court criminal proceedings, they can neither request the appointment of a public defender, nor be present to answer questions about their income and resources, to establish eligibility for public defense counsel. AFSC IRP must therefore seek appointment on their client's behalf. That work ranges from assisting the client in completing an attestation of their income and resources, known as a 5A form, to advocating for the timely appointment of counsel with court staff and coordinating with the prosecutor and public defender offices. New Jersey has 564 municipalities, twenty-one counties, and almost as many courts. This requires knowledge of and facility with the practices and procedures of each of them.

148. To explain their client's absence to public defense counsel and the court, and to assist in seeking resolution of filed charges, AFSC IRP attorneys often must attend the State-court criminal proceedings in their client's stead. That will usually entail hours of waiting for a case to be called, without the ability to focus on other work, or take on additional clients.

149. Some judges refuse to hold hearings unless an AFSC IRP client can be virtually produced, which leads to indefinite delay of the criminal matter. Because of Defendants' Refusal Policy and Practice, some criminal court judges have even

*required* AFSC IRP immigration attorneys to *guarantee* the production of their clients, in order to calendar the case.

### ii. Defendants' Refusal Policy and Practice impacts AFSC IRP's ability to serve its clients fully.

150.    Beyond injuring AFSC IRP's clients, Defendants' Refusal Policy and Practice has stymied AFSC IRP itself in achieving its organizational mission.

151.    AFSC IRP accepts DDDI funding to serve indigent noncitizens in immigration detention and removal proceedings. When AFSC IRP is forced to focus its resources on responding to Defendants' unconstitutional Refusal Policy and Practice, it limits its ability to serve additional impacted people.

152.    When AFSC IRP attorneys start attending State-court criminal proceedings on behalf of their clients, they are navigating a new court system that is not a routine place of practice for immigration attorneys. They must learn how to navigate the system and seek out supervision and resources in order to do so. AFSC IRP attorneys are also placed in the unusual position of not representing clients in the State-court criminal proceedings, but appearing and trying to help their clients navigate those proceedings, in a way that leads to a just resolution, and avoiding bench warrants and other consequences of nonappearance. They also must wait around in virtual criminal court, taking time away from assisting other individuals. Clients' access to the court system would obviate the need for those tasks and free up hours of attorney time.

153.    AFSC IRP attorneys must also assist their clients in obtaining defense counsel without the benefit of having the client appear in court and request counsel. This can lead to additional delay as AFSC IRP's attorneys submit applications on behalf of their clients and explain to courts that their clients have neither the income nor resources to secure defense counsel. This too leads to continual delay of the criminal matter, which continues to negatively impact AFSC IRP's clients' chances to obtain bond or immigration relief.

154.    In order to orchestrate all of this, AFSC IRP's staff must frequently locate and check dockets on which they do not appear and reach out to the State criminal courts to obtain scheduling and other pertinent information in those cases.

155.    These obstacles are mostly absent from AFSC IRP's representation of clients at other facilities, like EDC. If AFSC IRP needs to assist a client detained at EDC with a state criminal court appearance, it simply needs to email an employee of the facility and Defendant ICE's employee, the Acting Field Director, and the client's production will be arranged. AFSC IRP is able to more rapidly assist those clients in resolving criminal matters where possible, leading to more favorable and expeditious outcomes for bond and immigration relief.

156.    The delays in resolving criminal matters caused by Defendants' Refusal Policy and Practice have also greatly extended the time it takes an AFSC IRP attorney to resolve an immigration matter for a client detained at Moshannon.

Because AFSC IRP attorneys represent a client for the duration of their detention, the program is limited in the number of additional clients that it can take on for representation. This hinders AFSC IRP's overall ability to achieve its mission to represent low-income individuals facing deportation through the DDDI.

157.    The delays caused by Defendants' Refusal Policy and Practice have also strained AFSC IRP's attorneys' relationships with their clients. They must explain the Refusal Policy and Practice to their clients and its consequences, namely that their clients must either remain in detention longer with the hope of potentially resolving the criminal cases against them before seeking bond, or try to seek bond with the negative impact of unresolved criminal charges. Frustrated clients with no one else to turn to become distrustful of the judicial system and of AFSC IRP's ability to assist them, vent their frustrations at AFSC IRP attorneys, and overall face significant stress and pressure.  Ultimately, AFSC IRP has faced significant negative repercussions to their attorney-client relationships with clients detained at Moshannon.

## CLASS ALLEGATIONS

158.    The Individual Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2). Plaintiffs seek to represent a class defined as follows:

**All noncitizens detained by Defendants at the Moshannon Valley Processing Center who have unresolved criminal matters (inclusive**

**of petty disorderly persons, disorderly persons, and indictable offenses) to be charged or charged in a superior or municipal court in New Jersey.**

159.   The Individual Plaintiffs are each adequate representatives of the proposed class. They meet this class definition, and have each been harmed by Defendants' Refusal Policy and Practice.

160.   Defendants' Refusal Policy and Practice impacts every individual they detain at Moshannon following an arrest in New Jersey and with unresolved criminal matters in a New Jersey state or municipal court.

161.   There are numerous other individuals who are or will be apprehended by Defendants and detained at Moshannon following an arrest or with unresolved criminal matters and will be denied access to the state courts of New Jersey.

162.   The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because the class is so numerous that joinder of all members is impracticable. On average, at least 484 individuals met the class definition each year in 2022 and 2023. On average, at least 43 individuals join the class each month, with fewer exiting the class each month.

163.   Joinder is impracticable as Defendants deny Putative Class members access to the court system.

164.   Joinder is also impracticable because Putative Class members are detained by Defendants, many are unrepresented by immigration and criminal

defense counsel, many have Limited English Proficiency, and many are indigent and lack sufficient resources, financial or otherwise, to bring their own cases.

165.    Putative Class members are identifiable using records maintained in the ordinary course of business by Defendants.

166.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) because all Putative Class members are subject to Defendants' Refusal Policy and Practice while detained at Moshannon.

167.    Moreover, there are questions of law and fact common to the proposed class. Such questions include, but are not limited to:

a.    Whether Defendants' Refusal Policy and Practice amounts to an unconstitutional denial of court access, as guaranteed under the First, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

b.    Whether Defendants' Refusal Policy and Practice is unconstitutional and arbitrary and capricious, violating Putative Class members' rights under the APA.

c.    Whether Defendants must alter their policy and practice to comply with the law and allow court access to noncitizen New Jerseyans, and to submit to monitoring to ensure that they cease violating the constitutional and statutory rights of the class.

168.    The proposed class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Plaintiffs are typical of the claims of the class as a whole. Plaintiffs and Putative Class members are all individuals detained at Moshannon and subject to Defendants' Refusal Policy and Practice. Plaintiffs and the proposed class also share the same legal claims,

which challenge the constitutionality and legality of Defendants' Refusal Policy and Practice under the First, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and under the APA.

169.   The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Plaintiffs seek the same relief as the other members of the class—namely, (1) a declaration that Defendants' Refusal Policy and Practice violates the Constitution and the law, and (2) an order enjoining Defendants from continuing to implement it.

170.   In addition, proposed class counsel are highly qualified to serve as class counsel and collectively have extensive experience litigating class action and immigration detention cases.

171.   Finally, the proposed class satisfies Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the whole class by subjecting the entire class to the Refusal Policy and Practice that forms the basis of this complaint. Defendant ICE is required to monitor all policies and procedures related to the class, and is charged with promulgating, disseminating, and enforcing its policies and procedures applicable to the class as a whole. The injunctive and declaratory relief sought is appropriate and will apply to all members of the Putative Class.

172.   In the alternative, the class also qualifies for certification under Rules 23(b)(1)(A) and 23(b)(1)(B) of the Federal Rules of Civil Procedure.

**Claims For Relief**

**FIRST CLAIM FOR RELIEF**
**Violation of the Constitutional Rights to Court Access**
*Asserted by all Plaintiffs and the Putative Class*

173.    Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

174.    The noncitizens impacted by Defendants' Refusal Policy and Practice, including Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class, have unresolved criminal matters before New Jersey courts and, like all accused individuals, enjoy the presumption of innocence and the right to participate in their own defense.

175.    Defendants' Refusal Policy and Practice prevents the Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class from attending court proceedings, obtaining counsel, and pursuing a robust defense in unresolved State-court criminal proceedings. This violates numerous provisions of the U.S. Constitution that safeguard the rights of people charged with criminal offenses to access the courts and participate in and pursue defenses in cases brought against them.

176.    The Petition Clause of the First Amendment to the U.S. Constitution guarantees the right to petition the government for a redress of grievances. This includes the right of individuals to access state courts and to participate in their State-

court criminal proceedings and speak out in their own defense. By preventing the Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class from appearing in, attending, and participating in their State-court criminal matters, the Defendants have and continue to violate the First Amendment.

177.    The Due Process Clauses of the Fifth Amendment of the U.S. Constitution forbids the federal government from depriving an individual of life, liberty, or property without due process of law. Due Process includes the right to access state courts and to be present and participate in state court proceedings and put forth a defense, as well as the right to allocution at a plea hearing or sentencing. By preventing the Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class from appearing in, attending, and participating in State-court criminal matters, the Defendants have and continue to violate the Fifth Amendment.

178.    The Sixth Amendment to the U.S. Constitution guarantees defendants in criminal prosecutions the right to a speedy and public trial, compulsory process, assistance of counsel, and confrontation. By preventing the Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class from participating in their State-court criminal matters, the Defendants have:

   a. denied them their rights under the Confrontation Clause to confront their accusers and hear testimony regarding their alleged criminal conduct;

    b.   denied them their rights to a speedy trial as State-court criminal matters remain paused and subject to multiple delays because the accused have no means of making an appearance and participating;

    c.   denied them their rights to testify on their own behalf, should they wish to do so; and

    d.   denied them their rights to appointed counsel when they are forced to miss the initial court appearance during which public defense counsel is appointed.

In doing so, the Defendants have and continue to violate the Sixth Amendment.

179.   Defendants' constitutional violations have caused and will continue to cause the Individual Plaintiffs, clients of AFSC IRP, and members of the Putative Class irreparable harm.

## SECOND CLAIM FOR RELIEF
### Violation of the Right to Due Process in Immigration Proceedings
#### *Asserted by AFSC IRP Only*

180.   Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

181.   "Due process affords [a noncitizen] the following at immigration hearings: (1) a factfinding based on a record produced before the decisionmaker; (2) the opportunity to make arguments on his behalf; and (3) an individualized determination of his interests." *Sandhu v. Gonzales*, 126 F. App'x 80, 82 (3d Cir. 2005) (summary order) (citation omitted).

182.   Defendants' Refusal Policy and Practice significantly impacts the ability of AFSC IRP to fully and expeditiously represent their clients and ensure

their due process rights in immigration court. When a client is unable to contest factual allegations brought against them in State-court criminal proceedings and cannot resolve criminal charges brought against them by other government actors, AFSC IRP's attorneys cannot develop a full record in immigration court and are denied the opportunity to make all relevant arguments on behalf of their clients.

183.    Unresolved arrests and charged criminal offenses will often negatively impact an individual's applications for relief from removal/deportation and their ability to receive lawful immigration status or admission in the future. If AFSC IRP's clients were able to participate in their State-court criminal proceedings, they would have the opportunity to mount a defense and favorably resolve the charges, or they could attempt to ensure that any guilty plea would not include convictions that would harm their immigration cases. But since the Defendants' Refusal Policy and Practice results in the inability to address and resolve AFSC IRP's client's outstanding criminal charges, AFSC IRP's lawyers are deprived of a full record upon which they can argue that their clients are eligible for and are entitled to the immigration relief they seek.

184.    In addition, most people in immigration custody qualify for release on bond or parole pending completion of removal proceedings, but unresolved State-court criminal matters significantly reduce or preclude an individual's chances of securing such release. While the criminal matters are pending, AFSC IRP's lawyers

do not have a full record or opportunity to prove that their clients do not present a danger to the community at a bond hearing. This results in prolonged detention, which in and of itself is a deprivation of AFSC IRP's clients' liberty interests. Prolonged detention also hinders AFSC IRP's ability to work with its clients to gather evidence, witnesses, and otherwise prepare and present their immigration case.

185.   Defendants' Refusal Policy and Practice has caused and will continue to cause AFSC IRP irreparable harm by impeding its ability to present its clients' arguments in immigration proceedings on a complete record after the clients have had the opportunity to appear in and attempt to favorably resolve any outstanding State-court criminal proceedings.

## THIRD CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) - Arbitrary and Capricious and Unlawful Action
#### *Asserted by all Plaintiffs and the Putative Class*

186.   Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

187.   Defendants are subject to suit under the Administrative Procedure Act. *See* 5 U.S.C. § 703.

188.   The APA entitles "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

189.   Defendants' Refusal Policy and Practice constitutes "agency action" under the APA. *Id.* § 551(13). Defendants' denial also constitutes "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

190.   The APA compels a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, . . . or otherwise not in accordance with law." *Id.* § 706(2)(A).

191.   Here, the Refusal Policy and Practice is not in accordance with the law because it is unconstitutional for governmental entities holding people in detention to deny them access to the court system.

192.   Defendants have also abused their discretion and acted in an arbitrary and capricious manner, and not in accordance with the law, when they have and continue to:

    a. categorically refuse all virtual access to criminal and municipal courts for individuals detained at Moshannon;

    b. permit GEO to allow people in detention access to immigration courts and state family courts, and refuse to permit GEO to grant access to State-court criminal proceedings;

    c. enter into a contract with GEO and Clearfield County to administer Moshannon and fail to require or account for the need for people in detention to access their State-court criminal proceedings when they are aware of how many individuals have pending criminal charges;

    d. permit individuals detained in other facilities to virtually participate in criminal court proceedings but deny the same for individuals detained at Moshannon; and

e.  exacerbate the racial harms already inherent to the criminal legal system.

193.  Defendants' violation has caused and will continue to cause Plaintiffs and members of the Putative Class irreparable harm.

### FOURTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B) – Constitutional Violation
#### *Asserted by all Plaintiffs and the Putative Class*

194.  Plaintiffs re-allege and incorporate by reference all allegations in the foregoing paragraphs as if fully set forth herein.

195.  Defendants are subject to suit under the Administrative Procedure Act. *See* 5 U.S.C. § 703.

196.  The APA entitles "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

197.  Defendants' Refusal Policy and Practice constitutes "agency action" under the APA. *Id.* § 551(13). Defendants' denial also constitutes "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

198.  The APA requires that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

199.   Here, as set forth in Count One, the Refusal Policy and Practice is not in accordance with the law because it is unconstitutional for governmental entities holding people in detention to deny them access to the court system.  People charged with criminal offenses have federal and state constitutional rights to participate in cases brought against them and to pursue robust defenses in those matters. Depriving people in detention of access to the courts violates those constitutional rights. Defendants' constitutional violations have caused and will continue to cause Plaintiffs and members of the Putative Class irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

1.  Assume jurisdiction over this matter;

2.  Certify the proposed Class, and, as indicated above, appoint the Individual Plaintiffs to serve as representative of the Putative Class, and appoint undersigned counsel to represent the Putative Class;

3.  Enter judgment in favor of Plaintiffs and against Defendants;

4.  Issue a judgment declaring that Defendants' policies and practices as described herein are unlawful and violate the rights of the Individual Plaintiffs, members of the Putative Class, AFSC IRP, and the clients of AFSC IRP, under the United States Constitution and the APA;

5.   Enjoin Defendants, their subordinates, agents, employees, contractees, and all others acting in concert with them from subjecting Individual Plaintiffs, members of the Putative Class, AFSC IRP, and the clients of AFSC IRP to the unlawful acts and omissions described herein, and issue an injunction sufficient to remedy the violations of their constitutional rights, including:

     a.   An order that Defendants honor state and federal court writs of physical and virtual production for criminal, municipal, and significant civil proceedings, while individuals in detention shall continue to remain eligible for physical production for court proceedings should they wish to exercise their "in-person" rights and the option is available in that court.

     b.   An order that Defendants virtually produce via video conference individuals in its custody at Moshannon for all stages of cases ICE defines as criminal matters, including but not limited to court appearances involving arraignments, first appearances, ability-to-pay proceedings, evidentiary hearings, suppression and other substantive motions, court conferences, and trials. Virtual production will occur on the request of an individual in detention who is a party to, witness to, or subject of a court proceeding, without the need for a separately issued writ of production.

c.  An order that Defendants shall either require GEO Group or themselves to purchase and maintain sufficient computer hardware and software equipment at Moshannon such that people in detention shall be able to participate in state court proceedings. Defendants shall provide computer hardware and software equipment to meet the needs of the Putative Class, and in addition to the equipment purchased for EOIR proceedings.

d.  An order that Defendants shall either require GEO Group or themselves to purchase and maintain equipment to allow telephonic access to state courts for the people they detain at Moshannon.

e.  An order that Defendants shall pay for and be subject to monitoring requirements at Moshannon for a minimum of five years after they comply with their constitutional responsibilities to provide people in their custody with access to the courts. Monitoring shall either include a court-appointed monitor and/or inspection and production of equipment for Plaintiffs' counsel. The monitoring period shall extend should Defendants fail to comply.

f. Nothing in this order shall be understood to prohibit Defendants from issuing bond, granting parole, or releasing any person detained in any facility, under any circumstances.

6. Award Plaintiffs their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

Grant such other relief that the Court deems just and appropriate.

Dated: September 11, 2024

Respectfully Submitted,

*/s/ Gavin J. Rooney*
Gavin J. Rooney, Esq.
Alexander Shalom, Esq.
Natalie J. Kraner, Esq.
Naomi D. Barrowclough, Esq.
Anish Patel, Esq.*
Ruth Zimmerman, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597-2500

Shira Wisotsky, Esq.
Raquiba Huq, Esq.
Zoe Burke, Esq.
Emily Thornton, Esq.*
**LEGAL SERVICES OF NEW JERSEY**
100 Metroplex Drive, Suite 402
Edison, New Jersey 08817
(908) 882-2665

-84-

Tiffany J. Lieu, Esq.*
Philip L. Torrey, Esq.*
**CRIMMIGRATION CLINIC**
**HARVARD IMMIGRATION &**
**REFUGEE CLINICAL PROGRAM**
6 Everett Street, Suite 3106
Cambridge, Massachusetts 02138
(617) 496-5497

*Pro Bono Attorneys for Plaintiffs*

* *pro hac vice* motion forthcoming

## <u>CERTIFICATION UNDER L. CIV. R. 11.2</u>

I certify that the matter in controversy is not the subject of any other action

pending in any court, or of any pending arbitration or administrative proceeding.


Date: September 11, 2024                    <u>*/s/ Gavin J. Rooney*</u>
                                            Gavin J. Rooney
                                            **LOWENSTEIN SANDLER LLP**
                                            One Lowenstein Drive
                                            Roseland, New Jersey 07068
                                            (973) 597-2500