# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEFINA DOE; ISABELA DOE; COMMOR JEROME WELCH; FELIPE NIOMAR MARTINEZ ORTIZ; and JOSE DOE, on behalf of themselves and all others similarly situated; and THE AMERICAN FRIENDS SERVICE COMMITTEE, IMMIGRANT RIGHTS PROGRAM, | Civil Action No. 2:24-cv-09105-MEF-LDW |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; | |
| Defendants. | ORAL ARGUMENT REQUESTED |
| **(CONTINUED ON NEXT PAGE)** | |

Gavin J. Rooney, Esq.
Alexander Shalom, Esq.
Natalie J. Kraner, Esq.
Naomi D. Barrowclough, Esq.
Anish Patel, Esq.
Ruth Zimmerman, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973-597-2500

Shira Wisotsky, Esq.
Raquiba Huq, Esq.
Zoe Burke, Esq.
Emily Thorton, Esq.*
**LEGAL SERVICES OF NEW JERSEY**
908-882-2665
P.O. Box 1357
Edison, New Jersey 08818-1357

Tiffany J. Lieu, Esq.*
Philip L. Torrey, Esq.*
**CRIMMIGATION CLINIC HARVARD IMMIGRATION & REFUGEE CLINICAL PROGRAM**
6 Everett Street, Suite 3106
Cambridge, Massachusetts 02138
617-496-5497

*Pro Bono Counsel for Plaintiffs*

*Admitted Pro Hac Vice*

ALEJANDRO MAYORKAS,
Secretary of the Department of
Homeland Security, in his official
capacity; PATRICK J.
LECHLEITNER, Acting Director of
Immigration and Customs Enforcement
("ICE"), in his official capacity;
DANIEL A. BIBLE, Executive
Associate Director of ICE's
Enforcement and Removal Operations,
in his official capacity; CAMMILLA
WAMSLEY, Field Office Director for
the ICE Philadelphia Field Office, in
her official capacity; and
FRANCIS KEMP, Assistant Field
Office Director for the ICE
Philadelphia Field Office, in his
official capacity,

                Defendants.

# TABLE OF CONTENTS

**PAGES**

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION .................................................................................1

STATEMENT OF FACTS .......................................................................3

I.      Defendants' Refusal Policy and Practice prohibits people detained at
Moshannon from accessing state courts. ..........................................5

        A.    Defendants have the ability to provide noncitizens in detention
virtual access to state court proceedings. .............................7

        B.    The Refusal Policy and Practice is neither feasible nor realistic,
thus resulting in the denial of court access............................8

        C.    Defendants have not acted to protect court access rights for the
people they detain at Moshannon.......................................10

II.     Defendants' Refusal Policy and Practice causes Putative Class
members other direct harms in the criminal matters. ....................11

        A.    Defendants' Refusal Policy and Practice prevents Putative Class
members from asserting their rights to access criminal courts. ..........11

        B.    Plaintiffs and Putative Class members cannot secure public
defense counsel..................................................................13

        C.    Impacted individuals are frequently subjected to bench warrants
due to their inability to appear at court-ordered proceedings. ............14

III.    Defendants' Refusal Policy and Practice causes additional harms. ..............15

        A.    The Refusal Policy and Practice enacts significant, and
sometimes insurmountable, barriers to an individuals' ability to
be released. .......................................................................15

        B.    Prolonged detention is harmful. ...........................................16

LEGAL STANDARD...........................................................................18

ARGUMENT ..................................................................................................19

I.    The relief sought is feasible and will safeguard constitutional rights. ..........19

II.   This Court should grant Plaintiffs relief as they meet the standard
      needed for a preliminary injunction................................................................21

      A.    Plaintiffs are likely to succeed on the merits. ....................................21

            1.    Defendants' Refusal Policy and Practice violates
                  Plaintiffs' right to access to criminal courts under the First
                  and Fifth Amendments...............................................................21

            2.    Defendants' Refusal Policy and Practice violates the rights
                  of the Putative Class under the Sixth Amendment. ..................24

            3.    Defendants' Refusal Policy and Practice enacts barriers to
                  AFSC-IRP's ability to fully represent its clients. ....................26

            4.    The Refusal Policy and Practice violates the APA..................28

                  i.    The Refusal Policy and Practice is "final" agency
                        action.................................................................................28

                  ii.   Defendants' Refusal Policy and Practice violates
                        the APA because it is unconstitutional............................30

                  iii.  The Refusal Policy and Practice is arbitrary,
                        capricious, and an abuse of discretion............................30

      B.    Plaintiffs and the Putative Class will suffer irreparable harm
            absent this Court's intervention...........................................................35

      C.    The proposed injunction is in the public interest and would not
            harm Defendants..................................................................................37

III.  Should the Court wish to do so, it may consolidate an evidentiary
      hearing on the PI with an evidentiary hearing on the permanent
      injunction. ......................................................................................................39

CONCLUSION ...........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.C.L.U. v. Reno*,
217 F.3d 162 (3d Cir. 2000)), *aff'd on appeal*,
386 F.3d 514 (3d Cir. 2004) .................................................................38

*Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*,
755 F. Supp. 2d (D.N.J. 2010). *aff'd sub nom.*,
*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012)....38

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994) .......................................................19, 38

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987)....................................................................39

*Argersinger v. Hamlin*,
407 U.S. 25 (1972)......................................................................39

*Ass'n for Fairness in Bus., Inc. v. New Jersey*,
82 F. Supp. 2d 353 (D.N.J. 2000).......................................................35

*Barker v. Wingo*, 407 U.S. 514 (1972) .........................................25, 38

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).........................21

*Bounds v. Smith*,
430 U.S. 817 (1977), *overruled by*
*Lewis v. Casey*, 518 U.S. 343 (1996)...............................21, 22, 23, 39

*Boynes v. Limetree Bay Ventures LLC*, 10 F.4th 604 (3d Cir. 2024)...............20, 35

*Brainbuilders, LLC v. Ocean Healthcare Mgmt. Grp. Benefit Plan*,
No. 32-CV-2495 (GCT) (JB), 2023 WL 3167632 (D.N.J. Apr. 28, 2023)........34

*Brown v. Stone*, 66 F. Supp. 2d 412 (E.D.N.Y. 1999).............................23

*CEC Energy Co. v. Pub. Serv. Comm'n of V.I.*,
891 F.2d 1107 (3d Cir. 1989) ...........................................................29

*Cham v. Att'y Gen. of U.S.*, 445 F.3d 683 (3d Cir. 2006)........................................26

*Chamber of Com. v. Philadelphia*, 949 F.3d 116 (3d Cir. 2020) ...........................19

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*,
    233 F. Supp. 2d 647 (D.N.J. 2002) .....................................................................38

*Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*,
    730 F.3d 291 (3d Cir. 2013) ...............................................................................31

*Coy v. Iowa*, 487 U.S. 1012 (1988)...........................................................................24

*D.H.S. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)...........................30, 31, 33

*De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400 (D.N.J. 2018) .........................36

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
    108 F.4th 194 (3d Cir. 2024) ..............................................................................40

*Doe v. U.S. ICE*, 490 F. Supp. 3d 672 (S.D.N.Y. 2020).........................................23

*Duran v. Merline*, 923 F. Supp. 2d 702 (D.N.J. 2013) ...........................................22

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)......................................32

*Estelle v. Gamble*, 429 U.S. 97 (1976) ....................................................................39

*Foreman v. Lowe*, 261 F. App'x 401 (3d Cir. 2008)...............................................22

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)...................................................38

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ..........................................................39

*Gov't of Virgin Islands v. Mills*, 956 F.2d 443 (3d Cir. 1992) ...............................25

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    774 F.3d 192 (3d Cir. 2014) ...............................................................................20

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017) .............................................36

*Hudson v. Robinson*, 678 F.2d 462 (3d Cir. 1982) ..................................................22

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017) ..................................21

*Kentucky v. Stincer*, 482 U.S. 730 (1987)................................................................24

*Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024) ............................................35

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)............................18

*Ladha v. INS*, 215 F.3d 889 (9th Cir. 2000) ...........................................27

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
    562 F.3d 553 (3d Cir. 2009) ...........................................19

*Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537 (3d Cir. 2023) .....................31, 32, 34

*Lyon v. ICE*, 171 F. Supp. 3d 961 (N.D. Cal. 2016).................................27

*Matter of Guerra*, 24 I. & N. Dec. 37 (BIA 2006) ................................27

*Marine Elec. Sys., Inc. v. MES Fin., LLC*,
    644 F. Supp. 3d 84 (D.N.J. 2023)...............................................18, 19

*Marsellis-Warner Corp. v. Rabens*,
    51 F. Supp. 2d 508 (D.N.J. 1999)...............................................19

*May v. Sheahan*, 226 F.3d 876 (7th Cir. 2000)..................................22, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................31, 32, 33

*Muhanna v. Gonzales*, 399 F.3d 582 (3d Cir. 2005) ..............................26

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.
    Co.*, 290 F.3d 578 (3d Cir. 2002).........................................20

*Nutrasweet Co. v. Vit-Mar Enters., Inc.*,
    112 F.3d 689 (3d Cir. 1997) ................................................18

*Ocean Cnty. Landfill Corp. v. U.S. E.P.A., Region II*,
    631 F.3d 652 (3d Cir. 2011) ................................................28

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .............................................37

*Pinho v. Gonzales*, 432 F.3d 193 (3d Cir. 2005) ........................28, 29, 30

*Procunier v. Martinez*, 416 U.S. 396 (1974) .................................21, 22, 23

*Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251 (3d Cir. 2020) .....................35

*RCM Tech., Inc. v. D.H.S.*, 614 F. Supp. 2d 39 (D.D.C. 2009) ...............................29

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017) ........................18, 19

*Reno v. Flores*, 507 U.S. 292, 306 (1993) .................................................26

*Rock v. Arkansas*, 483 U.S. 44 (1987) ...............................................24, 25

*Rosa v. Garland*, 114 F.4th 1 (1st Cir. 2024) ...........................................37

*Rothgery v. Gillespie County*, 554 U.S. 191 (2008) ......................................24

*Serrano-Alberto v. Att'y Gen. U.S.*, 859 F.3d 208 (3d Cir. 2017) .........................26

*State v. A.M.*, 286 A.3d 660 (N.J. 2023) ................................................38

*Tennessee v. Lane*, 541 U.S. 509 (2004) ................................................39

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*,
    108 F.4th 144 (3d Cir. 2023), *amended on denial of reh'g*,
    110 F.4th 612 (3d Cir. 2024) ........................................................18, 39

*United States v. Leggett*, 162 F.3d 237 (3d Cir. 1998) ....................................24

*Valentine v. Beyer*, 850 F.2d 951 (3d Cir. 1988) .........................................35

## STATUTES

5 U.S.C. § 701(a)(2) .....................................................................30

5 U.S.C. § 704 ...........................................................................28

5 U.S.C. § 706(2)(A) .....................................................................30

5 U.S.C. § 706(2)(B) .....................................................................30

6 U.S.C. § 112(b)(2) ......................................................................4

8 U.S.C. § 1158 ..........................................................................37

8 U.S.C. § 1226(a) .......................................................................36

8 U.S.C. § 1231(g)(2) .....................................................................4

28 U.S.C. § 530C(a)(4) ................................................................................4

N.J.S.A. 2A:162-19 ....................................................................................10

**RULES**

Fed. R. Civ. P. 65(a) ...........................................................................18, 39

Fed. R. Evid. 201(b)(2) ...............................................................................9

**REGULATIONS**

8 C.F.R. § 1003.19 .....................................................................................36

**OTHER AUTHORITIES**

DHS, *Retention Memorandum/Implementation Review Memorandum: Moshannon Valley Processing Center* (Aug. 16, 2024), https://www.dhs.gov/sites/default/files/2024-09/24_0816_crcl-retention-memo-ice-moshannon-onsite-redacted_508.pdf ...........................................................17

Exec. Off. Immigr. Rev., *Immigration Court List—Administrative Control*, U.S. DOJ, https://www.justice.gov/eoir/immigration-court-administrative-control-list#Elizabeth (last visited Oct. 15, 2024). ..............................................8

GEO, Current Report (Form 8-K), https://investors.geogroup.com/static-files/9a6360f4-d63d-4aa6-b53e-c21fd35431a6 ...........................................4

Glenn A. Grant, Notice to the Bar, New Jersey Courts, Municipal Court - Virtual Format For All Initial Appearances (Mar. 13, 2023), https://www.njcourts.gov/sites/default/files/notices/2023/03/n230315c.pdf?cb=0996287c ....................................................................................................5

ICE, *Inter-Governmental Service Agreement* (Sept. 28 2021), https://www.ice.gov/doclib/foia/detFacContracts/|70CDCR21DIG000012_bm0004 _MoshannonValleyPC_PA.pdf .....................4

ICE, *Modification of Contract* (Nov. 14, 2023), https://www.ice.gov/doclib/foia/detFacContracts/70CDCR21DIG000012_P00011_MoshannonValleyPC_PA.pdf .....................11

ICE, *Virtual Attorney Visitation, Moshannon Valley Processing Center* (2022), https://www.ice.gov/doclib/detention/vavMoshannonPC.pdf ...........................8

*Municipal Court*, Borough of Allendale, https://www.allendalenj.gov/municipal-court/pages/court-sessions ........................................................................5

*Municipal Court*, Borough of South River, https://www.southrivernj.org/227/Municipal-Court.............................................5

*Municipal Court*, City of New Brunswick, https://www.cityofnewbrunswick.org/residents/services/municipal_court.php...5

*Municipal Court*, City of Newark, https://www.newarknj.gov/departments/municipalcourt ...................................5

*Municipal Court*, City of Trenton, https://www.trentonnj.org/251/Municipal-Court...................................................5

*Municipal Court*, Ocean City, https://www.ocnj.us/municipal-court ......................5

*Municipal Court*, Riverside Township, https://riversidetwp.org/municipal-court/...5

*Municipal Court*, Town of Hammonton, https://townofhammonton.org/courts/......5

*Municipal Court Office*, Borough of Longport, https://www.longportnj.gov/court/municipal_court.html....................................5

Temple University Beasley School of Law, *In the Shadow of the Valley: The Unnecessary Confinement and Dehumanizing Conditions of People in Immigration Detention at the Moshannon Valley Processing Center* 12 (2024), https://law.temple.edu/csj/2024/09/04/moshannan-valley-processing-center ........................................................................................4, 17

Transactional Recs. Access Clearinghouse, *Twelve ICE Facilities Hold Over 1,000 Immigrant Detainees Each* (Jan. 5, 2024), https://trac.syr.edu/whatsnew/email.240105.html ................................................4

**INTRODUCTION**

The Constitution mandates that individuals charged with a crime have the right to appear and defend themselves in court proceedings adjudicating that charge. And yet, Defendants—government actors responsible for enforcing federal immigration law—operate an unconstitutional policy and practice that denies people in their custody virtual access to State-court criminal proceedings. All Defendants need to do is provide the same ability to attend court through remote means, as they already do for other forms of legal proceedings. Inexplicably, Defendants refuse to do so.

Right now, Defendants apprehend hundreds of people in New Jersey who are the subject of unresolved criminal charges in New Jersey courts and then transfer them to the Moshannon Valley Processing Center ("Moshannon"), a remote detention facility in Pennsylvania. Defendants are well-aware that these individuals have unresolved criminal charges; indeed, Defendant Immigration and Customs Enforcement ("ICE") commonly apprehends these individuals upon their release by a New Jersey judge or local law enforcement. Defendants then deny these same individuals virtual access to the state criminal court system (the "Refusal Policy and Practice"). Instead of providing access to a tablet or laptop with Zoom or Microsoft Teams, Defendants require that individuals secure a writ from the New Jersey court calling for an in-person appearance and for New Jersey state officials to commit the

resources necessary to transport them to and from Moshannon. In practice, that rarely happens: it is neither feasible nor realistic for local law enforcement to expend resources to travel hours across state lines for each of the hundreds of New Jerseyans impacted by the Refusal Policy and Practice. Denial of virtual court access is a denial of any court access at all. This is especially so when the state court *only* operates virtually, rendering such writs futile, and when a person in detention has not yet been appointed with a public defender and thus has no mechanism to secure a writ.

The Refusal Policy and Practice is a paradigm of arbitrary decision-making. Tellingly, ICE provides virtual access at Moshannon for immigration and certain family court hearings but refuses to do so for criminal proceedings. The resulting harm is palpable and self-evident. People cannot access court. Frequently, bench warrants are issued against them for failure to appear. The Refusal Policy and Practice also often prolongs the individual's time in detention. While immigration courts and Defendant ICE commonly cite the mere pendency of charges to deny an individual's request for release, Defendants deny individuals the virtual court access that could allow them to contest the facts of or otherwise resolve the charge.

Indeed, Plaintiff Josefina's case shows the difference court access can make. She had a criminal court hearing on October 9, 2024, in a court operating primarily virtually, for charges pending since May 4, 2024. Although her prior requests for virtual production were repeatedly denied, after filing this case Defendants

consented to producing her telephonically. After Defendants produced Josefina on October 9, via Zoom, the Court dismissed all of the charges against her.

The Refusal Policy and Practice causes harm daily as Defendants continue to deprive the Putative Class[1] of court access. Because of the significant and irreparable harms caused by Defendants' unconstitutional policy and practice, Plaintiffs respectfully seek a Temporary Restraining Order ("TRO") and/or a Preliminary Injunction ("PI") enjoining Defendants from depriving all Putative Class members of their right to virtual appearance in criminal court proceedings.

## STATEMENT OF FACTS[2]

Defendants' refusal to permit virtual access to criminal court proceedings has the effect of denying state court access to most noncitizen New Jerseyans detained by Defendants at Moshannon. Located in Philipsburg, Pennsylvania, Moshannon is

---

[1] Pending before the Court is the Individual Plaintiffs' motion for class certification. (Dkt. No. 2-1). The "Putative Class" references the class of persons that Plaintiffs seek to certify pursuant to that motion, and includes the Individual Plaintiffs in this matter.

[2] The following facts are based upon the declarations submitted by Plaintiffs Josefina Doe, Isabela Doe, Jose Doe, Commor Welch, and Felipe Ortiz ("the Individual Plaintiffs"); impacted individuals (Marcelino Flores, Victor Alzamora Capunay, Andres Escorcia Tinoco, A. Morales, Isaac Huaman Bautista, and G.); staff members of Plaintiff American Friends Service Committee, Immigrant Rights Program ("AFSC-IRP") (Ilana Herr, Esq., Anna Meixler, and Priscila Abraham, Esq.); Plaintiffs' two expert witnesses (Ian Peacock, a data analysis expert; and Maureen A. Sweeney, Esq., an immigration expert); the Attorney Declaration of Shira Wisotsky, Esq.; and, to a limited extent, matters of public record. Several witnesses in support of this Motion are Putative Class members who remain detained and fear retaliation, and therefore are proceeding under pseudonym.

the largest immigration detention facility in the Northeast and one of just twelve facilities where Defendants detain over 1,000 individuals. Transactional Recs. Access Clearinghouse, *Twelve ICE Facilities Hold Over 1,000 Immigrant Detainees Each* (Jan. 5, 2024), https://trac.syr.edu/whatsnew/email.240105.html. While Defendants maintain oversight and control over Moshannon and set its policies, the facility is owned and operated by a private prison corporation, The GEO Group ("GEO").[3] Defendants detain an average daily census of at least 200 individuals at Moshannon who were apprehended in New Jersey with unresolved criminal matters. (Supplemental Declaration of Ian G. Peacock, Ph.D. ("Peacock Supp. Decl.") ¶ 18 (Oct. 15, 2024)).

---

[3] Moshannon operated as a federal prison from 2006 until 2021. Temple University Beasley School of Law, *In the Shadow of the Valley: The Unnecessary Confinement and Dehumanizing Conditions of People in Immigration Detention at the Moshannon Valley Processing Center* 12 (2024) [hereinafter *In the Shadow of the Valley*], https://law.temple.edu/csj/2024/09/04/moshannan-valley-processing-center. The Department of Homeland Security ("DHS") has broad authority to contract with private parties "as may be necessary and proper to carry out [its] responsibilities," and ICE is tasked with arranging for detention facilities. 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4); 8 U.S.C. § 1231(g)(2). Defendants set the standards and have control and oversight over those facilities. ICE, *Performance-Based National Detention Standards* (2011), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf. That is how, in 2021, ICE entered into an agreement with Clearfield County, which then entered into a contract with GEO, to operate Moshannon as a private detention facility. ICE, *Inter-Governmental Service Agreement between ICE and Clearfield County, PA* (Sept. 28, 2021), https://www.ice.gov/doclib/foia/detFacContracts/|70CDCR21DIG000012_bm0004 _MoshannonValleyPC_PA.pdf; GEO, Current Report (Form 8-K) (Sep. 28, 2021), https://investors.geogroup.com/static-files/9a6360f4-d63d-4aa6-b53e-c21fd35431a6.

I.    **Defendants' Refusal Policy and Practice prohibits people detained at Moshannon from accessing state courts.**

Defendants have refused to provide virtual access to criminal court at Moshannon since at least 2022, when most New Jersey courts transitioned to virtual proceedings during the pandemic. Many of the courts in New Jersey, including most municipal courts, continue to hold proceedings primarily[4] or entirely virtually.[5]

Defendants have repeatedly and consistently acknowledged the existence of the Refusal Policy and Practice—to employees of the New Jersey Judiciary; members of the Putative Class; the Organizational Plaintiff, the Immigration Rights Project of the American Friends Service Committee ("AFSC-IRP"); and legal advocates. Employees of Defendant ICE regularly state that, "Moshannon [] cannot accommodate teleconference, zoom, team meetings, etc. for criminal court matters.

---

[4]    *See, e.g., Municipal Court*, Riverside Township, https://riversidetwp.org/municipal-court/; *Municipal Court*, Borough of South River, https://www.southrivernj.org/227/Municipal-Court; *Municipal Court*, City of Trenton, https://www.trentonnj.org/251/Municipal-Court.

[5] *Municipal Court*, Borough of Allendale, https://www.allendalenj.gov/municipal-court/pages/court-sessions; *Municipal Court*, City of New Brunswick, https://www.cityofnewbrunswick.org/residents/services/municipal_court.php; *Municipal Court*, Ocean City, https://www.ocnj.us/municipal-court; *Municipal Court*, City of Newark, https://www.newarknj.gov/departments/municipalcourt; *Municipal Court*, Town of Hammonton, https://townofhammonton.org/courts/; *Municipal Court Office*, Borough of Longport, https://www.longportnj.gov/court/municipal_court.html; *see also* Glenn A. Grant, Notice to the Bar, New Jersey Courts, Municipal Court - Virtual Format For All Initial Appearances (Mar. 13, 2023), https://www.njcourts.gov/sites/default/files/notices/2023/03/n230315c.pdf?cb=0996287c.

All criminal matters are handled via writs. The requesting jurisdiction is responsible for the pick up and return of the noncitizen." (Declaration of Shira Wisotsky, Esq. ("Wisotsky Decl."), Ex. A (Oct. 15, 2024); *see also id.*, Exs. B–H). Staff at Moshannon use the same language to deny requests, (*see id.*, Exs. I–R), maintaining that it is ICE's policy (*see id.*, Ex. S; *id.*, Ex. T ("[D]etainees that need to appear in court for criminal charges will need to go through ICE."); *id.*, Ex. U ("Case Managers are not authorized to schedule any virtual hearings via phone call or video conferencing.")).

Staff of Defendant ICE and GEO have affirmed and enforced the Refusal Policy and Practice to the people they detain there as well. When Plaintiff Isabela and at least seven other women, all survivors of intimate partner violence, organized to speak together to explain that they require access to criminal court, a Moshannon official responded that such access "was not allowed because Moshannon has nothing to do with criminal court." (Declaration of Isabela Doe ("Isabela Decl.") ¶ 18 (Sept. 4, 2024)). Twice before scheduled court hearings, Plaintiff Isabela also asked a Moshannon official if she could participate in the upcoming hearings, even providing the court-provided Zoom information for upcoming court dates, and "both times, [the official] said that [she] was not authorized to participate in the criminal case in New Jersey, even by telephone." (*Id.* ¶¶ 13, 16). Plaintiffs Commor and Josefina had similar experiences and were told that "New Jersey has to initiate to

come and get [the person detained]," (Declaration of Commor Jerome Welch ("Commor Decl.") ¶¶ 11–12, 14 (Aug. 5, 2024)); Moshannon staff cannot facilitate virtual production, (*see* Declaration of Josefina Doe ("Josefina Decl.") ¶¶ 13, 20, 25 (Aug. 8, 2024)); and "the policy . . . is that [individuals ICE detains at Moshannon] cannot participate in [their] criminal court cases" (*id.* ¶ 20). Employees of Defendant ICE have said the same to Putative Class members. (*See*, *e.g.*, Declaration of Isaac Huaman Bautista ("Isaac Decl.") ¶ 6 & Ex. A (Oct. 15, 2024)).

Defendants apply their Refusal Policy and Practice even when the state court operates virtually. For example, when an advocate explained that "all in-person municipal sessions remain suspended . . . [t]he only way for my client to participate in his criminal proceedings is through video appearance," (Wisotsky Decl., Ex. G), ICE replied that, "the defendant would have to attend court via video from the local jail in Union County." (*Id.*). Rather than allowing the individual to use a computer at Moshannon, ICE insisted that state officials drive to Moshannon; transport the individual to a Union County, New Jersey jail; have the individual virtually appear from the Union County jail; then have state officials return the individual to Moshannon; and then return home.

### A. Defendants have the ability to provide noncitizens in detention virtual access to state court proceedings.

Defendants commonly provide virtual access to other kinds of court proceedings using telephonic and video technology already present in Moshannon.

Nearly all individuals detained at Moshannon are in active removal (deportation) proceedings docketed and heard virtually in the New Jersey Elizabeth Immigration Court.[6] Defendants also allow virtual production at Moshannon for other kinds of state court appearances, including certain family court proceedings. (*See, e.g.*, Wisotsky Decl., Exs. B, K, V).

Additionally, in 2022, Defendants implemented the Virtual Attorney Visitation ("VAV") Program at Moshannon, which "facilitates confidential contact with legal representatives through virtual technology." ICE, *Virtual Attorney Visitation, Moshannon Valley Processing Center* (2022), https://www.ice.gov/doclib/detention/vavMoshannonPC.pdf. To implement the VAV and other programs, Moshannon has 30 VAV booths, 220 telephones, and 225 tablets, which have video visitation capabilities. (Wisotsky Decl., Ex. W).

### B.  The Refusal Policy and Practice is neither feasible nor realistic, thus resulting in the denial of court access.

Local authorities have made clear that it is neither feasible nor realistic for them to expend resources to retrieve and return each noncitizen with an unresolved criminal matter, whom Defendants choose to detain hundreds of miles away from the court in which their case will be heard. New Jersey courts can be between 200

---

[6] Exec. Off. Immigr. Rev., *Immigration Court List—Administrative Control*, U.S. DOJ, https://www.justice.gov/eoir/immigration-court-administrative-control-list#Elizabeth (last visited Oct. 15, 2024).

and 340 miles away from Moshannon. It can take at least ten and up to sixteen hours to make the trip from New Jersey to Moshannon and back.[7]

Unsurprisingly, many state and local entities cannot facilitate transportation to and from Moshannon for in-person court proceedings, particularly for the number of people with unresolved criminal charges in New Jersey. For example, in response to one advocate's request for a writ, the Mercer County Superior Court staff responded that, "[u]nfortunately our sheriffs will not pick up the defendant." (Wisotsky Decl., Ex. X). Similarly, a court administrator for the Hoboken Municipal Court informed Defendant ICE that, "the Hoboken Police Department does not travel out of state to pick up defendants for court." (*Id.*, Ex. A). In another instance, during proceedings in the Superior Court, in response to a request for a writ, the judge made clear that under "[a]bsolutely no circumstances am I going to order Ocean Corrections Officials to go to Pennsylvania and take somebody out of ICE custody," and that "I wouldn't have the jurisdiction to do it in any event." (*Id.*, Ex. Y).

In many circumstances, local entities lack the legal authority to hold individuals not otherwise subject to state custody on behalf of Defendant ICE. For instance, in Class Member Marcelino Flores' case, the Municipal Judge noted in a

---

[7] The Court has the authority to take judicial notice of these facts because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), *i.e.*, Google Maps.

writ for *virtual* production that, "individuals facing criminal and other municipal charges in New Jersey Municipal Courts cannot be transferred into New Jersey State custody, *see* N.J.S.A. 2A:162-19." (*Id.*, Ex. Z).

Given these realities, Defendants' Refusal Policy and Practice relies on the inability of noncitizen New Jerseyans at Moshannon to secure and effectuate writs of in-person production. Defendants are aware of the volume of individuals who require court appearances, as they track that information. (*See, e.g.*, *id.*, Ex. AA (internal document noting pending charges); *see also* Peacock Supp. Decl. ¶ 15 (describing dataset that included the daily count of individuals with unresolved charges detained at Moshannon)). Allowing only in-person production for state court proceedings is only less resource-intensive if Defendants rely on in-person production not occurring. There are exhaustive intake and release procedures every time a person enters and exits Defendants' custody. *See* Performance-Based National Detention Standards ("PBNDS") §§ 1.3, 2.1.

## C. Defendants have not acted to protect court access rights for the people they detain at Moshannon.

The contracts and standards that apply to Moshannon are entirely within Defendants' control. Yet, Defendants have failed to establish a procedure or procure sufficient resources to ensure court access for individuals they *know* will require it. In neither the original contract nor in any of the at least eleven subsequent modifications have Defendants included any provision addressing court access at

Moshannon.[8] Moreover, none of the provisions in ICE's PBNDS mention, let alone guarantee, access to criminal courts. All of this is despite ICE simultaneously expanding the detention capacity at Moshannon. (Declaration of Viktoria Zerda ¶ 7 (Aug. 22, 2024)).

## II. Defendants' Refusal Policy and Practice causes Putative Class members other direct harms in the criminal matters.

### A. Defendants' Refusal Policy and Practice prevents Putative Class members from asserting their rights to access criminal courts.

Defendants' Refusal Policy and Practice prevents Putative Class members from exercising their rights to speak to and petition a criminal court. For example, Plaintiff Josefina, who experienced intimate partner abuse, has Limited English Proficiency ("LEP") and was arrested by police who did not use an interpreter; she has never been afforded an opportunity to speak on her own behalf. As she explains, "first my partner silenced me, and then the police would not hear me. The criminal court is the only place that I can tell my story and stand up for myself." (Josefina Decl. ¶ 40). Additionally, Plaintiff Isabela, along with at least seven other women who also survived domestic violence, organized to speak to Moshannon staff, emphasizing the importance of their ability to speak to the courts adjudicating the charges against them. (Isabela Decl. ¶ 18).

---

[8]    *See* ICE, *Modification of Contract* (Nov. 14, 2023), https://www.ice.gov/doclib/foia/detFacContracts/70CDCR21DIG000012_P00011_ MoshannonValleyPC_PA.pdf.

Moreover, because of Defendants' Policy and Practice, individuals are unable to attend court, even when co-defendants and alleged victims can. For instance, Plaintiff Commor's father, a non-detained co-defendant in the criminal matter brought against them, could attend proceedings. (Commor Decl. ¶ 13). Therefore, that co-defendant could participate in court, confront the evidence against him, and testify, all while the Refusal Policy and Practice prevented Commor from exercising those rights. Similarly, G., an individual arrested during an incident with their abusive partner, could not attend court while their abusive partner could. (Declaration of G. ("G. Decl.") ¶¶ 5, 8 (Sept. 19, 2024)). G.'s requests for virtual production to both ICE and Moshannon staff were denied; they therefore "had to rely on [their] partner, the person who hurt [them] and who had brought the charges against [them], to explain what was happening in the Court." (*Id.* ¶ 11). Because of G.'s absence, they had no information about the testimony the alleged victim offered and did "not know what the Judge said, or any more information about the charges." (*Id.* ¶ 11).

Defendants' Refusal Policy and Practice also pressures Putative Class members into affirmatively waiving their due process rights. As Commor explained,

> I knew that ICE would not allow me to go to Court, and so I had to decide whether my lawyer should make arguments about the case without me. . . . I decided that my lawyer should go ahead and make arguments . . . . It isn't fair though because I wanted to be present with the criminal court, at least on zoom or the telephone . . . so the case against me would not happen without me.

(Commor Decl. ¶ 15). In another instance, Marcelino Flores, via counsel, was able to negotiate for a single court appearance via telephone during five months at Moshannon. (Declaration of Marcelino Flores ("Marcelino Decl.") ¶¶ 15–20 (Sept. 25, 2024); Wisotsky Decl., Exs. BB–CC). Marcelino, who was desperate for release, described the "pressure[]" he felt "to plead guilty" at that appearance because he "knew that ICE would never put [him] on the phone for court again." (Marcelino Decl. ¶ 22). He "wanted to have a trial" and "tell [his] side of the story. . . But [he] never had the opportunity[.]" (*Id.*)

### B. Plaintiffs and Putative Class members cannot secure public defense counsel.

Most members of the Putative Class are indigent, and thus eligible for a public defender in criminal proceedings. Many of them cannot access public defense counsel because they are unable to attend the appearance in which counsel is appointed. For example, Plaintiff Felipe Martinez Ortiz could not make an initial request for the appointment of public defense counsel when charges against him were first pending in Superior Court. (Declaration of Felipe Martinez Ortiz ("Felipe Decl.") ¶ 13 (Sept. 3, 2024)). When Felipe was finally appointed counsel, the pending charges filed against him were significantly downgraded and remanded to municipal court just *three days* later. (*Id.* ¶ 14). Felipe was only able to obtain counsel because of the intervention of undersigned counsel LSNJ, a benefit not available to most of the Putative Class. (*Id.*). Following the downgrade, Felipe was

again without public defense counsel in the new proceedings. (*Id.* ¶ 15). Josefina Doe experienced the same. (Josefina Decl. ¶ 31; Wisotsky Decl., Ex. DD). As Victor Alzamora-Capunay, who was without a public defender for two months because he could not access the court, explains, "[y]ou should not need a lawyer in order to get a public defender appointed to help you in a criminal case." (Declaration of Victor Alzamora-Capunay ("Victor Decl.")  ¶¶ 9, 28–29 (Sept. 3, 2024)).

### C.    Impacted individuals are frequently subjected to bench warrants due to their inability to appear at court-ordered proceedings.

Courts routinely issue bench warrants against Putative Class members who cannot attend scheduled court dates in criminal proceedings because of the Refusal Policy and Practice. In fact, Individual Plaintiffs and multiple witnesses have either had bench warrants issued against them while they were detained at Moshannon, or expressed fear of one. (Isabela Decl. ¶ 16; Declaration of Jose Doe ("Jose Decl.") ¶¶ 6, 8 (Sept. 9, 2024); Victor Decl. ¶¶ 13, 17–18; Isaac Decl. ¶¶ 8–9, 11; *see also* Wisotsky Decl., Ex. EE (prosecution noting in response to motion to reconsider a bench warrant that "the defendant is being held in Pennsylvania by [ICE] and will not be brought to court appearances on this matter" and "[t]his court [thus] issued a bench warrant as a detainer.")).

When bench warrants are issued, the criminal case is sometimes removed from the Court's docket altogether or otherwise paused. (*See, e.g.*, Wisotsky Decl., Ex. FF (judiciary staff advising immigration counsel that a criminal case had been

made inactive because the individual was detained at Moshannon); *id.*, Ex. GG (municipal court unable to schedule an appearance because unresolved charges were in "Warrant Status," explaining the individual could re-petition to have the warrant lifted once ICE releases them)). A bench warrant also risks a delay in a person's release date or means they will not be released by Defendant ICE but transferred directly to state custody. As Putative Class member Isaac Huanan Bautista testifies, a bench warrant was issued against him after Moshannon and ICE staff repeatedly denied his requests for virtual production for a virtual court date. He successfully secured immigration relief and is set to soon be released by ICE. However, he is terrified that "[he] will be released from Moshannon just to be arrested again." (Isaac Decl. ¶¶ 11–12).

## III.    Defendants' Refusal Policy and Practice causes additional harms.

### A.    The Refusal Policy and Practice enacts significant, and sometimes insurmountable, barriers to an individuals' ability to be released.

Unresolved criminal matters significantly decrease the likelihood that an immigration judge or reviewing ICE employee will grant a release application. (Declaration of Maureen A. Sweeney, Esq. ("Sweeney Decl.") ¶¶ 17, 23–25 (Oct. 3, 2024)). Without the ability to resolve unresolved criminal matters, impacted individuals often postpone seeking bond or release until they have a chance that their request will be granted, (Josefina Decl. ¶ 32; Felipe Decl. ¶¶ 16, 19; Jose Decl. ¶¶ 9, 11; Declaration of Ilana Herr ("Herr Decl.") ¶¶ 12, 14, 21 (Oct. 10, 2024)), or

abandon pursuing bond altogether, (Isaac Decl. ¶ 14). For example, when Isabela asked the immigration judge for bond, she was to "wait to resolve the cases on the outside before asking again." (Isabela Decl. ¶ 22). Commor applied for and was denied bond, at least in part, because of the unresolved criminal matter against him. (Commor Decl. ¶ 19). Putative Class member Andres spent at least five months longer in detention than he would have absent the Refusal Policy and Practice, as his first bond application was denied because of unresolved charges, and it took five months and a waiver of his rights in criminal court to resolve them. (Declaration of Andres Felipe Escorcia Tinoco ("Andres Decl.") ¶ 19 (Sept. 27, 2024)); *cf.* Wisotsky Decl., Exs. HH, II).

### B.    Prolonged detention is harmful.

An inability to apply for or receive release leads to prolonged detention and the harms that it inflicts. Families are separated for months or years. Commor has never met his eleven-month-old baby. (Commor Decl. ¶ 3). Isabela's youngest child is living with her ex-partner and she is "terrified" because "[h]e is abusive and addicted to drugs." (Isabela Decl. ¶ 20; *see also* Jose Decl. ¶ 12; Marcelino Decl. ¶ 19; Felipe Decl. ¶¶ 18–19; Andres Decl. ¶ 21). This separation, and the inability to support their families, causes individuals psychological and emotional harms. (Josefina Decl. ¶ 32; Marcelino Decl. ¶¶ 4, 24, 26–27; Victor Decl. ¶ 33).

Moreover, individuals do not have access to adequate medical or mental health care at Moshannon.[9] For instance, there is no on-site gynecological care at Moshannon, and Josefina had to wait weeks before Defendants took her offsite for medical care. (Josefina Decl. ¶ 38). Class member G., who has diabetes, did not receive adequate care for over six weeks. (G. Decl. ¶ 16).

People detained at Moshannon are frequently subjected to violence. G., for instance, was physically assaulted by another individual in detention who previously used homophobic slurs against them. (G. Decl. ¶ 16). Likewise, Jose explained that part of the reason he so desperately seeks release is because, "[he is] trapped and there is violence here, just a few weeks ago there was a stabbing in the yard and at least three people were hurt." (Jose Decl. ¶ 12).

Finally, individuals at Moshannon suffer harmful conditions of confinement. Due to severe plumbing issues in the women's dorm, women were forced to live with excrement overflowing into living areas. (Josefina Decl. ¶ 27). Moshannon does not provide access to adequate language services, such that LEP individuals are unable to communicate with Moshannon staff about their medical, legal, and other

---

[9] Just this year, there have been multiple reports and complaints detailing inadequate access to medical and mental healthcare and language services at Moshannon. *See e.g.*, *In the Shadow of the Valley*, *supra* note 3, at 36–38; DHS, *Retention Memorandum/Implementation Review Memorandum: Moshannon Valley Processing Center* (Aug. 16, 2024), https://www.dhs.gov/sites/default/files/2024-09/24_0816_crcl-retention-memo-ice-moshannon-onsite-redacted_508.pdf.

needs. (Isabela Decl. ¶ 23; Felipe Decl. ¶ 9; Josefina Decl. ¶ 19). Putative Class members are forced to endure such conditions for longer than they otherwise would if they could resolve unresolved criminal matters.

## <u>LEGAL STANDARD</u>

A party seeking either a TRO or a PI must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *see also Nutrasweet Co. v. Vit-Mar Enters., Inc.*, 112 F.3d 689, 693 (3d Cir. 1997) (explaining the standard for a TRO, which is "treated as a preliminary injunction"); Fed. R. Civ. P. 65(a).

To show that Plaintiffs are likely to succeed on the merits of their claims, they "need not show that [they are] 'more likely than not' to succeed" but "only [] that there is a "'reasonable chance, or probability, of winning.'" *Marine Elec. Sys., Inc. v. MES Fin., LLC*, 644 F. Supp. 3d 84, 91 (D.N.J. 2023) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017) *as amended* (June 26, 2017)). Plaintiffs also must show "some harm that cannot be remedied in either law or equity following resolution on the merits," *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 150 (3d Cir. 2023), *amended on denial of reh'g*, 110 F.4th 612 (3d Cir. 2024), and a harm that cannot be rectified only by money

damages, *Marine Elec. Sys., Inc.*, 644 F. Supp. at 95 (citing *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009)).

The first two prongs are threshold matters. *Reilly*, 858 F.3d at 178. If those prongs are satisfied, the Court then decides "if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Chamber of Com. v. Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Reilly*, 858 F.3d at 179). The balance of equities analysis weighs the potential harms each party is likely to suffer, as "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Reilly*, 858 F.3d 173. In fact, when the moving party can show that the first two prongs are met, "it almost always will be the case that the public interest will favor" the issuance of an injunction. *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 532–33 (D.N.J. 1999) (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

## **ARGUMENT**

### I.    **The relief sought is feasible and will safeguard constitutional rights.**

The relief Plaintiffs seek on behalf of the Putative Class is simple. Defendants must allow the people they detain at Moshannon with pending charges in New Jersey virtual access to criminal proceedings, like they already do for other proceedings, and provide notice to the Putative Class of the same.

"District Courts are afforded considerable discretion in framing injunctions." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 206 (3d Cir. 2014) (quoting *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 169 (3d Cir. 2011)). An injunction is appropriate if it is "no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 598 (3d Cir. 2002) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). The relief sought is feasible and minimally burdensome to Defendants. Defendant ICE has already shown that they can provide virtual access to court proceedings at Moshannon as they already virtually produce people to immigration court and certain family court proceedings. They also accomplish the same at other facilities. Additionally, much of the legal and business world operates today via remote means, with Zoom and MS Teams now commonplace. Plaintiffs' request simply requires Defendants to take the necessary measures to extend their proven capabilities to respect individuals' constitutional rights to access criminal courts.

Courts regularly impose injunctive relief on defendants to protect individuals' statutory rights—surely, the constitutional rights at stake warrant any minimal burden on Defendants in the instant case. *See, e.g.*, *Boynes v. Limetree Bay Ventures LLC*, 10 F.4th 604, 609–11 (3d Cir. 2024) (affirming preliminary injunction requiring defendants to distribute bottled water in polluted areas); *Issa v. Sch. Dist.*

*of Lancaster*, 847 F.3d 121, 129, 143–44 (3d Cir. 2017) (affirming preliminary injunction requiring defendants to permit English language learners to transfer to a particular school that provides the programs). To the extent Defendants would need to expend resources, this is a small price to pay to protect Plaintiffs' constitutional rights. *See Bounds v. Smith*, 430 U.S. 817, 825 (1977), *overruled on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996).

## II.    This Court should grant Plaintiffs relief as they meet the standard needed for a preliminary injunction.

### A.    Plaintiffs are likely to succeed on the merits.

Defendants' Refusal Policy and Practice violates Defendants' constitutional obligations to allow individuals to participate in ongoing criminal proceedings and provisions of the Administrative Procedure Act ("APA") that protect from unconstitutional, unlawful, and arbitrary and capricious agency action.

### 1.    Defendants' Refusal Policy and Practice violates Plaintiffs' right to access to criminal courts under the First and Fifth Amendments.

"It is . . . established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds*, 430 U.S. at 821–22. This foundational right derives from the rights to petition and to due process. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (First Amendment); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (due process). Access to the courts safeguards the right of all individuals in custody, including noncitizens, *Foreman v. Lowe*, 261 F. App'x 401, 404 (3d Cir.

2008) (summary order), to meaningfully participate in proceedings on pending criminal charges, *Duran v. Merline*, 923 F. Supp. 2d 702, 722 (D.N.J. 2013).  These foundational rights are violated where (1) "the proceeding involves access to the courts," and (2) "some actual injury" occurred. *Hudson v. Robinson*, 678 F.2d 462, 466 (3d Cir. 1982). Putative Class members, who are effectively barred from participating in criminal proceedings, amply demonstrate both prongs.

The Refusal Policy and Practice violates the right of meaningful court access that is a fundamental part of the First and Fifth Amendments. *Bounds*, 430 U.S. at 823 ("'[M]eaningful access' to the courts is the touchstone" (alteration in original) (citation omitted)). The Supreme Court has held, for example, that the right requires sufficient access to a law library, *Bounds*, 430 U.S. at 828, and the assistance of attorneys, *Procunier*, 416 U.S. at 419. Defendants' Refusal Policy and Practice implicates an even more basic access impediment: the ability to appear in court in the first instance. The Seventh Circuit confronted a similar impediment in *May*, where a detained individual alleged that, as here, defendants refused to take him to assigned court dates physically *or virtually*. *May v. Sheahan*, 226 F.3d 876, 878 (7th Cir. 2000). The Circuit held that "[a] policy both preventing detainees from going to court and limiting drastically their access to attorneys has obvious problems under [the Supreme Court's] precedents," citing *Bounds* and *Procunier*, among others. *Id.* at 883.

Putative Class members have suffered and continue to suffer constitutional injury because the Refusal Policy and Practice prevents them from speaking out in their own defense, has forced them to withdraw claims, and causes them to suffer protracted detention. Simply put, they have been "hindered [in their] efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. Injury occurs where individuals are deterred from going to court to bring suit. *See Doe v. U.S. ICE*, 490 F. Supp. 3d 672, 694 (S.D.N.Y. 2020). In *Doe*, plaintiffs alleged that ICE arrested individuals in and around courthouses creating an "atmosphere of fear" that deterred individuals from bringing meritorious suits. *Id.* The court held that such deterrence was the "functional equivalent of denial of access." *Id.* (quoting *Monsky v. Moraghan*, 127 F.3d 242, 247 (2d Cir. 1997)). In sharp contrast to *Doe*, the instant case is not just a "functional equivalent" but an *affirmative* denial of court access. For example, survivors of intimate partner abuse, whose charges stem from defending themselves, cannot tell their side of the story, seek dismissal of the charges on that basis (Josefina Decl. ¶¶ 21, 25–26, 40), or appear in court to confront and cross-examine their abusers (*id.* ¶¶ 11, 16; Isabela Decl. ¶¶ 11, 18).

Additionally, withdrawal of meritorious claims constitutes injury. *Brown v. Stone*, 66 F. Supp. 2d 412, 435 (E.D.N.Y. 1999). Class members are thus injured when they feel "pressured to plead guilty to resolve the case" because they do not

know when or if they will be able to attend court again, even though they want a trial to "tell [their] side of the story and defend [themselves]." (Marcelino Decl. ¶ 22).

Finally, class members are injured when they suffer prolonged detention as a result of the Refusal Policy and Practice. *Compare May*, 226 F.3d at 883 (finding actual injury where plaintiff alleged that "he has been detained longer than would otherwise be necessary if he could go to court"), *with* (Jose Decl. ¶ 11; Commor Decl. ¶¶ 19–21). Because class members are foreclosed from accessing courts to resolve charges, those pending charges preclude them from obtaining release from detention on bond (Sweeney Decl. ¶¶ 13–16, 21–24). As a result, Putative Class members suffer prolonged detention in subpar conditions at Moshannon. Plaintiffs are therefore likely to succeed on their First and Fifth Amendment claims.

### 2. Defendants' Refusal Policy and Practice violates the rights of the Putative Class under the Sixth Amendment.

The Sixth Amendment safeguards individuals' rights in criminal proceedings through the right to counsel, *Rothgery v. Gillespie County*, 554 U.S. 191, 198, 211–12 (2008), the right to confront witnesses, *Coy v. Iowa*, 487 U.S. 1012, 1016–17 (1988), the right to be present, *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), the right to compel, *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (quoting *Washington v. Texas*, 388 U.S. 14, 17–19 (1967)), the right to testify, *United States v. Leggett*, 162 F.3d 237, 245 (3d Cir. 1998) (quoting *Rock*, 483 U.S. at 52), and the right to a speedy trial, *Barker v. Wingo*, 407 U.S. 514, 515 (1972).

Defendants' Refusal Policy and Practice violates each of these foundational Sixth Amendment rights. Plaintiffs cannot obtain appointed counsel because they cannot appear in court. (*See* Marcelino Decl. ¶¶ 6–7; Isabela Decl. ¶ 19; Felipe Decl.¶¶ 14–15; Commor Decl. ¶ 17; Josefina Decl. ¶ 31). Nor can Plaintiffs testify or present evidence on their own behalf, or confront witnesses against them. (*See, e.g.*, G. Decl. ¶¶ 8, 10–11 ("Because ICE did not let me go[] to the hearings, I had to rely on . . . the person who hurt me and who had brought the charges against me, to explain what was happening in court."); Jose Decl. ¶ 11 ("Without court production, I will never be able to defend myself[.]"); Commor Decl. ¶ 23 (same); Josefina Decl. ¶¶ 40–41 (same)). As a result, Plaintiffs suffer lengthy delays in resolving criminal proceedings. (*See, e.g.*, Jose Decl. ¶ 6 (describing one-and-a-half-year delay)).

The Refusal Policy and Practice serves no legitimate purpose, particularly when weighed against Sixth Amendment rights. *See Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 445–47 (3d Cir. 1992) (concluding violation of compulsory process right where individual was denied opportunity to present exculpatory evidence that would have cast doubt on other testimony). For that reason and all the reasons herein, Plaintiffs are therefore likely to succeed on their Sixth Amendment claims.

### 3. Defendants' Refusal Policy and Practice enacts barriers to AFSC-IRP's ability to fully represent its clients.

Defendants' Refusal Policy and Practice harms AFSC-IRP and its clients by hampering their ability to advocate fully and fairly for remedies in immigration proceedings. By refusing to produce AFSC-IRP's clients virtually, and thus preventing them from resolving charges, Defendants' Refusal Policy and Practice, *inter alia*, violates AFSC-IRP's clients' well-established rights to due process in civil immigration proceedings. *See Muhanna v. Gonzales*, 399 F.3d 582, 587 (3d Cir. 2005) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)).

Due process entitles noncitizens in immigration proceedings to a "full and fair hearing," meaning "factfinding based on a record produced before the decisionmaker," the opportunity to make arguments and present evidence on their own behalf, and "an individualized determination" of their interests. *Id.* (citation omitted). A noncitizen is deprived of a full and fair hearing where they were "prevented from reasonably presenting [their] case," and "substantial prejudice resulted," meaning that the "infraction has the *potential* for affecting the outcome of the deportation proceedings." *Serrano-Alberto v. Att'y Gen. U.S.*, 859 F.3d 208, 213 (3d Cir. 2017) (citations omitted). When Defendants interfere with attorneys' ability to create a record and to present a full argument, Defendants violate AFSC-IRP clients' rights to a full and fair hearing. *Cf. Muhanna*, 399 F.3d at 588 (preventing an individual from fully testifying is a due process violation); *Cham v. Att'y Gen. of*

-26-

*U.S.*, 445 F.3d 683, 691–93 (3d Cir. 2006) (denying the opportunity to present critical witness testimony is a due process violation); *Ladha v. INS*, 215 F.3d 889, 905 (9th Cir. 2000) (excluding documentary evidence is a due process violation). Due process, in other words, is abridged where individuals are precluded from fully establishing a record. By impeding AFSC-IRP's clients' ability to contest or resolve unresolved criminal charges, Defendants impair its ability to develop complete and accurate evidence to ensure full and fair immigration hearings. (Declaration of Anna Meixler, Esq. ("Meixler Decl.") ¶¶ 6, 22 (Oct. 9, 2024); Declaration of Priscila D. Abraham, Esq. ("Abraham Decl.") ¶ 24 (Oct. 7, 2024)).

This deficiency prejudices AFSC IRP's clients, as unresolved criminal charges weigh heavily in bond determinations and removal proceedings. *See Lyon v. ICE*, 171 F. Supp. 3d 961, 982–83 (N.D. Cal. 2016) (holding that ICE policy restricting noncitizens' access to phones to contact attorneys or the criminal courts could "affect the outcome of [the noncitizens'] removal proceedings"). Immigration judges consider unresolved criminal matters in evaluating an individual's applications for relief from removal, which impacts AFSC IRP's clients' ability to remain in the United States and receive lawful immigration status in the future. *See Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006); (*See* Sweeney Decl. ¶¶ 17–19, 26–27; Herr Decl. ¶ 11; Meixler Decl. ¶ 12; Abraham Decl. ¶¶ 19–20). Immigration judges and agency personnel also consider unresolved criminal charges

-27-

when determining whether to grant an AFSC-IRP client's release on bond, thereby subjecting their clients to prolonged detention in subpar conditions. (*See* Sweeney Decl. ¶¶ 13–16, 20–25; Meixler Decl. ¶¶ 5–6; Abraham Decl. ¶ 5).

### 4.    The Refusal Policy and Practice violates the APA.

Defendants' Refusal Policy and Practice also violates the APA. Courts can review agency actions that are final, that adversely affect the parties seeking review, and that are non-discretionary. *Pinho v. Gonzales*, 432 F.3d 193, 200 (3d Cir. 2005); *see also* 5 U.S.C. § 704. The Refusal Policy and Practice meets all these requirements and, for the reasons discussed above, violates Plaintiffs' constitutional rights.  It is also arbitrary, capricious, and unlawful. Therefore, the Court should find that Plaintiffs are likely to prevail on the merits of their claims that the Refusal Policy and Practice violates the APA.

### i.    The Refusal Policy and Practice is "final" agency action.

A final agency action for APA purposes must "mark the consummation of the agency's decision[-]making process" and "be [an action] by which rights or obligations have been determined or from which legal consequences will flow." *Ocean Cnty. Landfill Corp. v. U.S. E.P.A., Region II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). In determining whether an agency action is final, courts consider

> 1) whether the decision represents the agency's definitive position on the question; 2) whether the decision has the status of law with the expectation of immediate compliance; 3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision involves a pure question of law that does not require further factual development; and 5) whether immediate judicial review would speed enforcement of the relevant act.

*CEC Energy Co. v. Pub. Serv. Comm'n of V.I.*, 891 F.2d 1107, 1110 (3d Cir. 1989) (citing *Solar Turbines Inc. v. Seif*, 879 F.2d 1073, 1080 (3d Cir. 1989)). Defendants' Refusal Policy and Practice meets these requirements. As previously outlined, Defendants have consistently communicated the Refusal Policy and Practice to Plaintiffs and others over the course of over two years, without any indication that it is subject to reconsideration. *Supra* notes 6–8. For Plaintiffs, therefore, the Refusal Policy and Practice has the status of law and is immediately affecting their rights. There is no mechanism by which they may appeal or challenge the policy. *See Pinho*, 432 F.3d at 202. Nor do individual ICE officers or GEO employees have discretion to depart from the stated policy. *Compare* (Wisotsky Decl., Ex. H), *with RCM Tech., Inc. v. D.H.S.*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009). Given the immediate and ongoing impact of the Refusal Policy and Practice on Plaintiffs' constitutional rights and the lack of alternative mechanisms to challenge the policy, it is a "final agency action" that is reviewable under the APA.

Further, the Refusal Policy and Practice is not an exercise of discretionary authority delegated by Congress, and adversely impacts Plaintiffs' rights in both

criminal and immigration court proceedings. (Sweeney Decl. ¶¶ 20–27); *see D.H.S. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020) (noting that the exception to the presumption of judicial review is narrow and limited to "agency action committed to agency discretion by law" (quoting 5 U.S.C. § 701(a)(2)); *Pinho*, 432 F.3d at 200.

### ii. Defendants' Refusal Policy and Practice violates the APA because it is unconstitutional.

The APA requires a reviewing court to "hold unlawful and set aside" agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). For the reasons discussed above, the Refusal Policy and Practice violates the Constitution and will likely be set aside.

### iii. The Refusal Policy and Practice is arbitrary, capricious, and an abuse of discretion.

The Refusal Policy and Practice violates the APA's prohibition against agency action that is arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(A). Defendants violate the APA when they (1) categorically refuse virtual access to criminal courts for individuals detained at Moshannon but allow virtual access to other proceedings and permit individuals they detain elsewhere to virtually participate in criminal court proceedings, (*see* Herr Decl. ¶¶ 28–29); (2) enter into and modify contracts to administer Moshannon while failing to require or account for the need for people in detention to access State-court criminal proceedings when

they are aware of how many individuals have pending criminal charges; and (3) exacerbate the racial harms already inherent to the criminal legal system, (*see* Peacock Supp. Decl. ¶¶ 22–27).

In determining whether an agency action is arbitrary and capricious, a court scrutinizes whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Judicial review is limited to the grounds that the agency invoked when it took the action, not post hoc justifications offered during litigation. *Regents of the Univ. of Cal.*, 591 U.S. at 20–22.

The Refusal Policy and Practice does not pass muster under these standards because there is no satisfactory explanation for it. *See Logic Tech. Dev. LLC*, 84 F.4th at 549. While the Court may uphold the decision if it can reasonably discern the agency's reasoning from the record, *see Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 730 F.3d 291, 305–06 (3d Cir. 2013), that does

not exist here. Defendants' only explanation is that GEO "simply no longer has the staff or personnel resources to accomplish this." (Wisotsky Decl., Ex. G). This conclusory citation of "resources" does not provide the "minimal level of analysis" necessary to survive arbitrary and capricious review. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Defendants' explanation does not provide sufficient information for the Court to review the relevant facts underlying the decision. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Defendants have not explained why the facility cannot accommodate those hearings with its existing technology used for immigration and family-court proceedings. Nor have they detailed what additional staffing would be necessary and why it cannot allocate funds for such staffing, if necessary. Therefore, the explanation cannot and does not show a rational connection between the facts found and the choice made. *See Logic Tech. Dev. LLC*, 84 F.4th at 549 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). Second, this explanation makes clear that the agency "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Evidently, Defendants considered neither the impact of the Refusal Policy and Practice on the noncitizens in its custody or on the New Jersey judicial system.

These failures are especially egregious given that Defendants knew that they were detaining significant numbers of New Jerseyans with unresolved criminal cases

and had provided virtual access to criminal court hearings in the past, both at Moshannon and at other facilities. (*See* Peacock Supp. Decl. ¶ 20; Meixler Decl. ¶ 20; Herr Decl. ¶¶ 28–29; Abraham Decl. ¶ 8). Nonetheless, Defendants entered into a contract with GEO without, apparently, planning for this needed capacity. Moreover, Defendants failed to consider and account for the already-existing disproportionalities experienced by people of color in the criminal legal system, and the impact that the Refusal Policy and Practice would have when those same impacted individuals are denied access to contest the charges brought against them in that system. (*See* Peacock Supp. Decl. ¶¶ 23–27).

The APA also requires Defendants to at least weigh the reliance interests of noncitizens in custody, legal service providers like AFSC-IRP, and the state court system against competing policy concerns. *Regents of the Univ. of Cal.*, 591 U.S. at 33. They failed to do, rendering the policy arbitrary and capricious. *Id.* at 30.

Moreover, the limited explanation Defendants provided for the Refusal Policy and Practice is "implausible" and runs counter to the evidence. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Defendants assert that they only have the resources to produce individuals for New Jersey officials to transport them from Moshannon to court, and then receive them back at Moshannon following the court appearance. (*See supra* notes 8–10). That, however, requires more resources than simply making a tablet or laptop available at Moshannon, including processing detainees for release and intake

-33-

each time. *See* PBNDS §§ 1.3, 2.1 (transportation protocols). Additionally, Moshannon has the ability to facilitate virtual court appearances, as other immigration detention facilities do. (Herr Decl. ¶¶ 28–29). Indeed, as detailed above, Moshannon produces people for virtual immigration hearings, family court hearings, and attorney-client meetings. Therefore, there is no rational connection between the facts before the agency and its stated reasons for the Refusal Policy and Practice. *See Logic Tech. Dev. LLC*, 84 F.4th at 549.

Finally, ICE's stated rationale has shifted. As Dr. Glykeria Teji, managing attorney at the DDDI program at Seton Hall Law School testifies, Philadelphia Deputy Field Office Director O'Neill explained that ICE will not produce individuals virtually for court because Moshannon "was 'not intended to function as an extension of the Department of Corrections.' Therefore . . . MVPC computers and phone lines would be available to accommodate immigration court appearances and not criminal court hearings." (Declaration of Glykeria Teji, Esq. ¶ 14). It was only later that Defendants cited resource constraints. Any "change in reasoning raises legitimate questions for the Court . . . and supports the inference that both the process of reaching the determination and its substance were arbitrary and capricious." *Brainbuilders, LLC v. Ocean Healthcare Mgmt. Grp. Benefit Plan*, No. 32-CV-2495 (GCT) (JB), 2023 WL 3167632, at *8 (D.N.J. Apr. 28, 2023).

**B.    Plaintiffs and the Putative Class will suffer irreparable harm absent this Court's intervention.**

Irreparable harm is satisfied where plaintiffs demonstrate that they are "likely" to suffer harm that "cannot be redressed by a legal or an equitable remedy" absent an injunction from the Court. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 262–63 (3d Cir. 2020); *see Boynes*, 110 F.4th at 610 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)) (affirming that courts may grant relief for many plaintiffs based on the testimony of a few so long as evidence adequately demonstrates that plaintiffs are similarly situated).

First, Defendants' Refusal Policy and Practice obstructs the Putative Class from access to criminal court—a "loss of First Amendment freedoms" and other constitutional rights that "unquestionably constitutes irreparable injury" to the Putative Class. *Kim v. Hanlon*, 99 F.4th 140, 159 (3d Cir. 2024) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see Ass'n for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353, 363 (D.N.J. 2000) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm." (quoting *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997)); *see supra* Facts II.A; Argument II.A.1. The harms from such obstruction are real and immediate. *See Valentine v. Beyer*, 850 F.2d 951, 957 (3d Cir. 1988) (finding irreparable harm where inmates were provided insufficient access to the courts, including the ability to meet filing deadlines). Courts issue bench warrants against Putative Class members or stay their

cases because the Putative Class members cannot attend their criminal court hearings. *See supra* Facts II.C. In many cases, Putative Class members cannot obtain a public defender, leaving them without counsel, and particularly to help them secure a writ for production. (*See, e.g.*, Commor Decl. ¶ 17; Josefina Decl. ¶ 31). At core, with or without counsel, Putative Class members are irreparably deprived of their day in criminal court. (*See, e.g.*, Commor Decl. ¶ 15; Josefina Decl. ¶¶ 21–22).

Putative Class members have and will also suffer prolonged immigration detention as a result of the Refusal Policy and Practice. *Cf. Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (finding irreparable harm where plaintiffs were detained pursuant to policies that were likely unconstitutional). While noncitizens may seek release from discretionary immigration detention on bond if they can demonstrate to an immigration judge that they are neither a flight risk nor a danger to the community, *see* 8 U.S.C. § 1226(a); 8 C.F.R. § 1003.19, the Refusal Policy and Practice prevents them from being able to do just that. *See supra* Facts III. Unable to resolve unresolved charges, Putative Class members have suffered and will continue to suffer prolonged detention at Moshannon in substandard conditions that deprive them of liberty, access to adequate medical and mental health care, and human dignity. *Id.*

Finally, clients of AFSC-IRP will suffer harm in their immigration proceedings, including "the ultimate irreparable harm"—deportation. *De Jesus*

*Martinez v. Nielsen*, 341 F. Supp. 3d 400, 409 (D.N.J. 2018); *see also Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe penalty." (internal quotation marks omitted)). This harm is not speculative: immigration judges regularly deny discretionary forms of immigration relief based on unresolved criminal charges, even where the individual is otherwise statutorily eligible for relief. (*See, e.g.*, Isaac Decl. ¶ 13; Sweeney Decl. ¶ 26); *Rosa v. Garland*, 114 F.4th 1, 17–22 (1st Cir. 2024) (vacating discretionary denial of adjustment of status where based on pending criminal charge). Such denials include forms of relief that Putative Class members seek, such as asylum, 8 U.S.C. § 1158; cancellation of removal for individuals who have lived in the United States for many years, *id.* §§ 1229b(a), 1229b(b); and adjustment of status for individuals otherwise eligible to become legal permanent residents, *id.* § 1255(a); (*see* Sweeney Decl. ¶¶ 26–27). These harms are all the more severe because Putative Class members are likely deported to countries where they fear persecution and torture or where they would be separated from their families. (*See* Sweeney Decl. ¶ 17; Josefina Decl. ¶ 5; Commor Decl. ¶ 4). Absent injunctive relief, Putative Class members will continue to face irreparable harms.

## C. The proposed injunction is in the public interest and would not harm Defendants.

Where, as here, Plaintiffs have shown both likelihood of success and irreparable injury, "it almost always will be the case that the public interest will favor

the plaintiff." *Am. Tel. & Tel. Co.*, 42 F.3d at 1427 n.8.  A preliminary injunction serves the public interest given the constitutional rights at stake. *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 233 F. Supp. 2d 647, 666–68 (D.N.J. 2002) (citing *A.C.L.U. v. Reno*, 217 F.3d 162, 180–81 (3d Cir. 2000)), *aff'd on appeal*, 386 F.3d 514 (3d Cir. 2004); *see Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d, 614–15 (D.N.J. 2010) ("[T]he public's interest is not served by enforcing unconstitutional laws." (citing *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)), *aff'd sub nom.*, *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012).

Furthermore, an injunction requiring Defendants to produce Putative Class members for virtual state court hearings would result in more "swiftly and fairly administered" justice. *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979) (citing *Barker*, 407 U.S. at 519)). This benefits alleged victims as well as the accused. *See State v. A.M.*, 286 A.3d 660, 672 (N.J. 2023) (quoting *State v. Tedesco*, 69 A.3d 103, 113 (N.J. 2013)) (noting that "changes in the law [have] steadily strengthened the rights of victims to participate in criminal proceedings" (alterations in original)). Defendants, by contrast, will suffer limited or no impacts from an injunction. And, any asserted lack of resources is no excuse to deprive Putative Class members of their constitutional rights:

> It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial

> services to authenticate them, and with stamps to mail them. States
> must forgo collection of docket fees otherwise payable to the treasury
> and expend funds for transcripts. State expenditures are necessary to
> pay lawyers for indigent defendants at trial, and in appeals as of right.
> This is not to say that economic factors may not be considered, for
> example, in choosing the methods used to provide meaningful access.
> But the cost of protecting a constitutional right cannot justify its total
> denial.

*Bounds*, 430 U.S. at 824-25 (internal citations omitted) (citing, *inter alia*,

*Argersinger v. Hamlin*, 407 U.S. 25 (1972); *Gideon v. Wainwright*, 372 U.S. 335,

(1963); *Estelle v. Gamble*, 429 U.S. 97 (1976)); *see also Tennessee v. Lane*, 541 U.S.

509, 531–32 (2004) (describing affirmative obligations that flow from right to court

access).

**III.    Should the Court wish to do so, it may consolidate an evidentiary
hearing on the PI with an evidentiary hearing on the permanent
injunction.**

Rule 65(a)(2) invests the Court with discretion to convert the preliminary

injunction hearing to a trial on the merits and, given that this dispute principally

involves an issue of law, Plaintiffs respectfully suggest that the Court may do so

here. Indeed, "[t]he standard for a preliminary injunction is essentially the same as

for a permanent injunction with the exception that the plaintiff must show a

likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v.

Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *accord Transcon. Gas Pipe Line

Co.*, 108 F.4th at 150 (same).

Should the Court issue a TRO at the outset, there is no reason to try this case twice, and given the simplicity of the legal issue at stake here the Court should resolve this controversy by issuance of a final injunction. *See Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 206 (3d Cir. 2024) (discussing ways to "vindicate constitutional rights promptly," including by "mov[ing] up the trial to consolidate it with the preliminary-injunction hearing").

## CONCLUSION

Plaintiffs are seeking a simple and constitutionally-required remedy—that Defendants guarantee that each Putative Class member detained at Moshannon, whom Defendants already produce virtually in immigration and certain family court proceedings, also has access to state court criminal proceedings. For the reasons stated herein, and consistent with the Proposed Order to Show Cause, Plaintiffs respectfully request that the Court issue a Temporary Restraining Order and/or Preliminary Injunction to protect the constitutional rights of the Individual Plaintiffs, Putative Class, and Organizational Plaintiff while this matter remains pending.

Respectfully submitted,

Dated:  October 16, 2024

/s/ Gavin J. Rooney
Gavin J. Rooney, Esq.
Alexander Shalom, Esq.
Natalie J. Kraner, Esq.
Naomi D. Barrowclough, Esq.
Anish Patel, Esq.
Ruth Zimmerman, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973-597-2500

Shira Wisotsky, Esq.
Raquiba Huq, Esq.
Zoe Burke, Esq.
Emily Thorton, Esq.*
**LEGAL SERVICES OF NEW JERSEY**
908-882-2665
P.O. Box 1357
Edison, New Jersey 08818-1357

Tiffany J. Lieu, Esq.*
Philip L. Torrey, Esq.*
**CRIMMIGATION CLINIC**
**HARVARD IMMIGRATION &**
**REFUGEE CLINICAL PROGRAM**
6 Everett Street, Suite 3106
Cambridge, Massachusetts 02138
617-496-5497

*Pro Bono Counsel for Plaintiffs*

*Admitted Pro Hac Vice*