# EXHIBIT

# B

Plaintiffs-Appellees' Responsive Brief in *Dep't Homeland Sec. v. Josefina Doe*, No. 25-1628 (3d Cir.)

No. 25-1628

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

JOSEFINA DOE, *et al.*,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellants.*

On Appeal from The United States District Court
for the Western District of Pennsylvania
Case No. 3:24-cv-259
The Honorable Stephanie L. Haines, U.S.D.J.

### RESPONSIVE BRIEF OF PLAINTIFFS-APPELLEES

Alexander Shalom, Esq.
Natalie J. Kraner, Esq.
Gavin J. Rooney, Esq.
Naomi D. Barrowclough, Esq.
Rachel M. Dikovics, Esq. *(admission forthcoming)*
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
973.597.2500
ashalom@lowenstein.com

Tiffany J. Lieu, Esq.
**CRIMMIGRATION CLINIC**
**HARVARD IMMIGRATION &**
**REFUGEE CLINICAL PROGRAM**
6 Everett Street, Suite 3106
Cambridge, Massachusetts
617.496.5497
tlieu@law.harvard.edu

Shira Wisotsky, Esq.
Raquiba Huq, Esq.
Emily G. Thornton, Esq.
**LEGAL SERVICES OF NEW JERSEY**
100 Metroplex Drive, Suite 402
P.O. Box 1357
Edison, New Jersey 08817
908.882.2665
swisotsky@lsnj.org

*Pro Bono Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**PAGES**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ........................................................................................1

COUNTERSTATEMENT OF THE CASE.....................................................3

    I.      Plaintiffs and the Putative Class. .......................................................3

    II.     Under the Refusal Policy and Practice, Appellants Effectively Deny
         the Putative Class Access to State-Court Criminal Proceedings. .........5

    III.    Putative Class Members Are Irreparably Harmed by the Refusal
         Policy and Practice...........................................................................8

    IV.    Organizational Plaintiff AFSC-IRP Is Irreparably Harmed by the
         Refusal Policy and Practice...............................................................11

    V.     Appellees Obtain a Preliminary Injunction. .....................................12

    VI.    Appellants File a Motion to Clarify and Motion to Dismiss. .............12

    VII.   The Current Appeal..........................................................................13

STANDARD OF REVIEW..........................................................................14

SUMMARY OF ARGUMENT ....................................................................14

ARGUMENT .............................................................................................17

    I.      The District Court Correctly Concluded that Appellees Are Likely to
         Succeed on Their Access-to-Courts Claim. .......................................17

         A.    Appellees Have Standing to Challenge the Refusal
             Policy and Practice.................................................................18

         B.    Appellants' Refusal Policy and Practice Implicates
             the Constitutional Rights of Access to the Courts....................24

C.    Defendants in Criminal Matters Need Not Identify a Meritorious Affirmative Defense to Exercise Their Right to Access the Court and Defend Against Charges. ...................................................................31

II.    The District Court Properly Concluded that Appellees Are Likely to Succeed on Their Sixth Amendment Claims. ...................................33

III.    The District Court Correctly Held that 8 U.S.C. § 1252(b)(9) Did Not Bar It from Reviewing Count II. .......................................................36

IV.    The District Court Correctly Held That AFSC-IRP Has Standing to Assert Claims on Its Own Behalf and on Behalf of Its Clients. .........43

CONCLUSION .................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alli v. Decker*,
650 F.3d 1007 (3d Cir. 2011)..........................................................................37

*Barker v. Wingo*,
407 U.S. 514 (1972)........................................................................................33

*Benjamin v. Fraser*,
264 F.3d 175 (2d Cir. 2001)............................................................................35

*Bieregu v. Reno*,
59 F.3d 1445 (3d Cir. 1995)............................................................................24

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011)........................................................................................31

*Bounds v. Smith*,
430 U.S. 817 (1977)...................................................................................24, 28

*Bowman v. Wilson*,
672 F.2d 1145 (3d Cir. 1982)...............................................................19, 20, 22

*Brown v. Lowe*,
Civil Action No. 1:15-CV-02373, 2016 WL 4446551 (M.D. Pa.
June 22, 2016)................................................................................................26

*Caldwell v. Hall*,
No. CIV.A. 97–8069, 2000 WL 343229 (E.D. Pa. Mar. 31, 2000).............25, 32

*Copeland v. Mercer Cnty. Corr. Ctr.*,
Civil Action No. 17-5780 (MAS) (LHG), 2019 WL 3453273
(D.N.J. July 30, 2019)....................................................................................35

*Cobb v. Aytch*,
643 F.2d 946 (3d Cir. 1981)........................................................................34, 35

*Coy v. Iowa*,
487 U.S. 1012 (1988)......................................................................................31

*Dickey v. Florida*,
398 U.S. 30 (1970)..................................................................................33

*Doe v. U.S. ICE*,
490 F. Supp. 3d 672 (S.D.N.Y. 2020) ........................................................30

*Duran v. Merline*,
923 F. Supp. 2d 702 (D.N.J. 2013)......................................................25, 32

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021)....................................................................46

*E.O.H.C. v. Sec'y DHS*,
950 F.3d 177 (3d Cir. 2020).............................................................*passim*

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024).........................................................................*passim*

*Foreman v. Lowe*,
261 F. App'x 401 (3d Cir. 2008)..........................................................24, 27

*Forte v. O'Dwyer & Bernstein*,
No. CIV. A. 93-CV-4415, 1994 WL 249790 (E.D. Pa. June 9,
1994) ....................................................................................................19

*Geda v. Dir. USCIS*,
126 F.4th 835 (3d Cir. 2025).....................................................................43

*Hargis v. Atl. Cnty. Just. Facility*,
Civil Action No. 10-1006 (JBS), 2010 WL 1999303 (D.N.J. May
18, 2010)..........................................................................................26, 32

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)........................................................................17, 45, 46

*Hudson v. Robinson*,
678 F.2d 462 (3d Cir. 1982).................................................................24, 25

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025).....................................................................46

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)...........................................................................37, 38

*Kentucky v. Stincer*,
    482 U.S. 730 (1987)...............................................................................................31

*Khalil v. President, United States*,
    164 F.4th 259 (3d Cir. 2026)...........................................................................38, 41

*Kos Pharms., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004)...............................................................................25

*Lewis v. Casey*,
    518 U.S. 343 (1996).......................................................................................24, 30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)...........................................................................................19

*Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*,
    562 F.3d 553 (3d Cir. 2009)...............................................................................14

*Mallet & Co. Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021)...............................................................................25

*May v. Sheahan*,
    226 F.3d 876 (7th Cir. 2000)..............................................................................27

*Miller v. Samsung Elecs. Am., Inc.*,
    Civil Action No. 14-4076 (ES) (MAH), 2016 WL 6806331 (D.N.J.
    Nov. 16, 2016)....................................................................................................19

*Monroe v. Beard*,
    536 F.3d 198 (3d Cir. 2008)...............................................................................26

*Munaf v. Geren*,
    553 U.S. 674 (2008)...........................................................................................18

*NWDC Resistance v. ICE*,
    493 F. Supp. 3d 1003 (W.D. Wash. 2020)........................................................39

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
    280 F.3d 278 (3d Cir. 2002)...............................................................................44

*Payne v. Wyatt*,
    Civil Action No. 3:21-CV-01896, 2024 WL 1356686 (M.D. Pa.
    Mar. 29, 2024)....................................................................................................26

*Ponzi v. Fessenden,*
258 U.S. 254 (1922) ...............................................................................21, 22

*Prater v. City of Philadelphia,*
542 F. App'x 135 (3d Cir. 2013)....................................................................32

*Procunier v. Martinez,*
416 U.S. 396 (1974).................................................................................24, 28

*Pub. Int. Legal Found. v. Sec'y Pennsylvania,*
136 F.4th 456 (3d Cir. 2025)..........................................................................49

*Ramsay v. Nat'l Bd. of Med. Exam'rs,*
968 F.3d 251 (3d Cir. 2020)............................................................................14

*Reilly v. City of Harrisburg,*
858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017) ..............................25

*Rivera v. Monko,*
37 F.4th 909 (3d Cir. 2022)............................................................................26

*Smith v. Moffett,*
947 F.2d 442 (10th Cir. 1991).......................................................................19

*Spargo v. N.Y. State Comm'n on Jud. Conduct,*
351 F.3d 65 (2d Cir. 2003)............................................................................19

*State v. Lopez-Carrera,*
247 A.3d 842 (N.J. 2021)................................................................................8

*Torres-Tristan v. Holder,*
656 F.3d 653 (7th Cir. 2011).........................................................................39

*Tropskii v. Bondi,*
Civil No. 25-3226, 2025 WL 3016518 (E.D. Pa. Oct. 28, 2025) ......................10

*United States v. Joseph,*
730 F.3d 336 (3d Cir. 2013)...........................................................................18

*United States v. Thomas,*
905 F.3d 276 (3d Cir. 2018)............................................................................18

*United States v. Velazquez*,
  749 F.3d 161 (3d Cir. 2014)......................................................................34

*Ward v. Aviles*,
  Civil Action No. 11-6252, 2016 WL 1461753 (D.N.J. Apr. 13,
  2016) ........................................................................................................26

*In re Winship*,
  397 U.S. 358 (1970)..................................................................................31

*Wolff v. McDonnell*,
  418 U.S. 539 (1974)..................................................................................26

**Statutes**

8 U.S.C. § 1252(a)(2)(B)(ii).........................................................................43

8 U.S.C. § 1252(b)(4)(A) .............................................................................39

8 U.S.C. § 1252(b)(9) ............................................................................*passim*

N.J.S.A. 2A:162-18(b) ...................................................................................4

N.J.S.A. 2A:162-19........................................................................................29

**Regulations**

8 C.F.R. § 1003.1(b) .....................................................................................39

8 C.F.R. § 1240.1(a) .....................................................................................38

8 C.F.R. § 1240.31.........................................................................................38

8 C.F.R. § 1240.41.........................................................................................38

**Rules**

Fed. R. Civ. P. 12(h)(1)................................................................................18

**Other Authorities**

U.S. Const. amend. I..............................................................................1, 14, 27

U.S. Const. amend. V.............................................................................1, 14, 27

U.S. Const. amend. VI .................................................................................*passim*

ICE, *Inter-Governmental Service Agreement* (Sept. 28 2021),
    https://s3.documentcloud.org/documents/21177758/igsa-
    70cdcr21dig000012-base-fe-copy.pdf...............................................................4

Ingrid V. Eagly, Steven Shafer & Renee Moulton, *Access to Counsel
    in Immigration Court, Revisited*, 111 Iowa L. Rev. 1, 26 (2025).......................5

## INTRODUCTION

The Constitution requires that people charged with a crime have the right to appear and defend themselves in court proceedings adjudicating that charge. Appellants in this matter adopted an arbitrary, capricious, and unconstitutional policy that prohibits New Jerseyans held in immigration detention at the Moshannon Valley Processing Center in Pennsylvania ("Moshannon") from participating in New Jersey criminal court proceedings by virtual means, such as by Zoom (the "Refusal Policy and Practice" or "Policy"), despite the fact that virtual access is readily provided for immigration court proceedings and state-court family matters. The policy creates self-fulfilling harm: People detained at Moshannon cannot resolve their criminal cases because the Government prevents them from attending criminal court proceedings, and the same people cannot obtain release from immigration custody because of the continued existence of the very charges they seek to contest.

This Policy denies putative class members meaningful access to criminal courts—in violation of the First, Fifth, and Sixth Amendments as well as the Administrative Procedure Act ("APA")—and causes irreparable harm. Accordingly, the District Court properly granted the preliminary injunction at issue, ordering the Government to provide noncitizens from New Jersey detained at Moshannon with virtual access to state-court criminal proceedings.

Notably, on appeal, the Government does not deny the existence of the Refusal

-1-

Policy and Practice or that it has the means and infrastructure to provide virtual access to criminal proceedings. Nor does the Government dispute the District Court's finding that the Refusal Policy and Practice has caused irreparable harm, including: denial of access to counsel; inability to confront witnesses or contest evidence; exposure to bench warrants and contempt for nonappearances; inability to resolve criminal charges which, in turn, immigration courts and the U.S. Immigration and Customs Enforcement ("ICE") use to keep a noncitizen detained; and prolonged detention at Moshannon, a harm unto itself. Instead, the Government seeks to evade its obligation to protect the constitutional rights of individuals in its custody by contending that the constitutional right of court access excludes state-court criminal proceedings and by advancing specious jurisdictional and standing arguments to shield the Refusal Policy and Practice from judicial review. But the right to access and participate in one's criminal proceedings is well-established and, as the detaining authority, it is the Government's duty to safeguard the rights of the individuals in its custody and grant the court access the Constitution demands. The Government cannot insulate itself from liability by foisting that obligation on New Jersey or recasting this challenge to conditions of confinement at Moshannon as unreviewable.

For the reasons that follow, the Government's arguments all fail and Appellees urge this Court to affirm the District Court's decision granting a preliminary

injunction.

## COUNTERSTATEMENT OF THE CASE

Plaintiffs brought this case against the Department of Homeland Security ("DHS"), its agency, ICE, and federal officials (collectively, "Government" or "Appellants"), to challenge their policy and practice of denying people in their custody virtual access to state-court criminal proceedings so that they may appear, participate, and defend themselves in those proceedings.

### I.   Plaintiffs and the Putative Class.

The Putative Class is defined as "[a]ll noncitizens detained by [Appellants] at the Moshannon Valley Processing Center who have unresolved criminal matters (inclusive of petty disorderly persons, disorderly persons, and indictable offenses) to be charged or charged in a superior or municipal court in New Jersey," (the "Putative Class"). ECF No. 1 ¶ 158 (Compl.). Organizational Plaintiff American Friends Service Committee Immigrant Rights Program ("AFSC-IRP") is a legal services organization that is part of a state-funded initiative to provide no-cost legal services to indigent New Jerseyans facing immigration removal proceedings. AFSC-IRP's staff regularly represents clients impacted by the Refusal Policy and Practice. SA152–SA153 ¶¶ 2–4 (Declaration of Ilana Herr, Esq. ("Herr Decl.")).

Moshannon is an immigration detention facility operated by The GEO Group pursuant to its contracts with Clearfield County, Pennsylvania, and ICE. SA453 ¶ 1

-3-

(Declaration of David O'Neill ("O'Neill Decl.")). While The GEO Group operates the facility, it is ICE's policies that govern the operations of Moshannon. ICE, *Inter-Governmental Service Agreement between ICE and Clearfield County, PA* (Sept. 28, 2021), https://s3.documentcloud.org/documents/21177758/igsa-70cdcr21dig0000 12-base-fe-copy.pdf.

Moshannon is located at least 200 miles from the closest New Jersey court, or 5 hours by car. ECF No. 1 ¶ 69 (Compl.); *see also* A3 (Preliminary Injunction Memorandum and Opinion ("M&O")). The Government detains an average daily census of at least 200 Putative Class members at Moshannon. *See* SA187 ¶ 19 (Supplemental Declaration of Ian G. Peacock, Ph.D. ("Peacock Supp. Decl.")).

Pursuant to the New Jersey Criminal Justice Reform Act ("CJRA"), New Jersey courts release most Putative Class members pending trial shortly after their arrest, upon finding that their detention is not necessary to manage any threat to public safety or risk of non-appearance. N.J.S.A. 2A:162-18(b). ICE routinely apprehends these individuals immediately prior to or upon release, and moves them to Moshannon before they can request appointment of counsel or contest the charges brought against them. *See, e.g.*, SA004 ¶ 12 (Declaration of Josefina Doe ("Josefina Doe Decl.")); SA054–SA055 ¶¶ 6–8 (Declaration of Commor Jerome Welch ("Welch Decl.")); SA061–SA062 ¶¶ 6–8 (Declaration of Felipe Niomar Martinez Ortiz ("Ortiz Decl.")); SA025 ¶¶ 8–9 (Declaration of Isabela Doe ("Isabela Doe

-4-

Decl.")); SA152–SA154 ¶¶ 2–4, 6 (Herr Decl.). As a result, the vast majority of Putative Class members impacted by the Refusal Policy and Practice have not been appointed defense counsel—even if they are indigent and entitled to one. *See, e.g.*, SA007 ¶ 31 (Josefina Doe Decl.); SA027 ¶ 19 (Isabela Doe Decl.); SA063 ¶¶ 13–14 (Ortiz Decl.); SA072 ¶ 6 (Declaration of Marcelino Flores ("Flores Decl.")); SA090 ¶¶ 27–28 (Declaration of Victor Alzamora Capunay ("Capunay Decl.")); SA117 ¶ 8 (Declaration of A. Morales ("Morales Decl.")). At the same time, most people in detention do not have representation in their immigration matters, leaving them without any form of counsel. *See* Ingrid V. Eagly, Steven Shafer & Renee Moulton, *Access to Counsel in Immigration Court, Revisited*, 111 Iowa L. Rev. 1, 27 (2025) (explaining that only 31% of detained respondents in immigration courts have representation).

## II.   Under the Refusal Policy and Practice, Appellants Effectively Deny the Putative Class Access to State-Court Criminal Proceedings.

Although ICE makes video-conferencing services available to individuals detained at Moshannon for virtual participation in immigration court and certain family court proceedings, Appellants previously denied the Putative Class access to the same technology to allow them to participate in criminal matters before New Jersey courts. Appellants' Opening Brief ("AOB") at 5; *see also* SA233–SA264, SA269–SA271, SA277–SA282, SA293–SA346 (Exhibits to Declaration of Shira Wisotsky ("Wisotsky Decl.") (emails from attorneys requesting that Moshannon

produce their client to criminal court proceedings virtually)); SA005–SA006 ¶¶ 19–21, 25–26 (Josefina Doe Decl.); SA062 ¶ 12 (Ortiz Decl.); SA025–SA026 ¶¶ 11–13, 16 (Isabela Doe Decl.); SA055–SA056 ¶¶ 10–12, 14 (Welch Decl.). Instead, under the Refusal Policy and Practice, ICE insisted on a writ of habeas corpus ad prosequendum for in-person production from the state court and required state officials to retrieve the individual from Moshannon, transport them to the New Jersey courthouse, and then return them to Moshannon. *See* SA243–SA254 (Exhibit D to Wisotsky Decl.); *see also* A14–A15 (M&O); SA462 ¶ 68 (O'Neill Decl.); SA228–SA260, SA269–SA271, SA283–SA317, SA326–SA346, SA388–SA390, SA415–SA442 (Exhibits to Wisotsky Decl. (emails describing the Refusal Policy and Practice)).

The Refusal Policy and Practice constitutes an effective denial of court access. As an initial matter, the Government's in-person writ requirement is impractical and unworkable because it requires people in immigration detention—the vast majority of whom are not represented by counsel—to navigate the convoluted procedure of obtaining and enforcing a writ from a criminal court. This almost never happens. According to Appellants' own records, between the facility's opening in the fall of 2021, *see* ECF No. 1 ¶ 42 n.10 (Compl.), and November 14, 2024, only *eight* individuals were produced in criminal court pursuant to the in-person writ process, SA449–SA450 (Writs for In Person Production Executed at Moshannon).

Setting aside the steps that a Putative Class member must take to secure a writ for in-person production, a writ requires New Jersey authorities to dispatch local law enforcement to assume custody over an individual from Moshannon, deliver them to the New Jersey court, and then return them to Moshannon after the hearing, all at the state or municipality's sole cost and expense. *See* SA233–SA238, SA243–SA260, SA293–SA302, SA309–SA317 (Exhibits to Wisotsky Decl.) (emails from attorneys requesting that Moshannon produce their clients to criminal court proceedings virtually). Appellants' Refusal Policy and Practice requires a writ for in-person production despite the fact that many New Jersey criminal courts—especially municipal courts—exclusively conduct initial appearances and many other proceedings by virtual means. *See* A3 (M&O); ECF No. 1 ¶ 79 (Compl.).

Even in courts that routinely conduct both virtual and in-person appearances, it has proven neither feasible nor realistic for local law enforcement to pick up, detain, and then return an individual to Moshannon, which is located five-to-eight hours from the courts by car. *See, e.g.*, SA352 (Exhibit X to Wisotsky Decl.) (per Mercer County Superior Court staff, "[u]nfortunately our sheriffs will not pick up the defendant"); SA229 (Exhibit A to Wisotsky Decl.) ("[T]he Hoboken Police Department does not travel out of state to pick up defendants for court."). Some local authorities have also expressed concern that they lack jurisdiction to take custody from ICE. *See, e.g.*, SA362 (Exhibit Y to Wisotsky Decl.) (per Ocean County

Superior Court, under "[a]bsolutely no circumstances am I going to order Ocean Corrections Officials to go to Pennsylvania and take somebody out of ICE custody . . . I wouldn't have the jurisdiction to do it in any event"); *see also State v. Lopez-Carrera*, 247 A.3d 842, 854 (N.J. 2021) (holding that the CJRA does not authorize judges to detain noncitizens pretrial because they face possible removal by immigration authorities).

### III.     Putative Class Members Are Irreparably Harmed by the Refusal Policy and Practice.

The Government does not contest on appeal that Putative Class members have suffered irreparable harm. When Appellants prevent them from participating in virtual court proceedings, Putative Class members are left without appointed counsel for extended periods; cannot confront complaining witnesses or contest evidence; face bench warrants and contempt for non-appearance; cannot allocute or resolve cases; and are unable to resolve criminal charges which, in turn, are relied on by immigration courts and ICE to deny bond or other relief, prolonging detention. The District Court expressly found that these "specific deprivations" were "not conjecture or hypothetical," and Appellants do not challenge this finding. A13 (M&O).

In addition to impeding the ability of Putative Class members to seek appointed defense counsel, the Refusal Policy and Practice prevents them from testifying or otherwise participating in their defense, rendering it impossible—

-8-

particularly, in the absence of counsel—for them to defend themselves against or seek dismissal of the charges against them. *See, e.g.*, SA001, SA003–SA006 ¶¶ 2, 11–13, 18–20, 25 (Josefina Doe Decl.) (describing Appellants' denials of her requests for virtual access to court proceedings, where the municipal court ultimately dismissed the charges once she was produced); ECF No. 73 (Transcript of Dec. 5, 2024 Preliminary Injunction Hearing at 6:24–25-7:1) (documenting Josefina Doe's virtual production); SA053–SA057 ¶¶ 1, 4, 8–9, 15, 19 (Welch Decl.) (describing Appellants' refusal to produce Commor Welch for hearings on his motion to dismiss for lack of evidence).

Appellants' Refusal Policy and Practice also pressures Putative Class members into affirmatively waiving their due process rights. *See, e.g.*, SA447 ¶ 18 (Declaration of Glykeria Teji, Esq., S.J.D. ("Teji Decl.")); SA056 ¶ 15 (Welch Decl.); SA074–SA075 ¶¶ 15–20, 22 (Flores Decl.); SA374–SA387 (Exhibits BB and CC to Wisotsky Decl.). Further, courts routinely issue bench warrants against Putative Class members who cannot attend scheduled court dates in criminal proceedings because of the Refusal Policy and Practice. *See, e.g.*, SA026 ¶ 16 (Isabela Doe Decl.); SA037 ¶¶ 6, 8 (Declaration of Jose Doe ("Jose Doe Decl.")); SA088–SA089 ¶¶ 13, 17–18 (Capunay Decl.); SA124–SA125 ¶¶ 8–9, 11–12 (Declaration of Isaac Bautista ("Bautista Decl.")); SA447 ¶ 19 (Teji Decl.); SA391–SA409 (Exhibits EE–GG to Wisotsky Decl.).

Because Putative Class members are unable to resolve the criminal charges against them in the absence of virtual court access, their ability to seek release or other immigration relief is in turn limited and ultimately prolongs their detention. Unresolved criminal matters significantly decrease the likelihood of a bond or release application being granted. SA207–SA210 ¶¶ 13–14, 17, 20–25 (Declaration of Maureen A. Sweeney, Esq. ("Sweeney Decl.")). This, in turn, often prompts impacted individuals to postpone seeking bond or release until the charges are dismissed or to abandon pursuing bond altogether. SA447 ¶ 16 (Teji Decl.); SA007 ¶ 32 (Josefina Doe Decl.); SA063–SA064 ¶¶ 16, 19 (Ortiz Decl.); SA038 ¶¶ 9, 11 (Jose Doe Decl.); SA155–SA156, SA160 ¶¶ 12, 14, 21 (Herr Decl.); SA027 ¶ 22 (Isabela Doe Decl.); SA126 ¶ 14 (Bautista Decl.). Prolonged detention also leads to family separation for extended periods, causing Putative Class members significant psychological and emotional harm. *See, e.g.*, SA007–SA008 ¶ 32 (Josefina Doe Decl.); SA072, SA076 ¶¶ 4, 24, 26–27 (Flores Decl.); SA091 ¶ 33 (Capunay Decl.); SA053 ¶ 3 (Welch Decl.); SA027 ¶ 20 (Isabela Doe Decl.); SA038 ¶ 12 (Jose Doe Decl.); SA064 ¶¶ 18–19 (Ortiz Decl.); SA106–SA107 ¶ 21 (Declaration of Andres Felipe Exorcia Tinoco ("Tinoco Decl.")).

Prolonged detention at Moshannon is a harm unto itself, given the well-documented conditions of confinement. *See, e.g.*, *Tropskii v. Bondi*, Civil No. 25-3226, 2025 WL 3016518, at *3 (E.D. Pa. Oct. 28, 2025) (discussing conditions at

Moshannon and noting that "[t]aken together, the official government findings and the detainee accounts . . . depict a facility characterized by deficient medical care, pervasive language barriers, retaliatory discipline, and a climate of fear"); *see also* SA008 ¶ 38 (Josefina Doe Decl.) (forced to wait weeks for gynecological care); SA145 ¶ 16 (Declaration of G. ("G. Decl.")) (did not receive adequate care for diabetes for over six weeks). Extended detention exacts a mental toll, SA210 ¶ 25 (Sweeney Decl.), particularly for those subject to solitary confinement, SSA154– SSA155 ¶¶ 16–17 (Declaration of Anna Meixler ("Meixler Decl.")). People detained at Moshannon are also frequently subjected to violence. *See, e.g.*, SA145 ¶ 16 (G. Decl.); SA038 ¶ 12 (Jose Doe Decl.); SSA154 ¶ 14 (Meixler Decl.).

## IV. Organizational Plaintiff AFSC-IRP Is Irreparably Harmed by the Refusal Policy and Practice.

The Refusal Policy and Practice impedes AFSC-IRP's core business activity of providing immigration legal services to detained noncitizens, as unresolved criminal charges hinder AFSC-IRP's ability to obtain bond, release, or other immigration relief for its clients, including relief from removal and lawful immigration status or admission in the future. SA155–SA156 ¶¶ 10–14 (Herr Decl.); SA165–SA167 ¶¶ 5, 12, 15 (Meixler Decl.). AFSC-IRP's activities are further constrained when its attorneys must serve as a liaison between their clients, Moshannon, ICE, and the criminal court to schedule and/or attend their client's criminal court hearings. SA158–SA159, SA161 ¶¶ 17–18, 24 (Herr Decl.); SA166,

SA168 ¶¶ 8–9, 11, 19 (Meixler Decl.); SA172 ¶¶ 14–15 (Declaration of Priscila D. Abraham, Esq. ("Abraham Decl.")). Longer detention periods resulting from AFSC-IRP's clients' inability to resolve outstanding criminal charges also strains the organization's ability to take on representation of new clients. SA156–SA157 ¶¶ 14–15 (Herr Decl.).

## V.     Appellees Obtain a Preliminary Injunction.

On September 11, 2024, Appellees filed this action in the United States District Court for the District of New Jersey. Appellees also moved to certify a class of similarly situated noncitizens, which remains pending. The case was subsequently transferred to the United States District Court for the Western District of Pennsylvania.

On October 16, 2024, Appellees moved for a preliminary injunction seeking an order enjoining the Refusal Policy and Practice, as against all members of the Putative Class and on behalf of AFSC-IRP's clients. On January 31, 2025, the District Court granted the motion for a preliminary injunction.[1] A21 (Preliminary Injunction Order ("Order")).

## VI.    Appellants File a Motion to Clarify and Motion to Dismiss.

On February 14, 2025, the Government filed a Motion to Clarify the Court's

---

[1] The Court's decision dealt exclusively with the likelihood of success on the constitutional claims. Although raised by Appellees in their motion for emergent relief, the APA claims were not addressed in the decision below.

Preliminary Injunction Order and Stay Implementation, ECF No. 81 ("Motion to Clarify and Stay"), and a Partial Motion to Dismiss the Complaint, ECF No. 82.[2] Appellants' Motion to Clarify asked the District Court to clarify whether the Order applied only to the named plaintiffs or extended to the Putative Class and posed various questions regarding Appellants' use of existing resources to facilitate compliance with the Order. ECF No. 81. Appellees opposed both motions. ECF Nos. 92, 95. On March 28, 2025, the District Court issued an opinion on the Motion to Clarify and Stay, affirming that its Order applies to the Putative Class, but declining to "dictate the day-to-day function of [Moshannon]" as opposed to ensuring that Moshannon "operates in a way that comports with the law." A26 (Clarification Memorandum Opinion). The Court also declined to stay the case pending resolution of Plaintiffs' Motion for Class Certification. *Id.* at A28.

## VII. The Current Appeal.

On April 30, 2025, the Government appealed the District Court's Order, and on May 27, 2025, it appealed the District Court's Decision on the Motion for

---

[2] On August 18, 2025, Magistrate Judge Patricia L. Dodge issued a Report and Recommendation recommending that Defendants' Partial Motion to Dismiss be granted in part and denied in part. ECF No. 125. Specifically, Magistrate Judge Dodge found that while the *individual* claims of the four released Plaintiffs were moot by virtue of their release and should be dismissed, those Plaintiffs were still proper class representatives. *Id.* at 9. The Court otherwise denied Defendants' motion, holding that the claims were adequately pled. *Id.* at 10–11. The Government appealed the Report and Recommendation to the District Court, which has not yet issued a decision.

Clarification. Case No. 25-1628, ECF Nos. 10, 19.

## STANDARD OF REVIEW

This Court "employ[s] a tripartite standard of review" of orders granting preliminary injunctions, reviewing "the District Court's findings of fact for clear error," the court's "legal conclusions . . . de novo," and the "ultimate decision to grant or deny the injunction" for abuse of discretion. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 256 n.5 (3d Cir. 2020) (citation modified). "Unless an abuse of discretion is 'clearly established, or an obvious error has [occurred] in the application of the law, or a serious and important mistake has been made in the consideration of the proof, the judgment of the trial court must be taken as presumptively correct.'" *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 556 (3d Cir. 2009) (quoting *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 852 (3d Cir. 1986)).

## SUMMARY OF ARGUMENT

This Court should reject Appellants' arguments and affirm the District Court's preliminary injunction for three reasons.

*First*, Appellants' attacks on the access to courts claim under the First and Fifth Amendments fall flat. The Government argues for the first time that Appellees lack standing to bring these claims under principles of comity. Procedurally, the Government's comity defense is not properly before the Court because it was not

raised below and it is an abstention inquiry that does not implicate Article III standing. Moreover, the comity cases the Government relies upon all involve a criminal defendant facing charges in multiple jurisdictions seeking, through habeas or similar action, to challenge priority of prosecution, sentencing, or physical custody. The relief Appellees seek—virtual access to state criminal proceedings—does not disrupt the Government's physical custody or assertion of primary jurisdiction over Putative Class members and therefore does not implicate comity at all. The principles of comity have no bearing on a challenge to an unconstitutional condition of confinement at an immigration detention facility.

The Government also mistakenly argues that the right to court access is not implicated here because the right cannot be asserted for criminal trial court proceedings and because Appellees have not identified an affirmative claim that they were unable to pursue in state court. But that is not the law. It is axiomatic that people the Government detains have a constitutional right to appear and participate in proceedings involving criminal charges brought against them, and that right exists whether they are detained by a state prosecuting authority or in a federal immigration detention facility. The Government's attempt to carve out an exception to this right for pretrial criminal matters is unsupported by law or logic and would create the absurd result that a detained individual has a constitutional right to participate in proceedings attacking a criminal conviction but has no right to appear in his own

-15-

criminal trial.

*Second*, although Appellants acknowledge that the Refusal Policy and Practice infringes upon the Putative Class members' Sixth Amendment rights, they then make the astonishing leap that it is the State of New Jersey that is responsible for vindicating those rights on behalf of individuals who are in the federal government's custody. But this Circuit and other federal courts have repeatedly held that it is the detaining authority—here, the Government—that is duty-bound to safeguard the Sixth Amendment rights of individuals in its custody, including rights to a speedy trial and access to counsel in criminal proceedings, and that it is required to take corrective action. This duty cannot be discarded and relegated to other sovereigns that do not have access or control over the individuals or policies at Moshannon.

*Finally*, Appellants—having failed to mount any meritorious challenge to Appellees' constitutional and APA claims on the merits—proceed to attack the preliminary injunction order through jurisdictional and standing arguments directed solely to AFSC-IRP and the organization's Count II claim. These arguments, which have no bearing on the preliminary injunction's application to the named plaintiffs or the Putative Class, are unavailing. To begin, the District Court properly retained jurisdiction as to Count II under 8 U.S.C. § 1252(b)(9) because Count II does not "aris[e] from" removal proceedings. AFSC-IRP does not challenge "any action taken

or proceeding brought to remove an [individual] from the United States," 8 U.S.C. § 1252(b)(9), but rather, the unlawful conditions of confinement at Moshannon that bar its clients from attending criminal court proceedings. Moreover, Appellants' separate contention that AFSC-IRP lacks standing because it has not demonstrated an injury in fact and causation similarly fails. Appellants conveniently and problematically elide that the harm that AFSC-IRP faces is precisely the type of injury and causation that the Supreme Court recognized as sufficient to establish standing in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Namely, Appellants' Refusal Policy and Practice impedes AFSC-IRP's core business activity—providing legal representation to detained noncitizens in immigration proceedings—by forcing its attorneys to ensure that their clients' criminal court proceedings are resolved as needed for the immigration case.

## ARGUMENT

### I. The District Court Correctly Concluded that Appellees Are Likely to Succeed on their Access-to-Courts Claim.

Contrary to the Government's assertions, Appellees have standing, their claims implicate the constitutional right to access courts, and criminal defendants need not establish an affirmative defense to exercise that right.

### A. Appellees Have Standing to Challenge the Refusal Policy and Practice.

The Government asserts that "a detainee lacks standing to raise the issue of which sovereign exercises jurisdiction over him," and thus cannot show the "concrete injury" Article III requires for the court access claim. AOB1. As a threshold matter, because the Government did not raise this comity defense below, *see* ECF No. 60 (opposition to motion for a preliminary injunction); ECF No. 84 (partial motion to dismiss), it has likely waived it under Federal Rule of Civil Procedure Rule 12(h)(1), and certainly may not raise it for the first time on appeal. The Third Circuit has consistently held that "for parties to preserve an argument for appeal, they must have raised the same *argument* in the District Court—merely raising an *issue* that encompasses the appellate argument is not enough. Consequently, the degree of particularity required to preserve an argument is exacting" and the Government has not come close to doing so here. *United States v. Joseph*, 730 F.3d 336, 337 (3d Cir. 2013); *see also United States v. Thomas*, 905 F.3d 276, 284 (3d Cir. 2018) ("Theories not raised squarely before the district court cannot be surfaced for the first time on appeal." (citation modified)).

Appellants cannot evade their waiver of this argument by recasting comity as a jurisdictional defect. While courts may consider "insuperable objection[s]" like subject matter jurisdiction at any time, *see Munaf v. Geren*, 553 U.S. 674, 691 (2008), comity is a "prudential" or "equitable consideration[]," not a limit on Article III

-18-

jurisdiction, *Spargo v. N.Y. State Comm'n on Jud. Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (explaining that the holding in *Younger v. Harris*, 401 U.S. 37 (1971) "is not a jurisdictional bar based on Article III requirements, but instead a prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity"). Although the doctrine of comity could allow a court to exercise its discretion to refrain from exercising jurisdiction, it does not defeat subject matter jurisdiction. *See, e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (prudential standing is "not derived from Article III"); *Miller v. Samsung Elecs. Am., Inc.*, Civil Action No. 14-4076 (ES) (MAH), 2016 WL 6806331, at *5 (D.N.J. Nov. 16, 2016) ("[P]rinciples of federalism and comity do not trump Article III standing."); *Forte v. O'Dwyer & Bernstein*, No. CIV. A. 93-CV-4415, 1994 WL 249790, at *3 n.5 (E.D. Pa. June 9, 1994) ("[A]lthough comity underlies the doctrines of abstention, it is not an independent ground for declining jurisdiction." (citation omitted)); *Smith v. Moffett*, 947 F.2d 442, 445 (10th Cir. 1991) ("[C]oncerns of comity do not present a jurisdictional bar . . . .").

*Bowman v. Wilson*, on which Appellants rely, only reinforces that this Court treats comity as a "prudential limitation[]" distinct from Article III jurisdiction. 672 F.2d 1145, 1150, 1154–55 (3d Cir. 1982) (concluding that a habeas petitioner could not establish prudential standing to compel a transfer of custody to another sovereign because he was not "within the zone of interest of the rule of comity," as the

-19-

"beneficiary of that rule is not [petitioner] but the competing jurisdictions in a federal system of government"). Because the Government's comity theory was not raised below and does not implicate Article III standing or any other jurisdictional bar, it is not properly before this Court.

Even if the argument was preserved for this appeal, comity does not operate to deprive Putative Class members of their right to appear in state court criminal proceedings. The question here is not one of competing jurisdictional or detention authority, nor of priority of prosecution between state and federal prosecutors. The question is whether the Government can deprive Putative Class members of the right to a virtual appearance in a state court criminal proceeding. None of the cases cited by the Government even remotely suggest that it may do so. The Government's claim is thus both procedurally barred and substantively erroneous.

Although the Government warns against "relinquish[ing] custody" to New Jersey, AOB19, Appellees do not seek to reorder sovereign priority, compel transfer from Moshannon to New Jersey, or in any way ask the Government to relinquish its primary jurisdiction or delay their immigration proceedings.[3] Simply put: no priority-of-prosecution dispute exists to trigger comity here. Appellees seek only to

---

[3] For example, Appellants' reliance on *Bowman* is inapposite because that case, unlike here, involved a habeas petitioner who had been charged with unrelated criminal offenses by both the District of Columbia and the military and then sought to invoke the rule of comity to compel his return to the District of Columbia after being removed from the District and detained by the military. 672 F.2d at 1147–50.

attend criminal court proceedings via virtual means while remaining in Appellants' custody. The relief obtained under the preliminary injunction uses technology that Moshannon already possesses—four virtual courtrooms, thirty-one privacy booths, and tablets that Appellants provide for virtual appearances in immigration proceedings. *See* AOB5; SA469–SA470 ¶¶ 6, 9, 13–14 (Declaration of Francis Kemp ("Kemp Decl.")).

Denying the same modality for state criminal appearances is a self-imposed operational choice that harms the people the Government detains; nothing in the comity doctrine bars constitutional or statutory challenges to such a policy.

Indeed, comity's animating principles support the relief ordered here. Comity refers to respect and cooperation between state and federal authorities regarding prosecution and sentencing priorities and physical custody arrangements. *See* AOB18–19. For more than a century, *Ponzi v. Fessenden* has endorsed inter-sovereign cooperation—authorizing one sovereign to lend a prisoner to another, without disturbing priority, to ensure a "full and fair trial according to the law of the government whose sovereignty he is alleged to have offended." 258 U.S. 254, 260 (1922). Requiring the Government to use existing remote-access technology to facilitate participation in state criminal proceedings is the modern analogue of that "mutual assistance." *Id.* at 259. In fact, the Government has been providing access for more than thirteen months now pursuant to the preliminary

injunction. At minimum, comity does not forbid modern and less intrusive accommodations, like video or telephonic appearances, which leave primary federal custody and sovereign priority intact.

Appellants' arguments rely upon inapposite cases. Appellants rely on cases where a criminal defendant in pretrial custody brought a habeas corpus petition or took similar action challenging one sovereign's detention where the defendant faced charges in two jurisdictions. AOB18–21. In those circumstances, courts hold that the defendant lacks prudential standing to raise the issue of which sovereign should detain and prosecute him. *See, e.g.*, *Bowman*, 672 F.2d at 1155; *Ponzi*, 258 U.S. at 259–63. But this is not a habeas case, and Appellees do not seek to change the detaining sovereign.

Appellants' authorities are inapposite for a further reason: they involve proceedings pending in two sovereigns that are unrelated, whereas here the state criminal and federal immigration matters are inextricably intertwined. The resolution of state criminal charges often directly affects the length of immigration detention. *See* SA206–SA209 ¶¶ 8, 13–16, 21–23 (Sweeney Decl.); *id.* at SA209 ¶ 20 ("[U]nresolved criminal charges (1) can be and regularly are used as a negative discretionary factor in bond hearings; (2) can be and regularly are used as a negative discretionary factor in merits hearings for discretionary relief."); *id.* at SA210 ¶ 24 ("[A]n individual who is unable to appear in court to resolve an open criminal charge

-22-

may be subjected to prolonged ICE detention, often for months or years, in subpar and harmful conditions."). Appellants' policy creates a self-reinforcing barrier—state criminal cases cannot be resolved because remote access is denied, and immigration release cannot be obtained because state charges remain unresolved.

Accordingly, to the extent comity has any bearing here—which it does not—the interrelationship between Putative Class members' criminal court proceedings and their immigration detention would place Appellees within any relevant zone-of-interest analysis for establishing prudential standing to assert their claims. Indeed, unlike the habeas cases the Government cites, Appellees have a "recognized legal interest" here to challenge a detention center policy preventing them from participating in their criminal cases that is borne out of their constitutional right to court access. *See* AOB20 (quoting *Moody v. Stewart*, Civil Action No. 18-00063-CG-B, 2018 WL 10615237, at *10–11 (S.D. Ala. Mar. 22, 2018), *aff'd sub nom.*, *Moody v. Holman*, 887 F.3d 1281 (11th Cir. 2018)). The Putative Class members' state criminal proceedings bear directly on the length of their detention and prospects for release from immigration detention—producing the "concrete injury" the District Court identified and a sufficient interest to satisfy any standing requirement.

People detained by ICE cannot secure administrative immigration release because of pending state charges, yet they cannot resolve those charges because the Government categorically refuses to permit their participation in state-court criminal

proceedings. This catch-22 is the opposite of the cooperative federalism comity is meant to promote. The comity doctrine therefore does not bar Appellees' claims.

### B.   Appellants' Refusal Policy and Practice Implicates the Constitutional Rights of Access to the Courts.

Unquestionably, "prisoners have a constitutional right of access to the courts" derived from the rights to petition and due process. *Bounds v. Smith*, 430 U.S. 817, 821–22 (1977), *abrogated on other grounds by, Lewis v. Casey*, 518 U.S. 343 (1996) (petition); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (due process). This right extends to noncitizens in immigration custody. *Foreman v. Lowe*, 261 F. App'x 401, 404 (3d Cir. 2008) ("Detainees have a right of access to the courts."); *see also Bieregu v. Reno*, 59 F.3d 1445, 1453–55 (3d Cir. 1995) (grounding the source of the right to court access in the right to petition, the Sixth Amendment right to counsel, and due process), *abrogated on other grounds by, Lewis*, 518 U.S. 343.

The constitutional right to court access is violated where (1) "the proceeding involves access to the courts," and (2) "some actual injury" occurs. *Hudson v. Robinson*, 678 F.2d 462, 466 (3d Cir. 1982); *see also Lewis*, 518 U.S. at 343. The Government's Refusal Policy and Practice obstructs Appellees' ability to appear in criminal court—the most fundamental element of court access—with resulting cognizable injury. *See Bounds*, 430 U.S. at 822–23. The District Court thus correctly found that Appellees are likely to meet both requirements, thereby satisfying the first preliminary injunction element, which requires showing that there is a reasonable

chance, or probability, of success on the merits. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017); *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021). In this case, Appellees have shown far more than a "reasonable chance" of success as the Refusal Policy and Practice has the net effect of denying Putative Class members access to the courts and criminal defendants are injured when they are unable to contest the charges brought against them.

On appeal, the Government does not contest the District Court's determination that Appellees have demonstrated that actual injury has occurred sufficient to establish a violation of their constitutional rights. *Hudson*, 678 F.2d at 466. Rather, Appellants erroneously contend that Appellees' access to court claims are unlikely to succeed because the constitutional right does not apply to defending against criminal charges. AOB21–23. Indeed, Appellants neither cite authority for this proposition, nor do they persuasively argue why the constitutional right to court access applies only to individuals appealing their conviction or pursuing civil litigation post-conviction, but not to their own defense at trial. *See Duran v. Merline*, 923 F. Supp. 2d 702, 722 (D.N.J. 2013); *Caldwell v. Hall*, No. CIV.A. 97–8069, 2000 WL 343229, at *1 (E.D. Pa. Mar. 31, 2000).

Courts in this Circuit have repeatedly recognized that the right to court access applies to defending against criminal charges. *See, e.g.*, *Duran*, 923 F. Supp. 2d at

722–24; *Hargis v. Atl. Cnty. Just. Facility*, Civil Action No. 10-1006 (JBS), 2010 WL 1999303, at *5–6 (D.N.J. May 18, 2010); *Payne v. Wyatt*, Civil Action No. 3:21-CV-01896, 2024 WL 1356686, at *3 (M.D. Pa. Mar. 29, 2024); *Brown v. Lowe*, Civil Action No. 1:15-CV-02373, 2016 WL 4446551, at *3 (M.D. Pa. June 22, 2016); *Ward v. Aviles*, Civil Action No. 11-6252, 2016 WL 1461753, at *2 (D.N.J. Apr. 13, 2016).

Moreover, this Court has held that the constitutional right to court access is implicated when a custodian inhibits the ability of an individual in their custody to defend themselves against criminal charges and includes an affirmative obligation by a physical custodian to ensure that the people in their custody can access the courts. *See Rivera v. Monko*, 37 F.4th 909, 919–20 (3d Cir. 2022) (noting *Bounds* "broadened the [court access] right substantially by holding that states must not only avoid interfering with prisoners' access to the courts, but must also shoulder affirmative obligations to assure all prisoners meaningful access" (citation modified)); *see also Wolff v. McDonnell*, 418 U.S. 539, 578–79 (1974) (prison officials must "provide indigent inmates with access to a reasonably adequate law library for preparation of legal actions").

Appellants' arguments to the contrary fundamentally misunderstand the law and Appellees' claims. Appellants point to *Monroe v. Beard*, 536 F.3d 198 (3d Cir. 2008), which provides that access to court claims apply to individuals challenging

their sentences and "*conditions of confinement*." AOB22 (emphasis added) (quoting *Monroe*, 536 F.3d at 205). But Appellants ignore entirely that Appellees' claims fall precisely within these bounds: Appellees challenge the conditions of their confinement at Moshannon that prohibit their ability to attend criminal court proceedings, which is a quintessential court access issue.

Appellants' only other support for their erroneous assertion is to attempt to discount and distinguish *May v. Sheahan*, 226 F.3d 876 (7th Cir. 2000), but these efforts also fall flat. *See* AOB22. In *May*, the Seventh Circuit held that where a detained individual alleged, as here, that his custodian refused to take him to assigned court dates physically or virtually, that custodian's "policies could violate a detainee's rights of access to the courts." 226 F.3d at 883. Here, too, the Government's failure to facilitate virtual court production for the individuals in their custody infringes upon those individuals' rights under the First and Fifth Amendments to access the courts.

Appellants contend that *May* is distinguishable because the petitioner was detained in criminal custody rather than immigration custody. *See* AOB22. That is a distinction without a difference. This Court has previously made clear that the right to court access extends to a noncitizen in immigration detention who is litigating claims related to his criminal case. *Foreman*, 261 F. App'x at 404. The District Court in this matter thus correctly held that ICE "assumed custody of a released criminally

charged individual and so . . . must also assume responsibility for a criminally charged detainee's constitutional rights." A17 (M&O).

Here, Appellees amply demonstrated that Appellants' Refusal Policy and Practice likely violates their constitutional right to court access by obstructing their ability to attend criminal court proceedings. In fact, the Supreme Court has held that governmental custodial entities violated that right for far less egregious conduct, like denying sufficient access to a law library and restricting access to attorneys. *Bounds*, 430 U.S. at 828; *Procunier*, 416 U.S. at 419 (challenging Department of Corrections regulation banning law students and paralegals from interviewing incarcerated people). Thus, the constitutional right to court access is violated where, as here, a custodial entity prohibits the individual from appearing in criminal court proceedings.

The Government's sole challenge to the merits of Appellees' court access claims therefore falls flat, and the Government fails to raise any argument on appeal that Putative Class members have meaningful access to criminal court. Nor can it. To the extent Appellants argued below that the in-person writ process provides meaningful access—an argument which, notably, they do not reprise here— Appellees amply disproved this contention below. Indeed, Appellants' own evidence demonstrates that in 2023 and 2024, only eight individuals were transported via writ to state court. SA449–SA450 (Writs for In Person Production Executed at

Moshannon). To put this in perspective, Appellants detain an average daily census of at least 200 individuals at Moshannon apprehended in New Jersey with unresolved state criminal matters. SA186–SA187 ¶ 19 (Peacock Supp. Decl.). Moreover, as Appellees argued below, it is practically and legally infeasible for state entities to transport people in ICE detention to New Jersey and detain them there despite prior orders from state courts directing their release.[4] Finally, even if New Jersey courts are willing and able, such courts are at least 200 miles away from Moshannon, would require hours of travel for each court date, and Appellants place the full costs of transport and subsequent detention of the noncitizen on the State. The District Court was thus correct that Appellants did not provide "convinc[ing]" "testimony . . . that detainees are being provided an ascertainable opportunity to

---

[4] Certain New Jersey jurisdictions have stated unequivocally that they will not travel outside of New Jersey to pick up a noncitizen. *See* ECF No. 1 ¶ 20(h) (Compl.) (Deputy Court Administrator advising that: "the Hoboken Police Department does not travel out of state to pick up defendants for court"); SA351–SA355 (Exhibit X to Wisotsky Decl.) (emails from attorney requesting a writ to attend hearings, including Mercer County Superior Court staff stating that, "[u]nfortunately our sheriffs will not pick up the defendant"). New Jersey courts have even asserted that they do not have the legal authority to exact such transport. *See* SA356–SA367 (Exhibit Y to Wisotsky Decl.) (transcript of preliminary hearing conference, in which Superior Court judge stated that under "[a]bsolutely no circumstances am I going to order Ocean Corrections Officials to go to Pennsylvania and take somebody out of ICE custody," and "I wouldn't have the jurisdiction to do it in any event."); SA368–SA369 (Exhibit Z to Wisotsky Decl.) (statement of a Municipal Court judge in response to a writ for virtual production that "individuals facing criminal and other municipal charges in New Jersey Municipal Courts cannot be transferred into New Jersey State custody, *see* N.J.S.A. 2A:162-19").

attend criminal hearings." A17 (M&O).

Turning to the second element of right to court access violations, contrary to the Government's argument, AOB23, Appellees also sufficiently showed that the Government's Refusal Policy and Practice causes actual injury. *See Lewis*, 518 U.S. at 351. Indeed, Appellees presented evidence showing that the Policy: prevented Putative Class members from accessing public defenders and participating in their own defenses; compelled at least one Putative Class member to accept a plea rather than contest charges against him; and forced Putative Class members to miss court dates, resulting in the termination of at least one Putative Class member's participation in a pretrial intervention program and in prolonged detention for others. *See* SA057 ¶ 17 (Welch Decl.) (prevention of access to public defenders); SA007 ¶ 31 (Josefina Doe Decl.) (same); SA075 ¶ 22 (Flores Decl.) (acceptance of plea rather than contesting charges); SA173 ¶ 21 (Abraham Decl.) (termination of participation in pretrial intervention program); SA038 ¶ 11 (Jose Doe Decl.) (prolonged detention); SA057 ¶¶ 19–21 (Welch Decl.) (same); SA207–SA210 ¶¶ 13–16, 21–24 (Sweeney Decl.) (same).

A denial of court access is also an injury unto itself, and Appellants here are locking the courthouse door. *See, e.g.*, *Doe v. U.S. ICE*, 490 F. Supp. 3d 672, 694 (S.D.N.Y. 2020) (actual injury found where ICE created an "atmosphere of fear" through courthouse arrests that deterred individuals from bringing meritorious

claims). As recognized by the District Court, Appellees established "a waterfall of further disallowed deprivations . . . that . . . are illegal under the United States Constitution," stemming from an inability to appear in court. A8 (M&O).

### C. Defendants in Criminal Matters Need Not Identify a Meritorious Affirmative Defense to Exercise Their Right to Access the Court and Defend Against Charges.

Without citing any supporting caselaw, the Government argues that this Court should find that criminal defendants in governmental custody must first demonstrate that they have a viable defense in criminal proceedings to access court and attend those proceedings. *See* AOB23–24. The Government asks this Court to make that finding despite long-held constitutional principles that place the burden of proof in criminal proceedings on Government entities, *see In re Winship*, 397 U.S. 358, 364 (1970), and that guarantee the rights to petition, *see Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011), confrontation, *see Coy v. Iowa*, 487 U.S. 1012, 1016–17 (1988), and presence, *see Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). To flip the burden and require a criminal defendant to first prove a defense before the state begins to prove its case would upend longstanding constitutional principles and decades of precedent.

Remarkably, the Government argues that the right of access to the courts "is not implicated when a detainee seeks to defend himself against criminal charges," AOB21, and, to invoke such a right, a person in immigration detention must first

-31-

identify particularized meritorious defenses to those criminal charges, AOB23. This is plainly wrong. Rather than citing to cases relevant to people with unresolved criminal charges in government custody, the Government focuses on cases that discuss "*prisoners*"—individuals who have already incurred a conviction—and thus "[i]mpairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of *conviction* and incarceration." *Prater v. City of Philadelphia*, 542 F. App'x 135, 138 (3d Cir. 2013) (alteration in original) (quoting *Lewis*, 518 U.S. at 355). However, for individuals with open charges pending against them, this Court was clear that "we do not believe such a limitation is applicable." *Id.*

Consistent with that principle, courts in this Circuit distinguish between a court access claim brought before and after a conviction, affirming the constitutional right to court access to defend against "pending criminal charges." *Duran*, 923 F. Supp. 2d at 722; *see also, e.g.*, *Hargis*, 2010 WL 1999303, at *6 ("[A] pretrial detainee has a right of access to the courts with respect to . . . participation in one's own defense against *pending criminal charges*." (emphasis added)); *Caldwell*, 2000 WL 343229, at *1 ("To sustain a claim for denial of access to the courts . . . a prisoner must demonstrate actual injury by showing that he was hindered in his efforts *to assist in a pending criminal case* . . . .") (emphasis added)).

For all of these reasons, the District Court properly held that Appellees have

-32-

shown that the named plaintiffs and Putative Class members have established a likelihood of success on the court access claim.

## II. The District Court Properly Concluded that Appellees Are Likely to Succeed on their Sixth Amendment Claims.

Notably, Appellants do not challenge the *merits* of Appellees' Sixth Amendment claims. Nor can they, as Appellees have demonstrated that Appellants' Refusal Policy and Practice likely violates individuals' rights to counsel, speedy trial, confrontation, and compulsory process.

Instead, the Government's sole contention against Appellees' Sixth Amendment claims is that it is the duty of the prosecuting sovereign, not the detaining authority, to protect an individual's Sixth Amendment rights. *See* AOB24–26. In other words, the Government takes the position that it has no responsibility for ensuring the right of individuals in their custody to a speedy, public trial of charges brought in state court. This, too, is plainly wrong.

Appellants rely on two cases about the constitutional right to a speedy trial—*Barker v. Wingo*, 407 U.S. 514 (1972) and *Dickey v. Florida*, 398 U.S. 30 (1970)—to support the sweeping claim that "the prosecuting sovereign, not another sovereign that happens to be detaining the defendant, must vindicate the defendant's Sixth Amendment rights." AOB25. At best, these cases establish that the prosecuting authority must ensure that an individual is entitled to a speedy trial. They do not in any way suggest, as the Government would have it, that *only* the prosecuting

authority bears responsibility for safeguarding an individual's speedy trial right. *See United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (explaining that the speedy trial inquiry asks "whether *the government* or the defendant is more to blame," making no distinction between state or federal actors, prosecutors or custodians (emphasis added) (citing *Barker*, 407 U.S. at 530–31)). Nor does either case suggest, much less hold, that the detaining authority is exempt from safeguarding *any* of the other rights the Sixth Amendment affords.

Indeed, this Court and others have held detaining entities liable for violating individuals' Sixth Amendment rights to a speedy trial and access to counsel in criminal proceedings. In *Cobb v. Aytch*, pretrial detainees filed a class action lawsuit against Philadelphia prison authorities arguing that defendants violated their Sixth Amendment rights by transferring them to facilities across the state without notice to the individuals or their attorneys. 643 F.2d 946, 949 (3d Cir. 1981). As a result of the transfers, plaintiffs were unable to adequately meet with their attorneys to prepare their cases and missed numerous criminal court hearings. *Id.* at 951–52. The Third Circuit held that defendants' conduct of transferring plaintiffs infringed their Sixth Amendment right to effective assistance of counsel as well as their right to a speedy trial, because such transfers substantially interfered with access to counsel, geographically removed individuals from potential witnesses, and prolonged pretrial detention. *Id.* at 957–60. The Court affirmed an injunction barring defendants from

-34-

transferring individuals without notice. *Id.* at 960–62; *see also Copeland v. Mercer Cnty. Corr. Ctr.*, Civil Action No. 17-5780 (MAS) (LHG), 2019 WL 3453273, at \*5–6 (D.N.J. July 30, 2019) (denying detaining authorities' motion for summary judgment because a trier of fact could find that defendants violated pretrial detainee's Sixth Amendment rights to speedy trial and effective assistance of counsel by transferring him to a facility seventy miles away, which caused him to miss several criminal hearings).

Other courts have similarly held detaining authorities responsible for the Sixth Amendment rights of individuals in their custody in other contexts and have required those authorities to take corrective action. In *Benjamin v. Fraser*, pretrial detainees claimed that defendant New York City Department of Corrections violated their Sixth Amendment right to counsel by forcing them to face unpredictable and substantial delays when their attorneys arrived at the facility for attorney-client meetings. 264 F.3d 175, 179–81 (2d Cir. 2001). The Second Circuit concluded that the defendant's conduct undermined the plaintiffs' Sixth Amendment right to counsel by obstructing their access to counsel. *Id.* at 185–88. To safeguard plaintiffs' constitutional rights, the court affirmed the district court's order requiring defendant to establish procedures to ensure that attorney visits commenced within thirty or forty-five minutes of an attorney's arrival at the facilities and to ensure a sufficient number of private attorney visitation rooms. *Id.* at 180–81, 187–88. Ample

precedent, in sum, flatly contradicts Appellants' contention that, as the detaining authority, they have no responsibility to safeguard the Sixth Amendment rights of Putative Class members in their custody.

For these reasons, the District Court correctly concluded that the Government's Refusal Policy and Practice likely violates Putative Class members' Sixth Amendment rights—a finding on the merits that Appellants do not, and cannot, contest.

## III. The District Court Correctly Held that 8 U.S.C. § 1252(b)(9) Did Not Bar It from Reviewing Count II.

The Government wrongly asserts that Organizational Plaintiff AFSC-IRP's due process claim (Count II)[5] is barred by 8 U.S.C. § 1252(b)(9). As described herein, the purpose of that subsection is to ensure that all claims that arise from and can be resolved by immigration proceedings and the subsequent appellate process should be contained within one legal proceeding. But the constitutional harms that

---

[5] Through Count II, AFSC-IRP challenges a detention center policy that impairs its ongoing ability, as an organization, to "fully and expeditiously represent their clients and ensure their due process rights in immigration court." ECF No. 1 ¶ 182 (Compl.). The Refusal Policy and Practice prevents AFSC-IRP's clients from contesting and resolving state-court criminal charges, which, in turn, precludes AFSC-IRP from "develop[ing] a full record in immigration court" and "mak[ing] all relevant arguments on behalf of their clients." *Id.* The deprivation of due process caused by the Policy leads AFSC-IRP's clients to experience prolonged detention, further obstructing the organization's ability to "work with its clients to gather evidence, witnesses, and otherwise prepare and present their immigration case," *id.* ¶ 184, and its ability to represent new clients, *see id.* ¶ 12.

accrue to AFSC-IRP and its clients do not arise from removal proceedings and can neither be raised nor remedied within that channel, and, even if this Court disagrees, they constitute "now-or-never" claims that must be raised now. *E.O.H.C. v. Sec'y DHS*, 950 F.3d 177, 186 (3d Cir. 2020). Count II is thus reviewable at this juncture.

Section 1252(b)(9) provides in pertinent part:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien from the United States* under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9) (emphasis added). The Supreme Court and the Third Circuit have consistently cabined this statutory provision to apply only to actions "arising from" removal of individuals from the United States. *Id.* In *Jennings v. Rodriguez*, the Supreme Court disavowed an "expansive" interpretation of § 1252(b)(9) that would capture *any* claim traceable to removal proceedings, warning that such an approach would create "staggering results" and make certain claims "effectively unreviewable." 583 U.S. 281, 293 (2018); *see also Alli v. Decker*, 650 F.3d 1007, 1013 n.9 (3d Cir. 2011) (applying "the general rule that the narrower construction of a jurisdiction-stripping provision is favored" (citation modified)). The *Jennings* Court explained that § 1252(b)(9)'s application "turns on whether the legal questions that [the Court] must decide 'aris[e] from' the actions taken to remove" noncitizens, finding no jurisdictional bar where plaintiffs are not "asking for review of an order

-37-

of removal," "challenging the decision to detain them in the first place or to seek removal," or "challenging any part of the process by which their removability will be determined." 583 U.S. at 293–94; *see also Khalil v. President, United States*, 164 F.4th 259, 277 (3d Cir. 2026) (citing *Jennings*, 583 U.S. at 293–94).

The District Court rightly rejected the Government's attempt to stretch § 1252(b)(9) beyond its clearly defined scope, finding the provision inapplicable because AFSC-IRP's claim does not "arise from" the Government's efforts to detain or remove its clients. Rather, AFSC-IRP's claims arise from the unlawful conditions of confinement at Moshannon caused by the Government's Refusal Policy and Practice that hinders AFSC-IRP's ability to represent its clients. A13 (M&O); *E.O.H.C.*, 950 F.3d at 185. Indeed, Count II does not challenge individual orders of removal, decisions to detain, or an immigration court's process for determining removability, and it therefore falls outside the narrow categories identified in *Jennings* as unreviewable under § 1252(b)(9).

Nevertheless, Appellants contend that Count II "aris[es] from" removal proceedings because the due process harms allegedly can be remedied via petitions for review ("PFR"). AOB27–28 (citing *E.O.H.C.*, 950 F.3d at 186). Appellants have it backwards. Immigration judges are granted specific authority as to what they may and may not review, *see* 8 C.F.R. §§ 1240.1(a), 1240.31, 1240.41, and the Board of Immigration Appeals ("BIA") may review only what is put before it, 8 C.F.R.

-38-

§ 1003.1(b). In turn, a circuit court of appeals presented with a PFR may review only what is part of the record developed below. 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the administrative record on which the order of removal is based."). And, "[o]nly matters intimately associated and immediately associated with the final order or governed by the regulations applicable to the deportation proceeding itself" and "ordinarily presented to the special inquiry officer [immigration judge] who entered the deportation order fall within the ambit of direct appellate review." *Torres-Tristan v. Holder*, 656 F.3d 653, 658 (7th Cir. 2011) (citation modified); *see also E.O.H.C.*, 950 F.3d at 186–87; *accord NWDC Resistance v. ICE*, 493 F. Supp. 3d 1003, 1013 (W.D. Wash. 2020) (rejecting ICE's argument that § 1252(b)(9) barred a challenge to selective enforcement policies because plaintiffs sought declaratory judgment that the policy was unconstitutional but "do not seek review of any removal order and are not challenging any part of the process by which their removability will be determined"; therefore, "[t]he substance of the relief they seek demonstrates that their claims are independent of challenges to removal orders"). In this case, Count II does not arise from removal proceedings or the records from those proceedings, but rather the detention policies of Moshannon that bar AFSC-IRP's clients from accessing criminal court proceedings.

Additionally, under no law or regulation do either immigration judges or the BIA have the authority, in the course of adjudicating and reviewing removal proceedings, to command production of noncitizens in state court proceedings. In other words, there is no remedy that can be issued by an immigration judge or the BIA, nor in a PFR for an individual's removal proceedings, for the constitutional violations included in Count II stemming from AFSC-IRP's clients' inability to appear in criminal court under the Refusal Policy and Practice. Indeed, a PFR neither creates jurisdiction to adjudicate an organization's constitutional claim against a detention center policy nor authorizes the court of appeals to grant the forward-looking, facility-wide injunction sought here.

To that end, Appellants' reliance on PFR cases reviewing immigration judge and BIA process errors misses the mark. AOB28–29 (citing *Alarcon v. Att'y Gen. U.S.*, No. 21-2195, 2022 WL 1598948 (3d Cir. May 20, 2022); *Fadiga v. Att'y Gen. U.S.*, 488 F.3d 142 (3d Cir. 2007); *Calderon-Rosas v. Att'y Gen. U.S.*, 957 F.3d 378 (3d Cir. 2020); *Puspita v. Att'y Gen.*, 367 F. App'x 351 (3d Cir. 2010)). Those decisions evaluate whether an individual's immigration record was developed or adjudicated fairly where the situs of harm was the immigration proceeding itself. In contrast, the harm here (the violation of AFSC-IRP's clients' First, Fifth, and Sixth Amendment rights through the failure to provide court access) occurs in AFSC-IRP's clients' *criminal* proceedings where they are not permitted to participate; the harm

-40-

then has the downstream effect of a deprivation of due process in the clients'
immigration court proceedings, leading to their prolonged detention and AFSC-
IRP's ongoing impaired ability to represent its clients—or represent additional
individuals that would be covered by its grant—in immigration proceedings.

Additionally, as the Government acknowledges, AOB27–28, and the Court
recognized in *E.O.H.C.*, "some immigration-related claims cannot wait"; those
"now-or-never" claims are not barred by § 1252(b)(9) because a PFR cannot later
provide meaningful review, 950 F.3d at 180, 187 (holding § 1252(b)(9) did not
preclude habeas claims challenging a policy requiring petitioners to be relocated to
Mexico while their removal proceedings are pending because "[b]y the time there is
a final order of removal" to their home country of Guatemala, "it will be too late to
review or remedy their return to Mexico in the meantime"). *E.O.H.C.* further held
that petitioners' claim that returning them to Mexico would hinder their ongoing
access to and communication with their counsel, in violation of the Due Process
Clause, was a now-or-never claim because the right does not "aris[e] from" removal
proceedings and the "the constitutional harm . . . could not be remedied after a final
order of removal." *Id.* at 187; *cf. Khalil*, 164 F.4th at 274 (finding petitioner's
challenge to governmental policy punishing noncitizen political speech not a now-
or-never claim because it was "the government's very basis" for pursuing his

-41-

removal, and therefore not "wholly collateral" to the removal process as in *E.O.H.C.*).

Here too, even if considered related to immigration proceedings, AFSC-IRP's Count II is a now-or-never claim that evades review through a PFR and therefore falls outside the scope of § 1252(b)(9). The "constitutional harm" that AFSC-IRP's clients suffer when denied access to their criminal court proceedings will have already occurred and cannot "be remedied after a final order of removal." *E.O.H.C.*, 950 F.3d at 187. Nor can the organizational and representation harms that AFSC-IRP experiences—including its impaired ability to represent its clients in their immigration proceedings or to take on new clients—be remedied through an individual's PFR.

The Government's remaining arguments likewise fail. Contrary to Appellants' theory that the District Court "operated on the mistaken premise that § 1252(b)(9) applies only to judicial review of order[s] of *removal*" and "*presumably* drew this premise from the fact that § 1252 is entitled [j]udicial review of orders of removal," AOB26 (second emphasis added) (citation modified), the District Court's holding nowhere relied on the title of the statutory provision and its reasoning was entirely consistent with Third Circuit case law in this regard, *see* A14 (M&O) (rejecting Appellants' § 1252(b)(9) argument because Appellees' claims rested on the denial of constitutional rights "separate and apart from removal proceedings"). Appellants

-42-

rely on *Geda v. Director USCIS*, 126 F.4th 835, 845–46 (3d Cir. 2025), for this proposition as well as their claim that § 1252(b)(9) "applies to challenges arising outside the context of removal proceedings." AOB26–27. But while *Geda* underscores that titles do not control text, it was construing an entirely separate statutory provision (8 U.S.C. § 1252(a)(2)(B)(ii)) when holding that it lacked jurisdiction over the petitioner's adjustment-of-status application because that provision commits discretion for such forms of relief exclusively to the Secretary of DHS. 126 F.4th at 842–44. The Count II claim does not implicate discretion-based immigration status applications, but rather constitutional due process rights, which are not implicated by § 1252(b)(9).

In sum, § 1252 is not applicable to the questions of fact and law presented under Count II on behalf of Organizational Plaintiff AFSC-IRP and does not strip this Court or the District Court of jurisdiction to consider the merits of the claim.

## IV. The District Court Correctly Held That AFSC-IRP Has Standing to Assert Claims on Its Own Behalf and on Behalf of Its Clients.

Appellants contend that AFSC-IRP does not have standing because it has not demonstrated injury in fact and causation. *See* AOB30–32. But Appellants' arguments misunderstand *FDA*, upon which they heavily rely, as well as the record evidence. 602 U.S. at 380–81. Here, AFSC-IRP has demonstrated that the Government's Refusal Policy and Practice impedes AFSC-IRP's core business activity—providing legal representation to detained noncitizens in immigration

-43-

proceedings—by forcing its attorneys to spend time and resources ensuring that their immigration clients are produced for criminal court proceedings which necessarily impact their clients' immigration cases. This is *precisely* the type of injury and causation that the Supreme Court in *FDA* recognized as sufficient to establish standing. *See id.* at 394–95 (reaffirming *Havens*, 455 U.S. at 379). The District Court was correct when it held that AFSC-IRP has standing to bring Counts I, II, and IV.[6]

*First*, Appellants attempt to equate the injury that AFSC-IRP has suffered to that claimed by the medical associations in *FDA*. *See* AOB30–31. But that theory fails. In *FDA*, medical associations opposed to abortion challenging the FDA's regulation of mifepristone argued that they had suffered an injury because they incurred costs by conducting their own studies on mifepristone's risks and engaging in advocacy. 602 U.S. at 394. The Supreme Court held that the medical associations lacked standing, emphasizing that they did not prescribe, use, or otherwise have a connection to mifepristone, and instead are an "advocacy business" challenging the FDA's regulation of others. *Id.* at 385, 393–95. In so doing, the Court distinguished between expending resources for *advocacy* purposes and, as here, expending

---

[6] AFSC-IRP satisfies both organizational standing and third-party standing. Appellants do not, and cannot, contest AFSC-IRP's third-party standing, as AFSC-IRP has suffered a cognizable injury, its clients are hindered from bringing suit themselves, and the attorney-client relationship satisfies the close relationship requirement. *See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 289–91 (3d Cir. 2002).

additional resources to continue providing *services*. *Id.* at 394 ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money *to gather information and advocate* against the defendant's action." (emphasis added)). By contrast, the Supreme Court reaffirmed its longstanding precedent in *Havens* as an example of when impeding an organization's core business activity of providing services is a cognizable injury. *Id.* at 395.

The *FDA* Court explained that in *Havens*, defendants provided false information about housing availability to the plaintiff organization, which, "[c]ritically . . . not only was an issue-advocacy organization, but also operated a housing counseling *service*." *Id.* (emphasis added). The Supreme Court in *Havens* held that the defendants' conduct constituted an injury to the plaintiff organization because it "perceptibly impaired" plaintiff's ability to provide counseling and referral services to home seekers. 455 U.S. at 379. That is, the plaintiff organization had to "devote significant resources to identify and counteract" the defendants' actions, *id.*, which "directly affected and interfered with [the organization's] core business activities," *FDA*, 602 U.S. at 395.

So too here. Appellants fail entirely to mention, much less address, *Havens*—a glaring omission as AFSC-IRP's injury falls squarely within *Havens*' bounds. AFSC-IRP has demonstrated that Appellants' Refusal Policy and Practice obstructs

-45-

its immigration clients from attending and resolving criminal proceedings, which negatively impacts their immigration proceedings. *See* ECF No. 1 ¶¶ 11–12, 23–26, 139, 147–57 (Compl.). As a result, to fulfill AFSC-IRP's core and state-funded business activities—providing legal representation to New Jersey residents facing detention and removal proceedings—AFSC-IRP attorneys must also attend their clients' criminal proceedings and help procure criminal defense counsel to resolve the criminal court proceedings, a predicate step in obtaining the immigration relief they seek. *Id.* These criminal court interventions hinder AFSC-IRP's ability to represent their existing clients in immigration proceedings and reduces their capacity to take on additional immigration clients. *Id.* at ¶¶ 11–12, 148, 151, 156. Thus, as in *Havens*, Appellants' Refusal Policy and Practice "perceptibly impair[s]" AFSC-IRP's ability to fulfill its state-funded mission to provide legal services to detained New Jersey residents in immigration removal proceedings. 455 U.S. at 379; *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (relying on *Havens* and concluding injury requirement satisfied where immigration organizations had to divert "already limited resources" to help asylum seekers in light of challenged rule); *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025) (holding that an organization had standing to challenge the Remain in Mexico policy when it had to expend additional resources "to continue advancing its core business activities and longstanding mission of providing direct

-46-

representation, counseling, and legal assistance to noncitizens in removal proceedings").

*Second*, Appellants' contention that AFSC-IRP has failed to establish causation for standing similarly fails. Appellants attempt to analogize AFSC-IRP's injury to the individual doctors' claim in *FDA* that the FDA's actions would cause them to suffer monetary and related injuries. AOB31–32 (citing *FDA*, 602 U.S. at 392, 394). But the Court's reasoning in *FDA* is entirely distinguishable. There, the Supreme Court held that the doctors' theory of causation was improperly speculative because the doctors failed to show any evidence that the FDA's regulatory actions would lead to injuries. *FDA*, 602 U.S. at 390–92. The plaintiff doctors failed, for example, to provide evidence that more pregnant women sought the doctors' treatment or that the doctors had to divert time and resources from other patients as a result of mifepristone use. *Id.*

By contrast, Appellees have provided precisely the type of record evidence *FDA* contemplates to establish a "predictable chain of events leading from the government action" to AFSC-IRP's injury. *Id.* at 385. By obstructing AFSC-IRP's clients' ability to attend criminal court proceedings, Appellants force AFSC-IRP attorneys to expend time handling criminal court matters beyond their expertise—including appearing in criminal court—to ensure that their clients' criminal proceedings will get resolved as necessary for immigration proceedings. *See, e.g.,*

-47-

ECF No. 1 ¶¶ 139–57 (Compl.); SA158–SA159 ¶ 17 (Herr Decl.); SA166 ¶ 9 (Meixler Decl.); SA172 ¶¶ 15–16 (Abraham Decl.). Time spent handling criminal matters detracts from AFSC-IRP's immigration attorneys' ability to work on their clients' immigration case or take on additional immigration cases, which is their core mission as a state-funded legal services provider. *See, e.g.*, ECF No. 1 ¶¶ 151–54 (Compl.); SA169 ¶¶ 22–23 (Meixler Decl.). Moreover, Appellants' Policy delays resolution of criminal matters, which in turn impedes an individual's ability to be released from immigration detention on bond. Such delays prolong AFSC-IRP's representation of an individual client, which limits the number of additional clients that AFSC-IRP can take on for representation as is core to their mission. SA169 ¶ 23 (Meixler Decl.); SA156–SA157 ¶ 15 (Herr Decl.); ECF No. 1 ¶ 156 (Compl.). Thus, the links in the chain of causation are not attenuated; indeed, record evidence demonstrates that the Government's "action has caused [and] likely will cause injury in fact" to AFSC-IRP's core business activity. *FDA*, 602 U.S. at 385.

The Government's arguments to the contrary are unavailing. AFSC-IRP's work to resolve criminal proceedings is not a "voluntary reallocation[]." AOB31. Because pending criminal proceedings may impact AFSC-IRP clients' requests for release from detention and immigration relief, ensuring that their clients are able to resolve criminal matters is a "critical piece of [AFSC-IRP's] work" in providing

immigration representation. SA155 ¶¶ 10–11 (Herr Decl.).[7] Appellants' further suggestion that AFSC-IRP's injuries depend on the actions of New Jersey courts and prosecutors similarly fails: when people are unable to attend criminal proceedings, they unequivocally cannot resolve the charges against them. *See* AOB31. Thus, just as the Supreme Court in *FDA* recognized that government regulation of a business may cause downstream or upstream economic injuries to others in the chain, or that government regulation of one property may reduce the value of adjacent property is sufficient to establish injury and causation, so too here is the link of causation established. *See FDA*, 602 U.S. at 384–85 (collecting cases).

Accordingly, the District Court correctly concluded that AFSC-IRP has standing to bring Counts I, II, and IV.

## CONCLUSION

For all these reasons, the District Court's decision should be affirmed and the preliminary injunction should remain in place throughout the pendency of this litigation.

---

[7] Appellants' reliance on *Public Interest Legal Foundation v. Secretary Pennsylvania*, 136 F.4th 456 (3d Cir. 2025), *see* AOB31–32, is misplaced. That case involved an out-of-state organization that expended resources to obtain records but did "not represent any Pennsylvania citizens who have been affected" by the defendant's actions. *Pub. Int. Legal Found.*, 136 F.4th at 469. By contrast, AFSC-IRP provides legal services to individuals impacted by Appellants' conduct, and Appellants' conduct has hindered its ability to provide those services.

Dated:  February 23, 2026

*/s/ Alexander Shalom*

Alexander Shalom, Esq. (021162004)
Gavin J. Rooney, Esq. (027781992)
Natalie J. Kraner, Esq. (039422005)
Naomi D. Barrowclough, Esq. (027682010)
Rachel M. Dikovics, Esq.* (272642018)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
862.926.2029
Email:  ashalom@lowenstein.com
Email:  grooney@lowenstein.com
Email:  nkraner@lowenstein.com
Email:  nbarrowclough@lowenstein.com
Email:  rdikovics@lowenstein.com

Shira Wisotsky, Esq. (243172017)
Raquiba Huq, Esq. (030952007)
Emily G. Thornton (Minn. ID No. 0402010)
**LEGAL SERVICES OF NEW JERSEY**
100 Metroplex Drive, Suite 402
P.O. Box 1357
Edison, New Jersey 08817
908.882.2665
Email:  swisotsky@lsnj.org
Email:  rhuq@lsnj.org
Email:  ethornton@lsnj.org

Tiffany J. Lieu, Esq.
(Wash. ID No. 55175)
**CRIMMIGRATION CLINIC
HARVARD IMMIGRATION &
REFUGEE CLINICAL PROGRAM**
6 Everett Street, Suite 3106
Cambridge, Massachusetts 02138
617.496.5497
Email:  tlieu@law.harvard.edu

*Admission forthcoming*

*Pro Bono Counsel for Plaintiffs-Appellees*

-50-

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and Local Rules of this Court, I hereby certify the following:

1.      I am a member in good standing of the Bar of this Court.

2.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,787 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced 14-point font, using Microsoft Word in a 14-point Times New Roman font in the text and footnotes.

4.      Pursuant to Third Circuit L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

5.      The electronic file containing this brief was scanned for viruses using Microsoft Defender Antivirus version 1.445.211.0 and no viruses were detected.

Dated:  February 23, 2026

/s/ Alexander Shalom
Alexander Shalom, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
862.926.2029
ashalom@lowenstein.com

*Pro Bono Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 23, 2026, a true and correct copy of the foregoing

*Plaintiff-Appellees' Responsive Brief* was filed with the Clerk using the appellate

CM/ECF system. All counsel of record are registered CM/ECF users, and service

will be accomplished by the CM/ECF system.

Dated:  February 23, 2026          */s/ Alexander Shalom*
Alexander Shalom, Esq.
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
862.926.2029
ashalom@lowenstein.com

*Pro Bono Counsel for Plaintiffs-Appellees*