# EXHIBIT

# C

The Government's Reply Brief in *Dep't Homeland Sec. v. Josefina Doe*, No. 25-1628 (3d Cir.)

No. 25-1628

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

JOSEFINA DOE, *et al.*,

*Appellees*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
No. 3:24-cv-259
HONORABLE STEPHANIE L. HAINES

## APPELLANTS' REPLY BRIEF

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MARY L. LARAKERS
Senior Litigation Counsel

JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 598-7283
julian.m.kurz@usdoj.gov

*Counsel for Appellants*

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

ARGUMENT .....................................................................................................2

    I.    The District Court Erroneously Concluded that Appellees Were Likely to Succeed on Their Access-to-Courts Claim. ....................................................2

        A. Appellees' Waiver Argument Fails. ......................................................3

           1.  The Government Preserved the Standing Issue and May Advance Its Comity Framing on Appeal. .......................................................3

           2.  The Article III Defect Is Jurisdictional and Cannot Be Waived. .......6

           3.  In Any Event, This Court May Consider the Issue Because It Implicates the Public Interest.................................................................7

        B. Appellees Lack Standing Because Sovereign Priority Is a Matter of Comity Between Governments..............................................................8

           1.  A Detainee Has No Legally Cognizable Interest in Inter-Sovereign Priority. ......................................................................................8

           2.  ICE Inflicts No Concrete Injury by Declining to Facilitate Appellees' Preferred Mode of Participation in State Proceedings. ....9

           3.  Appellees Cannot Manufacture Article III Injury by Recasting a Sovereign-Priority Dispute as an Access Claim.............................10

        C. The Right of Access to the Courts Does Not Extend to Participation in Pending Criminal Defense Proceedings. .............................................12

           1.  Supreme Court and Third Circuit Precedent Confine the Access-to-Courts Doctrine to the Ability to Challenge Convictions and Conditions of Confinement.............................................................12

           2.  Appellees' Authorities Are Non-Binding Outliers That Conflict with *Monroe* and *Lewis*. .............................................................13

           3.  Expanding the Doctrine Would Constitutionalize Inter-Sovereign Custody Logistics. .......................................................................15

D. Appellees Failed to Identify a Nonfrivolous Underlying Claim. ..........16

II.   The District Court Erred in Holding that ICE Has a Duty to Vindicate
Appellees' Sixth Amendment Rights.......................................................17

III.   The District Court Erroneously Held that 8 U.S.C. § 1252(b)(9) Did Not
Bar Review of Count II. ...........................................................................20

IV.   AFSC Lacks Organizational Standing. ......................................................23

CONCLUSION .................................................................................................26

# **TABLE OF AUTHORITIES**

## **Cases**

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006)................................................................................................6

*Arizona All. for Retired Americans v. Mayes*,
117 F.4th 1165 (9th Cir. 2024) ...........................................................................23

*Barker v. Wingo*,
407 U.S. 514 (1972)....................................................................................... 16, 18

*Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*,
877 F.3d 136 (3d Cir. 2017) ..................................................................................7

*Benjamin v. Fraser,*
264 F.3d 175 (2d Cir. 2001)......................................................................... 17, 18

*Bounds v. Smith*,
430 U.S. 817 (1977).............................................................................. 10, 11, 15

*Bowman v. Wilson*,
672 F.2d 1145 (3d Cir. 1982) ......................................................................... 1, 8, 9

*Caisson Corp. v. Ingersoll-Rand Co.*,
622 F.2d 672 (3d Cir. 1980) ............................................................................3, 5

*Calderon-Rosas v. Att'y Gen.*,
957 F.3d 378 (3d Cir. 2020) ...............................................................................22

*Christopher v. Harbury*,
536 U.S. 403 (2002)....................................................................................... 15, 16

*Cobb v. Aytch*,
643 F.2d 946 (3d Cir. 1981)................................................................................18

*Copeland v. Mercer County Correctional Center,*
2019 WL 3453273 (D.N.J. July 30, 2019) ................................................. 17, 18

*Dickey v. Florida,*
   398 U.S. 30 (1970)......................................................................... 10, 16

*E.O.H.C. v. Sec'y DHS,*
   950 F.3d 177 (3d Cir. 2020) .............................................................20

*FDA v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024)..................................................................... 2, 9, 23

*Foreman v. Lowe,*
   251 F. App'x 401 (3d Cir. 2008).......................................................14

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)............................................................... 21, 22, 23

*In re Caterbone,*
   640 F.3d 108 (3d Cir. 2011) ...............................................................6

*Jennings v. Rodriguez,*
   583 U.S. 281 (2018)..........................................................................20

*Lebron v. Nat'l R.R. Passenger Corp.,*
   513 U.S. 374 (1995)............................................................................3

*Lewis v. Casey,*
   518 U.S. 343 (1996)................................................................. 2, 12, 13

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)..........................................................................24

*March for Our Lives Idaho v. McGrane,*
   749 F. Supp. 3d 1128 (D. Idaho 2024) ............................................24

*Matter of Santos,*
   19 I. & N. Dec. 105 (B.I.A. 1984) ........................................ 19, 20, 21

*Monroe v. Beard,*
   536 F.3d 198 (3d Cir. 2008) ................................................... 2, 10, 16

*Newark Morning Ledger Co. v. United States,*
   539 F.2d 929 (3d Cir. 1976) ...............................................................3

iv

*Nielsen v. Thornell*,
  101 F.4th 1164 (9th Cir. 2024) ....................................................................23

*Ponzi v. Fessenden*,
  258 U.S. 254 (1922)................................................................. 4, 5, 7, 8

*Prater v. City of Philadelphia*,
  542 F. App'x 135 (3d Cir. 2013) ...............................................................15

*Reno v. Flores*,
  507 U.S. 292 (1993)..................................................................................19

*Rivera v. Monko*,
  37 F.4th 909 (3d Cir. 2022) ............................................................. 11, 12, 14

*Tazu v. Att'y Gen.*,
  975 F.3d 292 (3d Cir. 2020) ............................................................. 20, 22

*United States v. Joseph*,
  730 F.3d 336 (3d Cir. 2013) ........................................................................3

*United States v. MacDonald,*
  456 U.S. 1 (1982)......................................................................................17

*United States v. Velazquez,*
  749 F.3d 161 (3d Cir. 2014) .......................................................................18

*Yee v. City of Escondido, Cal.*,
  503 U.S. 519 (1992)....................................................................................3

## **Statutes**

8 U.S.C. § 1252(b)(9)................................................................. 2, 19, 20, 21

42 U.S.C. § 1983 .......................................................................................13

## **INTRODUCTION**

This appeal concerns the limits of Article III, the scope of the access-to-courts doctrine, the allocation of Sixth Amendment responsibility between sovereigns, and Congress's decision to channel removal-related claims through the petition-for-review process. The district court's preliminary injunction rests on a series of legal errors on each of these issues. The district court converted inter-sovereign custody arrangements into Article III injuries, expanded access doctrine beyond its defined limits, reassigned Sixth Amendment responsibilities from the prosecuting sovereign to a separate custodial sovereign, and exercised jurisdiction over claims that must proceed through the immigration review scheme.

First, Appellees lack standing. Their alleged injury flows from discretionary decisions by a separate sovereign regarding the conduct of its criminal proceedings. Under settled precedent, the allocation of custody and prosecutorial priority between sovereigns is a matter of comity, not a personal entitlement enforceable by the detainee. *Bowman v. Wilson*, 672 F.2d 1145, 1154 (3d Cir. 1982). Because Appellees identify no legally protected interest in compelling ICE to restructure its custody practices to facilitate state proceedings, and because any asserted harm depends on the independent actions of third parties, Article III's requirements of injury, traceability, and redressability are not satisfied.

Second, even if standing existed, the right of access to the courts does not

1

extend to participation in pending criminal defense proceedings. Supreme Court and Third Circuit precedent confine access claims to the ability to pursue direct or collateral attacks on convictions and civil-rights suits challenging conditions of confinement. *Lewis v. Casey*, 518 U.S. 343, 354–55 (1996); *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). Appellees seek neither. Third, the Sixth Amendment assigns responsibility to the prosecuting sovereign. No authority holds that a custodial sovereign assumes another sovereign's duty to bring a defendant to trial. Fourth, Count II arises from removal proceedings and must be channeled through 8 U.S.C. § 1252(b)(9). Finally, AFSC cannot manufacture standing through voluntary resource expenditures. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394–95 (2024). Because the district court's likelihood-of-success analysis rests on these legal errors, the injunction cannot stand.

## ARGUMENT

### I. The District Court Erroneously Concluded that Appellees Were Likely to Succeed on Their Access-to-Courts Claim.

The district court's likelihood-of-success determination rests on legal errors concerning Article III and the scope of the access-to-courts doctrine. Appellees attempt to defend the district court's ruling through a series of threshold and merits arguments that do not withstand scrutiny. They first contend that the Government forfeited the central standing defect, but the standing issue was preserved below, cannot be waived in any event, and is properly considered here. On the merits,

2

Appellees lack Article III standing because the alleged injury arises from the allocation of custody and prosecutorial priority between sovereigns—a matter of intergovernmental comity that does not create a personal legal entitlement enforceable by detainees. Even if standing existed, the access-to-courts doctrine does not extend to participation in ongoing criminal defense proceedings, which fall outside the limited categories that the Supreme Court and this Court have recognized. And, at a minimum, Appellees have failed to identify the nonfrivolous underlying claim that is required to establish an access-to-courts injury. Each of these defects independently defeats the district court's conclusion that Appellees were likely to succeed on their access-to-courts claim.

### A. Appellees' Waiver Argument Fails.

#### 1. The Government Preserved the Standing Issue and May Advance Its Comity Framing on Appeal.

Appellees contend that the Government forfeited its standing argument because it did not invoke the term "comity" in the district court. That contention misstates the governing preservation standard. This Court "generally refuse[s] to consider issues that are raised for the first time on appeal, absent exceptional circumstances." *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 680 (3d Cir. 1980) (citing *Newark Morning Ledger Co. v. United States*, 539 F.2d 929 (3d Cir. 1976)). And it has "held on numerous occasions that a trial court should not be reversed on grounds that were never urged or argued in the court below." *Id.* The

3

relevant inquiry, therefore, is whether the issue was "urged or argued" below, not whether it was expressed in identical doctrinal terms. Once an issue is preserved, an appellant "can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992). A party may present "a new argument" on appeal so long as it falls within the scope of an issue raised below. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). And this Court has explained that litigants are "free . . . to place greater emphasis and more fully explain an argument on appeal than they did in the District Court," and may even, "within the bounds of reason, reframe their argument," so long as they do not change its substance. *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013). The question, then, is whether the Government preserved the standing issue, not whether it labeled that issue "comity."

The issue presented both below and on appeal is whether Plaintiffs-Appellees have Article III standing to challenge ICE's refusal to provide virtual access to New Jersey criminal proceedings when their alleged injury depends on decisions of a separate sovereign. In the Opening Brief ("OB"), Defendants-Appellants argued that Plaintiffs lack standing because "the priority of prosecution is a matter of comity between the federal government and the state." OB at 17 (citing *Ponzi v. Fessenden*, 258 U.S. 254, 261–62 (1922)). That formulation reflects the principle that allocation

4

of custody and prosecution between sovereigns does not create a cognizable injury in fact in the detainee and is not attributable to the federal detaining authority.

Defendants raised that same standing defect in their Opposition to Plaintiffs' Motion for a Preliminary Injunction ("PI Opp.").[1] They argued that "[a]ny injury that flows from New Jersey's choice not to transport noncitizens is not caused by Defendants." PI Opp. at 16. They further explained that "the federal Defendants and New Jersey are separate sovereigns that cannot dictate how the other chooses to expend its resources." *Id.* at 16. And they emphasized that "[t]here is simply no 'causal connection between the injury and the conduct complained of' where, as here, the injury is not 'fairly . . . trace[able] to the challenged action of the defendant,' but is 'th[e] result [of] the independent action of some third party not before the court.'" *Id.* at 16–17 (citation omitted). The Opposition also underscored that "this case reflects two separate choices by two completely separate sovereigns with no causal link between them." *Id.* at 17. Those arguments squarely presented the same inter-sovereign allocation and traceability defect that the Opening Brief described in comity terms.

Under *Caisson*, the question is whether the issue was "urged or argued" below. 622 F.2d at 680. It plainly was. The PI Opposition challenged injury in fact, causation, and redressability on the ground that the asserted harm flows from

---

[1] The PI Opp. is reproduced in the Second Supplemental Appendix.

decisions of a separate sovereign outside ICE's control. The Opening Brief's explicit invocation of comity and citation to *Ponzi* is, at most, a permissible refinement and doctrinal sharpening of the same standing objection. Under *Yee*, *Lebron*, and *Lockett*, that is sufficient to defeat any claim of waiver or forfeiture.

## 2. The Article III Defect Is Jurisdictional and Cannot Be Waived.

Appellees attempt to recast the Government's jurisdictional argument as a "prudential" comity objection distinct from Article III. Response Brief ("RB") at 18–19. But the Government does not invoke comity as a discretionary abstention doctrine. Rather, it invokes the structural allocation of authority between sovereigns to demonstrate the absence of a legally cognizable injury and the lack of traceability to the federal Defendants. That is a constitutional standing objection.

Article III standing issues "can never be forfeited or waived." *In re Caterbone*, 640 F.3d 108, 111 (3d Cir. 2011) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). Moreover, federal courts have an independent obligation to ensure that plaintiffs establish injury in fact, traceability, and redressability. Accordingly, if Appellees' alleged injury arises from decisions of a separate sovereign rather than a deprivation attributable to ICE, the Court must address that defect regardless of any asserted forfeiture. Even if this Court were to view the Government's appellate articulation as a refinement, the underlying Article III deficiency cannot be waived.

### 3. In Any Event, This Court May Consider the Issue Because It Implicates the Public Interest.

Even if this Court were to conclude that the Government's comity articulation was not fully preserved, it retains discretion to consider issues not pressed below when "the public interest requires." *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017). That exception applies where the issue presented transcends the parties' immediate dispute and bears on structural principles governing the exercise of judicial power.

The question here concerns the allocation of custodial authority and prosecutorial priority between sovereigns, and the extent to which a federal court may compel one sovereign to restructure its detention practices to accommodate another's criminal process. That issue implicates federalism, separation of powers, and the limits of federal equitable authority. It is not a narrow procedural objection but rather a structural constraint on how federal courts may intervene in inter-sovereign arrangements.

Allowing a detainee to leverage an access-to-courts theory to override established principles governing sovereign priority would alter longstanding allocations of authority between federal and state governments. Because this case implicates recurring and systemic consequences beyond the immediate parties, discretionary review would be appropriate under *Barna* even if the Court viewed the Government's appellate framing as a refinement of its earlier presentation.

7

**B. Appellees Lack Standing Because Sovereign Priority Is a Matter of Comity Between Governments.**

**1. A Detainee Has No Legally Cognizable Interest in Inter-Sovereign Priority.**

Appellees lack standing because the allocation of custody between sovereigns is a matter of comity, not a personal legal entitlement enforceable by a detainee. The Supreme Court has long recognized that "[o]ne accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that." *Ponzi*, 258 U.S. at 260. Relying on *Ponzi*, this Court has made clear that the "exercise of jurisdiction over a prisoner who has violated the law of more than one sovereignty and the priority of prosecution of the prisoner is solely a question of comity between the sovereignties which is not subject to attack by the prisoner." *Bowman*, 672 F.2d at 1154. And a detainee "has no standing to raise the issue." *Id.*

That rule forecloses Appellees' attempt to reframe sovereign allocation as a personal right to compel ICE to facilitate virtual participation in state proceedings. Appellees contend that the relevant question is whether "the Government can deprive Putative Class members of the right to a virtual appearance in a state court criminal proceeding." RB at 20. But even if state and federal proceedings are practically connected, that does not transform inter-sovereign logistics into an enforceable entitlement. As *Bowman* holds, priority of custody is "not a personal

8

right of the prisoner." 672 F.2d at 1154. Because detainees cannot challenge which sovereign exercises jurisdiction over them, they cannot demand that one sovereign restructure its custody decisions to accommodate another's preferred procedures.

### 2. ICE Inflicts No Concrete Injury by Declining to Facilitate Appellees' Preferred Mode of Participation in State Proceedings.

Appellees also fail to establish injury-in-fact because they identify no legally protected entitlement to compel ICE to provide virtual access to a state courtroom.[2] Article III requires a plaintiff to demonstrate a "concrete" injury that is fairly traceable to the defendant and likely to be redressed by judicial relief. *FDA*, 602 U.S. at 380–81. A sovereign does not inflict a "concrete injury" when it chooses to exercise its own jurisdiction rather than make a detainee available to another sovereign. *See Bowman*, 672 F.2d at 1154–55; *Ponzi*, 258 U.S. at 260–62.

Appellees possess personal constitutional protections in their criminal proceedings, including the right to a speedy trial and other Sixth Amendment guarantees. But the prosecuting sovereign is responsible for vindicating those rights.

---

[2] Appellees' theory also overlooks the operational constraints that underlie ICE's practices. The detention facility's videoconferencing infrastructure is primarily dedicated to asylum officer interviews for credible fear determinations, immigration-court proceedings, which are conducted remotely for detained respondents, and virtual attorney-client conversations. *See* PI Opp. at 5 (citing Kemp Declaration). Expanding virtual appearances for state criminal proceedings would require ICE to divert its limited videoconferencing resources away from immigration functions. ICE's decision not to reallocate its resources to accommodate a separate sovereign's proceedings reflects ordinary facility-management and resource-allocation judgments, not the denial of a personal constitutional entitlement.

*See Dickey v. Florida*, 398 U.S. 30, 33–34, 37–38 (1970). Nothing in *Dickey* suggests that a separate detaining sovereign must facilitate a defendant's preferred mode of appearance in another sovereign's court. Absent a personal legal entitlement to demand virtual participation, ICE's refusal to provide that accommodation does not constitute a concrete injury traceable to ICE, nor would an injunction compelling virtual access necessarily redress the asserted harms, which depend on the interaction of two sovereign systems.

### 3. Appellees Cannot Manufacture Article III Injury by Recasting a Sovereign-Priority Dispute as an Access Claim.

Appellees attempt to recast a structural custody dispute as a violation of the right of access to the courts. But relabeling their theory does not alter the Article III analysis. The asserted inability to participate in state proceedings ultimately depends on decisions by New Jersey courts and prosecutors—actors outside ICE's control. Where an alleged injury flows from the independent actions of a separate sovereign, it is not fairly traceable to federal defendants and cannot support Article III standing.

Appellees assert a general inability to appear virtually in state proceedings and contend that this inability itself constitutes constitutional injury. That theory would expand access doctrine beyond its established limits and collapse the distinction between personal constitutional rights and inter-sovereign allocation rules. As this Court has already explained, the allocation of prosecutorial priority between sovereigns is a matter of inter-sovereign comity, not an enforceable right

10

belonging to the detainee. *Bowman*, 672 F.2d at 1154. Because sovereign priority remains a matter of comity between governments, Appellees cannot transform a structural allocation principle into a personal constitutional injury sufficient for Article III standing.

Nor does invoking the term "access" cure the traceability defect. The alleged inability to participate in state proceedings ultimately depends on discretionary decisions by New Jersey courts and prosecutors, such as whether to schedule hearings, issue writs, grant continuances, or drop charges. ICE does not control those decisions. Where the asserted injury flows from the independent actions of a separate sovereign, it is not fairly traceable to federal defendants and is not redressable by an injunction directed at ICE.

In short, Appellees' access framing does not convert a matter of sovereign comity into a cognizable Article III injury. The Constitution does not grant detainees a personal right to dictate how coordinate sovereigns allocate custody or structure their proceedings. Because the claimed harm arises from inter-sovereign logistics rather than from the invasion of a legally protected interest belonging to Appellees, standing is lacking.

**C. The Right of Access to the Courts Does Not Extend to Participation in Pending Criminal Defense Proceedings.**

**1. Supreme Court and Third Circuit Precedent Confine the Access-to-Courts Doctrine to the Ability to Challenge Convictions and Conditions of Confinement.**

The Supreme Court's decisions in *Bounds* and *Lewis*, as applied by this Court in *Monroe*, confine the access-to-courts doctrine to the ability to initiate and pursue specific categories of legal claims. *Lewis*, 518 U.S. at 349, 354–55; *Monroe*, 536 F.3d at 205; *Bounds v. Smith*, 430 U.S. 817, 827 (1977). Before *Bounds*, the Court recognized only a negative right of access—"a right for prisoners to litigate claims without state interference." *See Rivera v. Monko*, 37 F.4th 909, 919 (3d Cir. 2022). *Bounds* imposed affirmative obligations, but the Court made clear that an inmate needed to "demonstrate that the alleged shortcomings in the [prison] hindered his efforts to pursue a legal claim." 430 U.S. at 823.

*Lewis* then narrowed the doctrine in two critical respects. First, *Lewis* held that "'an inmate alleging a violation of *Bounds* must show actual injury' to his right to access the courts, reasoning that *Bounds* did not establish a freestanding right to a prison law library or legal assistance program." *Rivera*, 37 F.4th at 920 (citing *Lewis*, 518 U.S. at 350–51). Second, "*Lewis* held that only certain types of claims—specifically, direct or collateral attacks on a prisoner's conviction or sentence, or civil rights suits challenging the conditions of his confinement—could support an access-to-courts injury." *Id.* (citing *Lewis*, 518 U.S. at 355). Here, Appellees are not

12

attempting to file habeas petitions, direct appeals, or civil-rights suits challenging conditions of confinement. They are criminal defendants seeking to attend and defend pending prosecutions. That request does not fall within the narrow categories recognized in *Lewis* and reaffirmed in *Rivera* and *Monroe*. Appellees' theory therefore exceeds the doctrine's defined scope.

### 2. Appellees' Authorities Are Non-Binding Outliers That Conflict with *Monroe* and *Lewis*.

Appellees rely heavily on district court decisions—*Duran*, *Hargis*, *Payne*, *Brown*, and *Ward*. RB at 25–26. None is binding. More importantly, to the extent that those decisions suggest that access doctrine extends to participation in criminal defense proceedings, they cannot be reconciled with *Lewis*'s limitation of the right of access to habeas claims and conditions-of-confinement claims. *Lewis*, 518 U.S. at 355; *see Rivera*, 37 F.4th at 920. By definition, a pending criminal prosecution is neither a direct or collateral attack nor a civil rights suit challenging conditions of confinement. If district courts have recognized broader participation rights, they represent a minority position inconsistent with controlling precedent.

Appellees also mischaracterize *Rivera v. Monko*. *Rivera* involved a prisoner who "appeal[ed] the District Court's order dismissing his complaint against two corrections officers and a prison law librarian." *Rivera*, 37 F.4th at 912. The prisoner alleged that the officers and librarian had "completely deprived him of the ability to research evidentiary and court rules ahead of and during his trial." *Id.* The "trial" at

13

issue was a civil rights trial concerning conditions of confinement—not the defense of pending criminal charges. The opinion opens by recognizing that "[p]risoners have a well-settled constitutional right to access the courts to challenge their convictions and conditions of confinement." *Id.* Rivera had already filed and was litigating his own civil claim. The Court held that qualified immunity barred relief because the right was not clearly established at the time. It did not recognize a right to attend or defend criminal prosecutions. Appellees' attempt to transplant *Rivera*— a civil-rights trial case—into the criminal-defense context disregards both the posture and the holding of that decision.

Appellees also invoke *Foreman v. Lowe*, F. App'x 401 (3d Cir. 2008), but that case reinforces, rather than undermines, the limitations recognized in *Lewis*. *Foreman* was a "civil rights action brought pursuant to 42 U.S.C. § 1983 and *Bivens*." *Id.* at 402. The plaintiff challenged his custody classification and alleged that prison officials had unlawfully restricted his access to the law library. This Court affirmed dismissal because the plaintiff failed to demonstrate actual injury and because the docket showed that he had obtained extensions and met deadlines. *Foreman* did not recognize a right to attend or defend criminal proceedings; it applied the traditional actual-injury framework to a civil action. Appellees' reading of *Foreman* as supporting a right to participate in criminal defense proceedings is unsustainable.

Appellees' attempt to repackage their theory as a "conditions of confinement" claim fares no better. RB at 27. The operative question under *Lewis* is what type of claim the prisoner seeks to pursue. The New Jersey proceedings that Appellees seek to attend are criminal prosecutions. They therefore fall outside the limited categories recognized in *Lewis*—direct or collateral attacks on convictions and civil-rights suits challenging conditions of confinement. If labeling an attendance request as a "conditions" claim were sufficient to overcome the absence of a qualifying civil-rights or conditions-of-confinement claim, the categorical limitation announced in *Lewis* would be meaningless. The doctrine turns on the nature of the underlying proceeding, not on how plaintiffs characterize their theory.

### 3. Expanding the Doctrine Would Constitutionalize Inter-Sovereign Custody Logistics.

Appellees' theory would transform routine inter-sovereign custody arrangements into constitutional mandates. But access doctrine is not triggered by logistical inconvenience; a claimant can establish a violation only if he shows that he was actually injured by the alleged denial of access. *Lewis*, 518 U.S. at 351; *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). And where the underlying proceeding is not one of the "certain types of claims" recognized in *Lewis*, a cognizable access injury cannot occur. *Lewis*, 518 U.S. at 355.

Here, Appellees do not allege the loss of a habeas petition, appeal, or civil rights action. Instead, they seek to convert sovereign allocation and transportation

decisions into constitutional violations. That move would untether the doctrine from its anchoring requirement that the plaintiff "demonstrate that the alleged shortcomings in the [prison] hindered his efforts to pursue a legal claim." *Bounds*, 430 U.S. at 823. The Supreme Court's limitation of access claims to specific categories of underlying actions prevents precisely this kind of expansion. No binding authority recognizes a constitutional right to attend and defend pending criminal proceedings under the access-to-courts doctrine, and this Court should decline to create one.

### D. Appellees Failed to Identify a Nonfrivolous Underlying Claim.

Appellees rely on *Prater v. City of Philadelphia*, 542 F. App'x 135 (3d Cir. 2013), to argue that *Lewis*'s categorical limitation does not apply to pretrial detainees. But *Prater* did not dispense with the requirement that a plaintiff identify a specific, nonfrivolous underlying claim that was actually lost. To the contrary, the Court expressly remanded for consideration of whether the alleged interference "caused the loss of a meritorious case," citing *Harbury*, 536 U.S. at 414. *Prater*, 542 F. App'x at 138–39. Even under Appellees' reading of *Prater*, they must satisfy *Harbury*'s core requirement.

They have not done so. Appellees do not identify any particular defense, motion, or legal argument that ICE prevented them from presenting in state court. Instead, they argue that missing a court appearance is itself a sufficient injury and

16

that, because the prosecution bears the burden in criminal proceedings, they need not identify a "claim." But access doctrine is not concerned with burden allocation in criminal procedure; it requires a showing that official action caused the loss of a specific, nonfrivolous legal claim. Appellees have never described such a claim.

Moreover, *Prater* involved alleged interference by jail officials with a detainee's ability to litigate matters in the courts of the very sovereign that detained him. This case is different. Appellees are in federal custody and seek to compel the federal government to facilitate their participation in criminal proceedings brought by a separate sovereign. That inter-sovereign feature—absent in *Prater*— underscores why the alleged injury here does not fit within traditional access doctrine and why, at a minimum, strict adherence to *Harbury*'s underlying-claim requirement is essential. Because Appellees have not satisfied that requirement, they cannot demonstrate the "actual injury" that *Lewis*, *Monroe*, and *Harbury* demand.

## II. The District Court Erred in Holding that ICE Has a Duty to Vindicate Appellees' Sixth Amendment Rights.

The Sixth Amendment allocates responsibility to the prosecuting sovereign. The Supreme Court has made clear that "[a] defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process." *Barker v. Wingo*, 407 U.S. 514, 527 (1972). And in *Dickey v. Florida*, the Court rejected the view that delay was "caused wholly by the federal officials having custody of his person," holding instead that the prosecuting state

17

bore responsibility for vindicating the defendant's speedy-trial right. 398 U.S. at 33–34, 37–38. That allocation principle is reinforced in *United States v. MacDonald*: "Of course, an arrest or indictment by one sovereign would not cause the speedy trial guarantee to become engaged as to possible subsequent indictments by another sovereign." 456 U.S. 1, 10 n.11 (1982). Under that settled rule, custody by a different sovereign does not transfer Sixth Amendment obligations. Here, New Jersey is the prosecuting sovereign. If a Sixth Amendment violation has occurred in Appellees' state prosecutions, responsibility lies with New Jersey, not with ICE, which neither initiated nor controls those prosecutions.

Appellees' reliance on *United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014), does not alter that conclusion. *Velazquez* explained that the speedy-trial inquiry asks "whether the government or the defendant is more to blame," making no distinction between state or federal actors, prosecutors or custodians. *Id.* at 174. But *Velazquez* did not involve multiple sovereigns; it concerned allocation of blame within a single prosecution. Nothing in that decision addressed whether a separate sovereign assumes responsibility for vindicating another sovereign's prosecutorial obligations. It therefore cannot resolve the distinct inter-sovereign question presented here.

The same is true of the other cases on which Appellees rely: *Cobb v. Aytch*, *Copeland v. Mercer County Correctional Center*, and *Benjamin v. Fraser*. *Cobb*

involved pretrial detainees challenging transfers by Philadelphia prison authorities in prosecutions brought by Pennsylvania; Philadelphia is a subdivision of the same sovereign that brought the charges. 643 F.2d 946, 949 (3d Cir. 1981). *Copeland* likewise concerned alleged interference by county jail officials with proceedings brought by the same state sovereign. 2019 WL 3453273, at *5–6 (D.N.J. July 30, 2019). And *Benjamin* addressed attorney visitation practices within the New York City Department of Correction in cases prosecuted by New York authorities. 264 F.3d 175, 179–81 (2d Cir. 2001). None of those cases involved two distinct sovereigns. And none held that a custodial sovereign assumes the prosecutorial sovereign's Sixth Amendment duties. These cases therefore do not answer the inter-sovereign allocation question presented here.

Appellees cite no case involving two sovereigns in which a custodial sovereign was held responsible for vindicating another sovereign's Sixth Amendment obligations. None of their authorities holds that a detaining sovereign "has a duty to bring [the defendant] to trial" in proceedings that it did not initiate. *Barker*, 407 U.S. at 527. By imposing such a duty on ICE, the district court effectively collapsed sovereign distinctions that the Supreme Court has expressly recognized. If Appellees' Sixth Amendment rights are being violated in their New Jersey prosecutions, that violation is attributable to the prosecuting sovereign. The

19

Constitution does not reassign that responsibility to a separate sovereign that merely has physical custody.

**III.    The District Court Erroneously Held that 8 U.S.C. § 1252(b)(9) Did Not Bar Review of Count II.**

Section 1252(b)(9) is a channeling provision that requires claims "arising from any action taken or proceeding brought to remove an alien" to be reviewed through the petition-for-review process. 8 U.S.C. § 1252(b)(9). It does not sweep in every detention-related claim. *Jennings v. Rodriguez*, 583 U.S. 281, 293–95 (2018). But it does channel claims that challenge the fairness or validity of removal proceedings themselves. *E.O.H.C. v. Sec'y DHS*, 950 F.3d 177, 180, 184 (3d Cir. 2020); *Tazu v. Att'y Gen.*, 975 F.3d 292, 299 (3d Cir. 2020). Count II falls squarely within that category. Appellees allege that ICE's detention practices deprive noncitizens of due process in their removal proceedings because unresolved criminal matters—stemming from ICE's refusal to facilitate participation in state-court proceedings—and impair their ability to seek immigration relief. That theory directly contests the adequacy and fairness of removal proceedings. As such, it "arises from" removal proceedings within the meaning of § 1252(b)(9) and must be raised through the review scheme that Congress prescribed.

Due process protections are cognizable within removal proceedings and reviewable on petition for review. The Supreme Court has recognized that "the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno*

20

*v. Flores*, 507 U.S. 292, 306 (1993). Consistent with that principle, the Board has explained that a removal order will be invalidated if an alien is prejudiced by a procedural defect. *Matter of Santos,* 19 I. & N. Dec. 105, 107–08 (B.I.A. 1984). Immigration judges must ensure that respondents receive a "fundamentally fair hearing," and respondents may raise objections, seek relief, and preserve due process claims for appellate review before the Board and, ultimately, the court of appeals. *Id.* at 108–12. If a respondent believes that ICE's detention policies render his removal proceedings fundamentally unfair, he may assert that claim before the immigration judge, present it to the Board, and obtain judicial review in a petition for review. *See* OB at 28–29 (citing examples).

Appellees also note that immigration judges and the Board lack authority to compel production in state criminal proceedings. But that reframes the inquiry. The question under § 1252(b)(9) is not whether immigration judges can command state courts. It is whether respondents may assert, within their removal proceedings, that the proceedings are fundamentally unfair. They may. And if a court of appeals agrees that a removal proceeding was constitutionally defective, it may vacate the removal order and remand. The statutory channeling scheme therefore provides a mechanism to review and remedy removal-related due process injuries without collateral district-court intervention.

*E.O.H.C.* does not compel a different result. There, the claim was "now or

21

never" because deportation would have occurred before meaningful judicial review could take place. *E.O.H.C.*, 950 F.3d at 180. Here, by contrast, respondents who preserve a due process objection in their removal proceedings may seek review of any final removal order and obtain vacatur if the proceedings were fundamentally unfair. *Matter of Santos,* 19 I. & N. Dec. at 107–08. The asserted injury—an allegedly defective removal proceeding—is thus reviewable and remediable through the petition-for-review process. *Calderon-Rosas v. Att'y Gen.*, 957 F.3d 378, 385–86 (3d Cir. 2020); *Tazu*, 975 F.3d at 299. That is precisely the type of claim that Congress required to be channeled.

Finally, the presence of an organizational plaintiff does not alter the jurisdictional analysis. Section 1252(b)(9) channels claims based on the source of the injury—actions taken in connection with removal proceedings—regardless of the identity of the plaintiff. To the extent that AFSC alleges harm flowing from the conduct or outcome of removal proceedings, those claims likewise arise from removal proceedings and must proceed through the statutory review scheme. Jurisdictional channeling does not turn on whether multiple petitions for review may be required, but instead on whether the claim arises from removal proceedings.

Because Count II challenges the fairness of removal proceedings and seeks relief that would effectively alter how those proceedings are conducted, § 1252(b)(9) requires Appellees to pursue their claims through the petition-for-review process.

The district court therefore lacked jurisdiction over Count II, and its contrary conclusion was error.

## IV.    AFSC Lacks Organizational Standing.

AFSC's organizational-standing theory is foreclosed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), which clarified and narrowed *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *FDA*, the Court rejected the proposition that standing exists whenever an organization reallocates resources in response to government action. 602 U.S. at 393–95. The plaintiffs argued that standing arises when an organization "diverts its resources in response to a defendant's actions." *Id.* at 395 (citing *Havens*, 455 U.S. 363). The Court responded unequivocally: "That is incorrect," explaining that an organization "cannot spend its way into standing." *Id.* at 394–95. A plaintiff must show "far more than simply a setback to the organization's abstract social interests." *Id.* at 394 (quoting *Havens*, 455 U.S. at 379).

AFSC's allegations fall squarely within what *FDA* described as "incorrect." AFSC contends that ICE's refusal policy makes its representation more difficult and requires additional time, coordination, and litigation strategy. But *FDA* rejected materially identical claims—allegations that agency action "impaired [the plaintiff's] ability to provide services and achieve their organizational mission" and forced them to "divert[] [their] resources in response to" the challenged policy. 602

23

U.S. at 394–95 (quotations omitted). The Court held that such voluntary reallocations, undertaken to adapt to or oppose government policy, do not establish injury in fact absent direct interference with the organization's own operations. *Id.* at 395. Record evidence of increased expenditures cannot revive a theory that the Supreme Court has rejected as a matter of law.

*Havens* does not alter that conclusion. There, the defendant's discriminatory steering practices "perceptibly impaired [the plaintiff organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers." 455 U.S. at 379. The injury was direct: the defendant's conduct "directly affected and interfered with [the plaintiff's] core business activities." *FDA*, 602 U.S. at 395. Here, by contrast, ICE has not restricted AFSC's operations, barred it from counseling clients, or altered the terms on which it provides legal representation. AFSC remains free to represent detained noncitizens. Its alleged injury arises from the collateral consequences of detention and the independent administration of state criminal proceedings, not from any constraint imposed on AFSC's own activities. That downstream complexity is not the kind of direct operational impairment recognized in *Havens* and amounts, at most, to a "setback to the organization's abstract social interests," which is insufficient. 455 U.S. at 394.

Appellees' reliance on Ninth Circuit diversion-of-resources cases does not change the analysis. Although the Ninth Circuit at one point recognized standing

24

where a defendant's conduct "frustrated [an organization's] mission and caused it to divert resources," *Nielsen v. Thornell*, 101 F.4th 1164, 1170 (9th Cir. 2024), that approach has since been overruled because it is "irreconcilable" with *FDA*. *Arizona All. for Retired Americans v. Mayes*, 117 F.4th 1165, 1175–78 (9th Cir. 2024), *reh'g en banc granted*, 130 F.4th 1177 (9th Cir. 2025). In any event, binding Supreme Court precedent governs. And *FDA* makes clear that there is no "categorical rule allowing standing whenever an organization diverts its resources in response to a defendant's actions." *March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1138 (D. Idaho 2024) (citing *FDA*, 602 U.S. at 393–95). AFSC has not alleged the sort of direct interference with "core business activities" required by *Havens* as clarified in *FDA*.

AFSC's theory also fails for lack of traceability. Organizational plaintiffs "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals," and must establish "a causal connection between the injury and the conduct complained of." *FDA*, 602 U.S. at 393–94; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). AFSC's alleged harms depend on the independent decisions of New Jersey courts and prosecutors—decisions concerning scheduling, transportation, and case management. That multi-step chain of independent decision-making breaks the causal link required by Article III. *See FDA*, 602 U.S. at 382–83, 393–95 (rejecting standing where alleged injury depended on third-party

25

decision-making rather than direct regulation of the plaintiffs themselves); *Lujan*, 504 U.S. at 562 (when injury arises from the government's regulation "of someone else," causation "ordinarily hinge[s] on the response of the regulated (or regulable) third party"). AFSC's claimed harms are derivative of third-party choices, not directly caused by ICE.

In sum, AFSC alleges disagreement with ICE's policy and voluntary efforts to mitigate its effects. That is not a cognizable Article III injury. Because AFSC cannot establish injury in fact or traceability under controlling Supreme Court precedent, it lacks organizational standing.[3]

## CONCLUSION

The preliminary injunction rests on a fundamental misapprehension of constitutional structure and jurisdictional limits. Appellees seek to convert inter-sovereign logistics into personal constitutional rights, to extend access doctrine beyond its defined scope, to reassign Sixth Amendment obligations to a sovereign that did not initiate the prosecutions at issue, and to bypass the review mechanism that Congress prescribed for removal-related claims. None of those moves is supported by binding precedent.

---

[3] Appellees assert that AFSC "satisfies both organizational standing and third-party standing." RB at 44 n.6. But third-party standing presupposes that the litigant has suffered its own Article III injury. *See FDA*, 602 U.S. at 393–94. It cannot cure the absence of injury in fact.

Article III does not permit federal courts to compel one sovereign to alter its custody decisions to accommodate another's criminal process absent a legally cognizable personal injury. The access-to-courts doctrine does not constitutionalize attendance at pending prosecutions. The Sixth Amendment binds the prosecuting sovereign. Section 1252(b)(9) channels removal-related challenges through the petition-for-review process. And AFSC cannot spend its way into standing. For all of these reasons, the Court should reverse the district court's order granting a preliminary injunction and remand with instructions to dismiss for lack of jurisdiction.

Date: March 10, 2026

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MARY L. LARAKERS
Senior Litigation Counsel

Respectfully submitted,

/s/ *Julian M. Kurz*
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 598-7283
julian.m.kurz@usdoj.gov

*Counsel for Appellants*

27

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Appellate Rule 46.1(e), I, Julian Kurz, hereby certify that I am counsel of record, am an attorney for the federal government, and am thus exempt from the requirement of being a member of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Julian M. Kurz
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice

## CERTIFICATE OF WORD COUNT

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,118 words, excluding the parts of the brief that Fed. R. App. P. 32(f) exempts.

2.      This brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it uses 14-point Times New Roman font.

*/s/ Julian M. Kurz*
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice

## **CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS**

I, Julian Kurz, hereby certify that the text of this electronic brief is identical

to the text of the paper copies that will be dispatched by mail to the Clerk of the

Court of the United States Court of Appeals for the Third Circuit.

*/s/ Julian M. Kurz*
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice

## CERTIFICATE OF PERFORMANCE OF VIRUS CHECK

I, Julian Kurz, hereby certify that on March 10, 2026, I caused a virus check to be performed on this brief using Microsoft Defender Antivirus software. No virus was detected.

*/s/ Julian M. Kurz*
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

I, Julian Kurz, hereby certify that on March 10, 2026, I filed the foregoing brief with the Third Circuit's electronic court filing system, which electronically served this brief on all counsel of record.

*/s/ Julian M. Kurz*
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice
